**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE THOMAS J. AQUILINO, JR., SENIOR JUDGE**

| | | |
|---|---|---|
| THE AD HOC COALITION OF AMERICAN SAP PRODUCERS, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Court No. 23-cv-00010 |
| UNITED STATES, | ) ) | **PUBLIC VERSION** |
| Defendant, | ) ) | |
| and | ) ) | |
| LG CHEM, LTD., | ) ) | |
| Defendant-Intervenor. | ) ) ) | |

**THE AD HOC COALITION OF AMERICAN SAP PRODUCERS'**
**<u>MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>**

Pursuant to Rule 56.2 of the Rules of this Court, Plaintiff The Ad Hoc Coalition of American SAP Producers moves for judgment on the agency record with regard to certain aspects of the determination of the United States Department of Commerce (the "Department") in *Certain Superabsorbent Polymers From the Republic of Korea: Final Determination of Sales at Less Than Fair Value*, 87 Fed. Reg. 65035 (Oct. 27, 2022) ("Final Determination") and accompanying Issues and Decision Memorandum (Oct. 20, 2022) ("IDM") (collectively, the "Contested Determination").

Plaintiff respectfully requests the Court to rule that certain aspects of the Contested Determination are unsupported by substantial evidence on the record or otherwise not in accordance with law, or arbitrary, capricious, or an abuse of discretion.  Plaintiff further requests that the Court remand the Contested Determination to the Department with the instructions set forth in the accompanying proposed order.  The reasons justifying this motion are set forth in the accompanying Memorandum Of Law In Support Of Plaintiff's Rule 56.2 Motion For Judgment Upon The Agency Record.

Respectfully submitted,

July 14, 2023
Date

/s/ Stephen J. Orava
Stephen J. Orava
Jamieson L. Greer
Daniel L. Schneiderman

King & Spalding LLP
1700 Pennsylvania Avenue, NW
Washington, DC  20006-4706
(202) 737-0500

Counsel for Plaintiff

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE THOMAS J. AQUILINO, JR., SENIOR JUDGE**

| | |
|---|---|
| THE AD HOC COALITION OF AMERICAN SAP PRODUCERS, )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>LG CHEM, LTD., )<br><br>Defendant-Intervenor. ) | Court No. 23-cv-00010 |

## <u>ORDER</u>

Upon consideration of The Ad Hoc Coalition Of American SAP Producers'

Motion For Judgment On The Agency Record, and upon consideration of other

papers and proceedings herein, it is hereby

ORDERED that the motion is granted; and it is further

ORDERED that this case is remanded to the U.S. Department of Commerce
with instructions to reconsider its final determination and recalculate LG Chem's
dumping margin consistent with the Court's opinion.


Dated: _____          _____
                                 Judge
                                 U.S. Court of International Trade

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE THOMAS J. AQUILINO, JR., SENIOR JUDGE

| | |
|---|---|
| THE AD HOC COALITION OF AMERICAN SAP PRODUCERS,  ) ) ) ) | |
| Plaintiff,  ) ) | |
| v.  ) ) | Court No. 23-cv-00010 |
| UNITED STATES,  ) ) | **PUBLIC VERSION** |
| Defendant,  ) ) ) | |
| and  ) ) | |
| LG CHEM, LTD.,  ) ) ) | |
| Defendant-Intervenor.  ) ) | |

## PLAINTIFF THE AD HOC COALITION OF AMERICAN SAP PRODUCERS' MEMORANDUM OF LAW IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Stephen J. Orava
Jamieson L. Greer
Daniel L. Schneiderman
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 737-0500

*Counsel For The Ad Hoc Coalition Of American SAP Producers*

July 14, 2023

PUBLIC VERSION

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..........................................................................v

STATEMENT PURSUANT TO RULE 56.2..........................................................1

I.    ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED ........................................................................1

II.    PROCEDURAL HISTORY AND STATEMENT OF FACTS............2

    A.    Initiation Of The Investigation, Model Match Determination, And Preliminary Determination .......................2

    B.    Final Determination ..................................................................9

III.    ISSUES PRESENTED.........................................................................12

    A.    Whether the Department's finding of "commercially significant" differences based on model match physical characteristics CRC1, AUP, and PERM was unsupported by substantial evidence? ............................................................12

    B.    Whether the Department's dumping margin analysis is not in accordance with law because the Department contravened its practice of not changing a settled model match hierarchy at the end of an investigation? ......................12

    C.    Whether the Department's use of a replacement model match hierarchy is not in accordance with law because the Department relied on unverified alternative cost and sales files to calculate the dumping margin for LG Chem? ......................................................................................12

    D.    Whether the Department's use of a replacement model match hierarchy is not supported by substantial evidence and is not in accordance with law because the Department did not address the distortive and easily manipulated nature of the model match product characteristics? ..........................................................................12

E.      Whether the Contested Determination was arbitrary and capricious or constituted an abuse of discretion? .....................13

IV.    STANDARD OF REVIEW ................................................13

V.     SUMMARY OF ARGUMENT ..........................................14

VI.    ARGUMENT ...................................................................15

A.      The Department's Decision To Use Replacement Model Match Characteristics For The Final Determination Is Not Supported By Substantial Evidence Because There Are No Commercially Significant Price Or Cost Differences Related To Such Characteristics ...........................15

1.      LG Chem's sales and cost data do not support the Department's replacement model match hierarchy........19

2.      Anecdotal references to AUP, permeability, and varying CRC ranges do not support the Department's replacement model match hierarchy........21

B.      The Department's Decision To Use The Replacement Model Match Characteristics Is Not In Accordance With Law Because This Contravened Its Established Practice .........29

C.      The Department's Decision To Use The Replacement Model Match Characteristics Is Not In Accordance With Law Because The Department Relied On Unverified Alternative Cost And Sales Files To Calculate The Dumping Margin For LG Chem ................................................33

D.      The Department Erred By Failing To Remedy Or Address The Distortive And Easily Manipulated Nature Of The Replacement Model Match Characteristics.................38

1.      The Department's use of LG Chem's preferred model match criteria introduces a substantial risk of distortion and manipulation into the dumping margin analysis ...........................................................38

2.      The Department did not consider material evidence and arguments regarding the risk of manipulation

and distortion from test-based physical
characteristics used in the model match for the
final determination............................................................42

    E.    For The Foregoing Reasons, The Department's Decision
To Use The Replacement Model Match Characteristics
Was Arbitrary And Capricious And Constituted An
Abuse Of Discretion ..................................................45

CONCLUSION AND PRAYER FOR RELIEF ....................................................47

PUBLIC VERSION

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Asociacion Colombiana de Exportadors de Flores v. United States*,
 12 C.I.T. 1174 (Ct. Int'l Trade 1988) ..................................................43

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
 467 U.S. 837 (1984)...............................................................................45

*Coalition for Preservation of American Brake Drum and Rotor
 Aftermarket Manufacturers*,
 23 C.I.T. 88 (Ct. Int'l Trade 1999) .....................................................33

*Consolidated Edison Co. v. NLRB*,
 305 U.S. 197 (1938)...............................................................................13

*CS Wind Vietnam Co. v. United States*,
 832 F.3d 1367 (Fed. Cir. 2016) ...........................................................13

*Ghigi 1870 S.p.A. v. United States*,
 547 F. Supp. 3d 1332 (Ct. Int'l Trade 2021) ......................... 31, 32, 41

*Hyundai Steel Co. v. United States*,
 282 F. Supp. 3d 1332 (Ct. Int'l Trade 2018) ......................................34

*Itochu Bldg. Prods., Co., Inc. v. United States*,
 163 F. Supp. 3d 1330 (Ct. Int'l Trade 2016) ......................................43

*JTEKT Corp. v. United States*,
 33 C.I.T. 1797 (Ct. Int'l Trade 2009) .................................................35

*JTEKT Corp. v. United States*,
 35 C.I.T. 510 (Ct. Int'l Trade 2011) ...................................................42

*JTEKT Corp. v. United States*,
 675 F. Supp. 2d 1206 (Ct. Int'l Trade 2009) ......................................42

*Koyo Seiko Co., Ltd. v. United States*,
 31 C.I.T. 1512 (Ct. Int'l Trade 2007) .................................................45

*Koyo Seiko Co. v. United States*,
    66 F.3d 1204 (Fed. Cir. 1995) ............................................................ 16

*La Molisana S.p.A. v. United States*,
    Slip Op. 23-59 (Ct. Int'l Trade Apr. 24, 2023) ................................ 16, 38, 40, 41

*Metallverken Nederland B.V. v. United States*,
    13 C.I.T. 1013, 728 F. Supp. 730 (Ct. Int'l Trade 1989) .................................... 13

*NMB Singapore Ltd. v. United States*,
    557 F.3d 1316 (Fed. Cir. 2009) ........................................................... 30

*Pakfood Public Co. v. United States*,
    35 C.I.T. 60, 753 F. Supp. 2d 1344 (Ct. Int'l Trade 2011) ................................ 30

*Pesquera Mares Australes Ltda. v. United States*,
    266 F.3d 1372 (Fed. Cir. 2001) ........................................................ 16, 38, 40, 44

*SKF USA, Inc. v. United States*,
    537 F.3d 1373 (Fed. Cir. 2008) ........................................................... 38

*Suzano S.A. v. United States*,
    589 F. Supp. 3d 1225 (Ct. Int'l Trade 2022) ................................................ 43

*Taian Ziyang Food Co. v. United States*,
    33 C.I.T. 828, 637 F. Supp. 2d 1093 (Ct. Int'l Trade 2009) ............................... 31

*Taiwan Semiconductor Mfg. Co., Ltd. v. United States*,
    25 C.I.T. 324 (Ct. Int'l Trade 2001) ...................................................... 34

*Ugine and ALZ Belgium v. United States*,
    551 F.3d 1339 (Fed. Cir. 2009) ........................................................... 30

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951) ...................................................................... 13

**Statutes**

19 U.S.C. § 1516a(b)(1)(B) ................................................................... 13

19 U.S.C. § 1677(16)(A) ...................................................................... 15

19 U.S.C. § 1677b(a) ......................................................................... 15

19 U.S.C. § 1677m(i) ....................................................................34, 36, 37

**Administrative Materials**

*Acrylonitrile-Butadiene Rubber From France: Final Affirmative
    Determination of Sales at Less Than Fair Value, and Final
    Affirmative Determination of Critical Circumstances, in Part,* 87
    Fed. Reg. 37833 (June 24, 2022) .................................................31, 32

*Certain Coated Paper Suitable for High-Quality Print Graphics
    Using Sheet-Fed Presses From the People's Republic of China:
    Final Determination of Sales at Less Than Fair Value*, 75 Fed.
    Reg. 59217 (Sept. 27, 2010) ..............................................................34

*Certain Superabsorbent Polymers From the Republic of Korea:
    Antidumping Duty Order,* 87 Fed. Reg. 77794 (Dec. 20, 2022) .......................12

*Certain Superabsorbent Polymers From the Republic of Korea: Final
    Determination of Sales at Less Than Fair Value*, 87 Fed. Reg.
    65035 (Oct. 27, 2022) and accompanying Issues and Decision
    Memorandum ...............................................................................*passim*

*Certain Superabsorbent Polymers From the Republic of Korea:
    Initiation of Less-Than-Fair-Value Investigation*, 86 Fed. Reg.
    67915 (Nov. 30, 2021) ........................................................................2

*Certain Superabsorbent Polymers From the Republic of Korea:
    Preliminary Affirmative Determination of Sales at Less Than Fair
    Value, Postponement of Final Determination, and Extension of
    Provisional Measures*, 87 Fed. Reg. 34647 (June 7, 2022) ................................8

PUBLIC VERSION

**PLAINTIFF THE AD HOC COALITION OF AMERICAN SAP PRODUCERS' MEMORANDUM OF LAW IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Plaintiff, The Ad Hoc Coalition of American SAP Producers, submits the following memorandum in support of its Motion for Judgment on the Agency Record in accordance with Rule 56.2(c) of the Rules of the United States Court of International Trade.  For the reasons set forth below, Plaintiff respectfully requests that the Court remand the challenged determination of the U.S. Department of Commerce (the "Department") with instructions to recalculate the dumping margin for the respondent LG Chem, Ltd. ("LG Chem").

## STATEMENT PURSUANT TO RULE 56.2

### I.    ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED

Plaintiff seeks review of the final determination in the antidumping duty ("AD") investigation in *Certain Superabsorbent Polymers From the Republic of Korea: Final Determination of Sales at Less Than Fair Value*, 87 Fed. Reg. 65035 (Oct. 27, 2022) (P.R. 188) ("Final Determination") and accompanying Issues and Decision Memorandum (Oct. 20, 2022) (P.R. 184) ("IDM") (collectively, the "Contested Determination").

## II.   PROCEDURAL HISTORY AND STATEMENT OF FACTS

### A.   Initiation Of The Investigation, Model Match Determination, And Preliminary Determination

The Department initiated this antidumping investigation on November 30, 2021.  *Certain Superabsorbent Polymers From the Republic of Korea: Initiation of Less-Than-Fair-Value Investigation*, 86 Fed. Reg. 67915 (Nov. 30, 2021) ("*Initiation*") (P.R. 34).  Plaintiff was the Petitioner in the underlying proceeding.  Superabsorbent polymers ("SAP") consist of a granular powder that can retain large amounts of water and other aqueous liquids.  SAP is a synthetic polymer made from polyacrylic acid, which most commonly takes the form of sodium polyacrylate.  Petition Volume I (Nov. 2, 2021) at 1 (C.R. 2, P.R. 2).  On December 21, 2021, the Department selected LG Chem, Ltd. ("LG Chem") as a mandatory respondent in the investigation of SAP from Korea.

In its notice of initiation, the Department solicited comments and information from all parties regarding the appropriate physical characteristics of SAP that should be used to define control numbers ("CONNUMs") for reporting and product-comparison purposes in the dumping margin calculations.  *Initiation* (P.R. 34).  Plaintiff submitted comments explaining that Centrifuge Retention Capacity ("CRC") – the capacity of SAP to retain fluids – is "{t}he primary physical characteristic" that distinguishes among SAP products.  Petitioner Comments on Model Match Product Characteristics (Dec. 13, 2021) at 1 (P.R. 42).

CRC is the amount of saline solution (*i.e.*, water containing 0.9% sodium chloride, by mass) that the SAP can retain under free swelling conditions when surface water has been removed in a centrifuge.  It typically is measured in terms of grams of saline solution retained per gram of SAP ("g/g").  Plaintiff explained that "{l}ow capacity grades generally retain less than 30 g/g, intermediate capacity grades generally retain in the range of 30 to 36 g/g, and high capacity grades generally retain more than 36 g/g." *Id.*  Thus, Plaintiff proposed that the model match hierarchy consist of the physical characteristic CRC broken out into "low," "intermediate," and "high" capacity ranges based on these three categories and requested that reporting producers identify the specific standard used to measure CRC.  *Id*.

Respondent LG Chem also submitted comments requesting that the Department use CRC, describing it as "{t}he first and most important criterion for distinguishing SAP products."  LG Chem Comments on Model Match Product Characteristics (Dec. 13, 2021) at 2 (P.R. 43).  However, LG Chem did not propose dividing CRC by low, intermediate, or high ranges.  Rather, LG Chem asserted that "the traditional classification in the market {for SAP} is to group by divisions of 4 g/g." *Id*.  LG Chem then asked the Department to break the CRC characteristic into five categories of guaranteed CRC, three of which were

divisions of 4 g/g and two that were much broader (or did not specify a guaranteed

CRC at all).  Specifically, LG Chem proposed the following five ranges:

> 1 = No minimum guarantee or minimum guaranteed CRC less than 26
> g/g;
> 2 = Minimum guaranteed CRC equal to or more than 26 g/g and less
> than 30 g/g;
> 3 = Minimum guaranteed CRC equal to or more than 30 g/g and less
> than 34 g/g;
> 4 = Minimum guaranteed CRC equal to or more than 34 g/g and less
> than 38 g/g;
> 5 = Minimum guaranteed CRC equal to or more than 38 g/g

*Id.* at 3.

LG Chem also proposed a physical characteristic representing Absorbency

Under Pressure ("AUP"), including Absorbency Under Load ("AUL"), with

different model match codes for this characteristic depending on the type of test

performed (or no guaranteed AUP level at all).  AUP assesses SAP's ability to

absorb liquid under a certain amount of pressure, *e.g.*, 0.7 psi.  LG Chem proposed

a cut-off threshold of 15 g/g for each test-based division for the proposed AUP

characteristic, as follows:

> 1 = No minimum guarantee
> 2 = Minimum guaranteed AUP(0.3psi) less than 15 g/g
> 3 = Minimum guaranteed AUP(0.3psi) equal to or more than 15 g/g
> 4 = Minimum guaranteed AUP(0.7psi) less than 15 g/g
> 5 = Minimum guaranteed AUP(0.7psi) equal to or more than 15 g/g
> 6 = Minimum guaranteed AUL(0.9psi) less than 15 g/g
> 7 = Minimum guaranteed AUL(0.9psi) equal to or more than 15 g/g

*Id.* at 5.

LG Chem next proposed a model match characteristic for permeability ("PERM"), which measures the ability of liquid to pass through SAP particles. LG Chem proposed that the physical characteristic divisions for permeability, like AUP, be divided into codes depending on the test used by the producer to measure permeability. It assigned varying cutoff thresholds to these divisions:

> 1 = No minimum guarantee
> 2 = Minimum guaranteed Gel Bed Permeability ("GBP") less than 40 (u.o.m. = Darcy($10^{-8}$cm$^2$))
> 3 = Minimum guaranteed GBP equal to or more than 40 (Darcy($10^{-8}$cm$^2$))
> 4 = Minimum guaranteed Gel Permeability Under Pressure ("GPUP") or Saline Flow Conductivity ("SFC") less than 15 ($10^{-7}$ cm$^3$sec/g)
> 5 = Minimum guaranteed GPUP or SFC equal to or more than 15 ($10^{-7}$ cm$^3$sec/g)
> 6 = Minimum guaranteed Permeability Dependent Absorbency Under Pressure ("PDAUP") less than 10 (g/g)
> 7 = Minimum guaranteed PDAUP equal to or more than 10 (g/g)

*Id*. at 6.

With respect to AUP and permeability, LG Chem explained that these characteristics are "generally inversely related" to CRC, *e.g.*, as CRC increases, AUP and permeability decrease. *Id*. at 4.

Finally, LG Chem proposed that the Department include a fourth physical characteristic distinguishing between SAP with raw materials ultimately sourced from crude oil and SAP with raw materials sourced "from biodiesel and other bio materials." *Id*. at 6 – 7 and Attachment 1.

Foreign producer Sumitomo Seika Polymers Korea Co., Ltd. ("Sumitomo Seika"), an interested party, submitted rebuttal comments regarding the model match hierarchy.  Like Plaintiff and LG Chem, Sumitomo Seika agreed that CRC was relevant to distinguishing SAP.  Sumitomo Seika also explained that it "does not believe the inclusion of AUP or permeability is necessary to differentiate between its different models of {SAP}."  Sumitomo Seika Rebuttal Comments on Model Match Product Characteristics (Dec. 23, 2021) at 2 – 3 (P.R. 53).  Further, the company agreed with Plaintiff that CRC is best classified as low, intermediate, and high capacity.  However, Sumitomo Seiko's proposal for an intermediate CRC category (*i.e.*, 30 g/g to 42 g/g) differed slightly from the Plaintiff's proposal for that category (*i.e.*, 30 g/g to 36 g/g).  Sumitomo Seiko's proposal represented a broader increment of 12 g/g.  *Id.*

Plaintiff's rebuttal comments reiterated the importance of classifying CRC in appropriate low, intermediate, and high categories, and emphasized the fact that optimizing SAP for a certain CRC level generally will lead to trade-offs in the levels of AUP and permeability.  Petitioner Rebuttal Comments on Model Match Product Characteristics (Dec. 23, 2021) at 4 – 6 (P.R. 49).  Plaintiff further pointed out that LG Chem's proposal to assign divisions within AUP and permeability characteristics by a respondent's chosen test methodology rather than physical characteristics would introduce distortions and allow a respondent to manipulate

the dumping margin analysis.  Specifically, Plaintiff argued that a given product could be categorized in multiple divisions within the AUP or PERM product characteristics depending on the selected testing method, resulting in more than one CONNUM2 being possible for such a product.  *Id*. at 5 – 6.

After considering comments and rebuttal comments from Plaintiff, LG Chem, and Sumitomo Seika, on January 21, 2022, the Department finalized its model match hierarchy.  The Department rejected LG Chem's proposal and chose to use the key physical characteristic for SAP, CRC, divided into three measurement ranges for low (less than 30 g/g), intermediate (30 to 36 g/g), and high (more than 36 g/g) CRC.  *Less-Than-Fair-Value Investigation of Certain Superabsorbent Polymers from the Republic of Korea: Product Characteristics Hierarchy*, (Jan. 21, 2022) ("Model Match Determination") (P.R. 89).

LG Chem then made an extraordinary filing to ask the Department to reconsider its decision on the model match hierarchy, asserting that the hierarchy was "simplistic," and that the agency should disregard the views of Sumitomo Seiko.  LG Chem Request for Reconsideration (Jan. 28, 2022) at 2 and 4 (C.R. 53, P.R 93).  In its request, LG Chem acknowledged that "the Department has historically been hesitant to revise the CONNUM once established."  *Id*. at 2.  The Department did not modify its decision in response to LG Chem's extraordinary request.

In its questionnaire responses, LG Chem reported the CRC characteristic as defined by the Department, but the company also voluntarily provided alternative sales and cost files in which CONNUMs were defined by other physical characteristics excluded from the Department's chosen model match hierarchy.  In particular, LG Chem reported alternative "CONNUM2s" using its proposed modified CRC characteristic (CRC1) and new permeability (PERM) and absorbency under pressure (AUP) characteristics based on testing protocols chosen by LG Chem.  LG Chem's Sections B-D Questionnaire Response (Feb. 11, 2022) at B-10 – B-12 (C.R. 60-61, 99, P.R. 97).  This alternative reporting was unsolicited, and the Department played no role in defining the CRC1, PERM, or AUP characteristics.

In the preliminary determination, the Department based its antidumping analysis on the standard sales and cost files using the model match hierarchy finalized on January 21, 2022.  The Department ignored the unsolicited alternative sales and cost files submitted by LG Chem for purposes of the preliminary determination and calculated a dumping margin of 28.74 percent for LG Chem. *Certain Superabsorbent Polymers From the Republic of Korea: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 87 Fed. Reg. 34647 (June 7, 2022) (P.R. 154).

**B.     Final Determination**

Following the preliminary determination, the Department conducted

verification of LG Chem's responsive cost and sales files.  The Department

ignored and did not verify the alternative cost and sales files or any associated

values in the CRC1, AUP, or PERM characteristics put forward by LG Chem.

Sales Verification Report (Sept. 1, 2022) (C.R. 257, P.R. 173) and Cost

Verification Report (Aug. 29, 2022) (C.R. 256, P.R. 171).

In the final determination, without warning, the Department reversed its

position on the model match hierarchy and recalculated LG Chem's margin using

the alternative sales and cost files based on the company's proposed CRC1,

PERM, and AUP characteristics.  Specifically, the Department found that

"reporting CRC in 4 g/g increments, as well as including AUP and permeability,

are commercially significant."  IDM at 14 (P.R. 184).  The Department claimed

that replacing the CONNUMs that had been used throughout the investigation with

LG Chem's CONNUM2s "recognizes the significant physical and price differences

in SAP produced with certain guaranteed levels of the physical characteristics."

*Id*.  The Department asserted that price differences between products based on LG

Chem's proposed characteristics were "meaningful from a commercial

perspective."  *Id*. at 9.  However, the Department conceded that "cost differences

were *not* instructive in determining that the differences were related to the

additional physical differences." *Id*. (emphasis added).  The Department

nevertheless found that each of the proposed characteristics was commercially

meaningful because "the price differences highlighted by LG Chem and observed

by {the Department} appear to have a commercial basis."  *Id*. at 10.

The Department based its finding of commercial significance due to price

differences largely on marketing materials apparently obtained from the public

domain and provided by LG Chem.  With respect to LG Chem's modifications in

CRC1, the Department relied on a 2015 slide presentation from BASF for a legacy

product which reports a difference in CRC of 10 percent between two SAP

products in BASF's HySorb product line (*i.e.*, HySorb 9030 and HySorb 9900).

LG Chem asserted that a 10 percent difference is approximately equivalent to 4

g/g.  *Id*.  The Department also relied on CRC ranges suggested by Plaintiff in the

U.S. International Trade Commission's (the "Commission's") injury investigation

with respect to Korean producers' underselling of domestic SAP.  For that separate

exercise by the Commission, Plaintiff identified product groups for the

underselling analysis with CRC ranges of 6, 7, and 8 g/g.  IDM at 11, n.83.

With respect to AUP and PERM, the Department again relied on various,

largely undated, marketing materials for the proposition that these characteristics

are commercially significant.  These marketing materials identified numerous

physical characteristics of SAP, including CRC, absorption speed, odor control,

haptics properties, saline flow conductivity ("SFC"), raw materials purity, flow

rate, bulk density, particle size distribution, absorption, pH, absorption under

pressure, gel bed permeability ("GBP"), residual monomer and extractables, and

color.  LG Chem Model Match Rebuttal Comments (Dec. 23, 2021) at Attachment

1, pp. 3, 13, and 18-21; Attachment 2, Section II "SAP Properties;" Attachment 3,

p. 1 and Table 3; Attachment 4; and Attachment 5, pp. 9 – 10 and 13 – 14 (P.R. 54-

55).

  The Department also referred to a statement by a witness for the Plaintiff at

the Commission's staff conference in response to a staff member's request to

understand "two or three standards" used to assess the quality of the end product.

In response to this question, the witness first cited CRC and absorption speed.  *Id.*

at Attachment 6, pp. 100 – 101 (P.R. 55).  She then provided two more examples,

including AUP and permeability, and repeated her reference to absorption speed.

  These sources identified a number of physical characteristics inherent to

SAP.  For the final determination, the Department found that of these many

characteristics, AUP and PERM as proposed by LG Chem – along with a modified

CRC – are commercially significant with respect to price.  IDM at 11 – 12 (P.R.

184).  The Department asserted that differences associated with these three

characteristics as presented by LG Chem "are reflected in the sales price to LG

Chem's customers."  *Id.* at 12.

Following the Department's replacement of the model match hierarchy for

the final determination, the dumping margin for LG Chem declined from 28.74

percent to 17.64 percent.  Final Determination at 65036 (P.R. 188).  After an

affirmative final determination by the Commission, the Department published an

antidumping order based upon the Contested Determination.  *Certain

Superabsorbent Polymers From the Republic of Korea: Antidumping Duty Order*,

87 Fed. Reg. 77794 (Dec. 20, 2022) (P.R. 196).  This appeal ensued.

## III.   ISSUES PRESENTED

A.   Whether the Department's finding of "commercially significant"

differences based on model match physical characteristics CRC1, AUP, and PERM

was unsupported by substantial evidence?

B.   Whether the Department's dumping margin analysis is not in

accordance with law because the Department contravened its practice of not

changing a settled model match hierarchy at the end of an investigation?

C.   Whether the Department's use of a replacement model match

hierarchy is not in accordance with law because the Department relied on

unverified alternative cost and sales files to calculate the dumping margin for LG

Chem?

D.   Whether the Department's use of a replacement model match

hierarchy is not supported by substantial evidence and is not in accordance with

law because the Department did not address the distortive and easily manipulated nature of the model match product characteristics?

E.   Whether the Contested Determination was arbitrary and capricious or constituted an abuse of discretion?

## IV.   STANDARD OF REVIEW

The statute requires the Court to "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B).  Substantial evidence is evidence that "a reasonable mind might accept as adequate to support a conclusion."  *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Under the substantial evidence standard, the Court is not to reweigh the evidence or substitute its judgment for that of the Department.  *Metallverken Nederland B.V. v. United States*, 13 C.I.T. 1013, 1017, 728 F. Supp. 730, 734 (Ct. Int'l Trade 1989).  The Court, however, must take into account the entire record, including evidence that detracts from the conclusion reached by the Department.  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).  *See also CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (the Department "must take into account whatever in the record fairly detracts from" the weight of the evidence).

## V.    SUMMARY OF ARGUMENT

The Department's decision to use, in the final determination, LG Chem's alternative and unverified sales and cost files based on the unsolicited CRC1, PERM, and AUP characteristics was unsupported by substantial evidence and was not in accordance with law.  *See* Contested Determination at Appendix II, Comment 1 (P.R. 184).  The record showed a lack of any material correlation between reported CRC1, PERM, and AUP characteristics and either prices or costs, and the Department's finding that those characteristics were "commercially significant" was unsupported by substantial evidence.

Even assuming the CRC1, PERM, and AUP characteristics were commercially significant, the Department's wholesale replacement of the model match in a final determination contravened established practice and thus was not in accordance with law.  Moreover, the Department did not verify LG Chem's alternative sales and cost files based on the CONNUM2 definitions, and the Department's use of such unverified information in the final determination is contrary to the statute and otherwise not in accordance with law.

Finally, the CRC1, PERM, and AUP characteristics as defined by LG Chem were distortive and unusable, because the same SAP product could be classified into multiple categories at LG Chem's discretion based on its chosen testing protocol, creating a significant risk of manipulation.  The Department simply

ignored this problem without addressing or attempting to ameliorate it. Accordingly, in this respect, the Contested Determination was also unsupported by substantial evidence and not in accordance with law.

For the foregoing reasons, the Department's decision to use LG Chem's alternative reporting also was arbitrary, capricious, and constituted an abuse of discretion.

## VI.   ARGUMENT

### A.   The Department's Decision To Use Replacement Model Match Characteristics For The Final Determination Is Not Supported By Substantial Evidence Because There Are No Commercially Significant Price Or Cost Differences Related To Such Characteristics

The Department's final determination regarding its chosen model match hierarchy must be supported by substantial evidence.  The statute requires the Department to conduct a "fair comparison" between normal values and export price or constructed export price for its dumping margin analysis.  19 U.S.C. § 1677b(a).  Normal value is based in the first instance on the adjusted price of the foreign like product, which is defined in relevant part in 19 U.S.C. § 1677(16)(A) as "{t}he subject merchandise and other merchandise which is identical in physical characteristics."  The Court of Appeals for the Federal Circuit has held that the Department may implement the statute's requirement to compare merchandise that is "identical in physical characteristics" through establishing a model match

hierarchy of the subject merchandise's physical characteristics.  *See, e.g., Koyo Seiko Co. v. United States*, 66 F.3d 1204, 1209 (Fed. Cir. 1995) ("Congress has implicitly delegated authority to Commerce to determine and apply a model-match methodology.").

Differences among the physical characteristics identified in the hierarchy must be "commercially significant," and "minor differences" are disregarded. *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1384 (Fed. Cir. 2001).  Although the Department has discretion in establishing the model match hierarchy, it does not have discretion to make a determination that is unreasonable due to a lack of substantial evidence.  Indeed, this Court has held that determining the appropriate model match hierarchy "is a fact-intensive inquiry."  *La Molisana S.p.A. v. United States*, Slip Op. 23-59 (Ct. Int'l Trade Apr. 24, 2023) at 7.

Here, there is not substantial evidence on the record to support the Department's determination that there are commercially significant differences among the physical characteristics used in CONNUM2s (*i.e.*, PERM, AUP, and narrower ranges included in CRC1).  The Department's sweeping conclusions regarding the commercial significance of LG Chem's proposed model match characteristics are premised on a very thin layer of suggestion and inference from a sparse record, none of which rises to meet the substantial evidence standard.

PUBLIC VERSION

The Department decided at the outset of the investigation, after due consideration of industry comments, to use CRC as the key product characteristic in the model match hierarchy for SAP.  Model Match Determination (P.R. 89).  Indeed, all three U.S. producers and one Korean producer (Sumitomo Seiko) all agreed that CRC should be the only physical characteristic used in the model match hierarchy.  These parties also agreed that CRC should be divided into three categories – low, intermediate, and high capacity – and that the increment for the intermediate capacity division should be at least 6 g/g, with Sumitomo Seiko suggesting a broader 12 g/g increment for intermediate capacity SAP.  And all four of these producers explicitly rejected the notion that AUP and PERM account for commercially significant differences.  Sumitomo Seiko's comments succinctly summarize the general industry view: "SSPK does not believe the inclusion of AUP or permeability is necessary to differentiate between its different models of superabsorbent polymers."  Sumitomo Seiko Rebuttal Model Match Comments at 3 (P.R. 53).  The Department finalized the model match on this basis at the beginning of the investigation, held its position despite a request for reconsideration by LG Chem, and continued to use the CRC product characteristic in the Preliminary Determination.  Moreover, at verification, the Department completely disregarded LG Chem's alternative cost and sales files that reported the company's data based on its preferred product characteristics.

But in its Final Determination, the Department replaced the model match characteristic that had served as the basis of the entire investigation with a new hierarchy.  In its explanation of this consequential reversal, the Department first claimed that price and cost differences associated with the three new model-match criteria "could be substantial."  IDM at 9 (P.R. 184).  The Department then asserted that price differences among these characteristics were commercially meaningful, while conceding the cost differences were not.[1]  *Id.*  As shown below, the evidence for the Department's conclusions as to price and commercial significance is sparse and tenuous, and it does not provide a reasonable basis for the Department's last-minute decision to use these new characteristics for the final determination of the investigation.

Some additional background on the characteristics in question provides a useful framework for understanding the significance of any differences.  CRC, AUP, and permeability parameters necessarily involve trade-offs – optimizing performance for one characteristic tends to decrease performance in the other characteristics, and generally it is not possible to optimize all three.  Petitioner Rebuttal Model Match Comments at 3 – 4 (P.R. 49).  This means that no SAP type

---

[1]     The Department concedes that there are no commercially significant differences among CONNUM2 characteristics by cost.  The Department found that "there is *no evidence* that additional material or conversion costs are associated with the need to achieve certain guaranteed physical characteristics solicited by {LG Chem}."  IDM at 12 (emphasis added) (P.R. 184).

is inherently superior or inferior to any other; it simply depends on the customer's preference for balancing the above-mentioned parameters.  And as discussed below, this also means that there is no inherent relation between costs, price, and the characteristics proposed by LG Chem.  With this in mind, below we discuss the Department's failure to meet the evidentiary standard for finding commercially significant differences among LG Chem's proposed characteristics.

**1.      LG Chem's sales and cost data do not support the Department's replacement model match hierarchy**

LG Chem's data do not show that any price differences were related to differences in physical characteristics.  The Department's analysis centers on this unsupported statement:  "it is clear that different guaranteed levels of AUP and permeability have commercially significant differences to downstream producers, and . . . these differences are reflected in the sales price to LG Chem's customers."  IDM at 12 (P.R. 184).  But nowhere in the Contested Determination does the Department provide a scintilla of evidence that this is the case.  Indeed, the Department did not point to any direct (or inverse) relationships between prices and its replacement physical characteristics (*e.g.*, prices increase as permeability increases, prices decrease as absorbency increases, *etc.*).  The Department did not point to any evidence showing how prices changed due to changes in narrower CRC ranges or the AUP or PERM characteristics.  It did not cite to any agreements or contracts specifying price "adders" or premiums for different levels of AUP or

PERM, or among the narrower bands of CRC proposed by LG Chem.  And LG Chem did not provide any such evidence, because there is not any.  Moreover, if there were any concrete indication that prices for LG Chem products changed due to narrower CRC1 bands or changes to AUP or PERM, LG Chem surely would have produced it.

Rather, the evidence the record paints the exact opposite picture.

**Attachment 1** hereto summarizes average prices by product characteristic and market, and it illustrates the utter lack of any consistent or significant correlations between prices and the CRC1, AUP, and PERM characteristics in the U.S. and home market sales files.  Petitioner Rebuttal Brief (Sept. 19, 2022) at 5 and Attachment 1 (C.R. 259, P.R. 178).  There is no rhyme or reason to the price differences by characteristic.  For example, as CRC1, AUP, or PERM increases, the average unit value ("AUV") for sales price does not have an increasing or decreasing trend.  For example, as shown in **Attachment 1** hereto, AUVs for categories [          ] of AUPH [                    ].  There is no pattern or correlation in price at all, and the same is true for CRC1 and PERM – AUVs are [                                        ] without any discernible correlation.  LG Chem's data, in other words, *do not show commercially meaningful cost or price differences that vary according to the respondent's preferred CRC1, AUP, and PERM characteristics*.

But this is not surprising.  As the Department explicitly acknowledged, it is

not inherently more costly to produce SAPs optimized for CRC, AUP, or

permeability, so there typically would not be price premiums associated with

particular CRC, AUP, or permeability levels either.  *See* IDM at 9 (P.R. 184); *see*

*also* Petitioner Comments on Model Match Product Characteristics (P.R. 42);

Petitioner Rebuttal Comments on Model Match Product Characteristics (P.R. 49).

> ### 2.   Anecdotal references to AUP, permeability, and varying CRC ranges do not support the Department's replacement model match hierarchy

As demonstrated above, *there is no discernible correlation between price*

*and the characteristics and ranges selected by LG Chem and adopted by the*

*Department*.  Thus, in the absence of any data to support its conclusions, the

Department precariously balances its conclusions on the most slender of

evidentiary reeds.  The Department's determination relies very heavily on limited

and largely undated "marketing materials" cherry-picked by LG Chem to fit its

desired narrative.  IDM at 10 – 11 (P.R. 184).

> ### a)   CRC1

All interested parties agree that CRC is the critical characteristic for

differentiating SAP.  But only LG Chem advocated using narrow 4 g/g ranges

within the CRC characteristic.  The Department premised its decision on CRC1 on

the notion that "SAP products are marketed as distinct due to a small percentage

difference in CRC." *Id*. at 10, n.76.  But LG Chem was unable to find a single shred of evidence from its own books and records to demonstrate any kind of commercial significance to 4 g/g increments.  The only two kernels of "evidence" the Department relies upon to reject the broader industry's view and justify its use of narrower ranges for CRC1 are (1) a single graphic in an eight-year-old BASF presentation discussing legacy products and (2) the broad CRC ranges Plaintiff suggested the Commission use for its underselling analysis of certain products. Neither of these ephemeral mentions of CRC levels – either individually or together – represents "substantial evidence" to support a reasonable conclusion that CRC must be divided into narrower bands to achieve a fair comparison under the statute.

To support its assertions on CRC1, the Department first cites a simple graphic in a BASF presentation from 2015.  This graphic contains a small arrow showing a 10 percent difference in CRC levels between two legacy SAP products. Nothing on the graphic links the increase in capacity to price (or cost).  LG Chem Model Match Comments at Attachment 1, pp. 5 and 9 (P.R. 43).  Yet the Department extrapolated this single graphic from an eight-year-old slide deck into an incredibly broad finding applicable to the entire SAP industry that "reporting CRC in 4 g/g increments . . . {is} commercially significant."  IDM at 9 (P.R. 184). Such a sweeping conclusion based on such a narrow and outdated anecdote about

two discrete SAP products does not come anywhere close to meeting the Court's "substantial evidence" standard, particularly given that it is contradicted by the pricing data in this case that reveal no correlation among LG Chem's preferred characteristics and prices.

The Department attempted to buttress this exceedingly thin evidentiary foundation by reference to the CRC ranges for the pricing products used in the Commission's underselling analysis. The Department observed that the CRC ranges for those pricing products were different than those it used in the model match throughout most of the investigation. *Id,* at 11. But this effort fails as well. In the first place, the Commission's underselling analysis (which identifies how often the foreign like product is sold for less than domestic like product) is completely different from the Department's dumping margin analysis (which determines the level at which the foreign exporter is dumping in the United States below normal value). The Commission does not use a model match hierarchy for its analysis, so the product ranges it chooses are of no relevance to the Department's methodology.

Even if the products suggested by Plaintiff to the Commission for the underselling analysis were relevant, the CRC parameters of the underselling products strongly *undermine* the Department's claim that 4 g/g is a commercially significant industry standard for CRC. Plaintiff's suggested pricing products for

the Commission's underselling analysis products had CRC ranges of 6, 7, and 8 g/g – well above the 4 g/g increment chosen by LG Chem to reflect its preferred product comparisons. *Id.* at 11, n.83. For the Department's model match hierarchy, Plaintiff suggested a 6 g/g range for intermediate level CRC. Plaintiff's suggested CRC ranges for the underselling products show that broader categories are appropriate and that 4 g/g increments are not a market standard.

But this is not the only reason why the Department's evidentiary basis is without foundation. The Department contends that 4 g/g is the appropriate increment for CRC levels, but in accepting LG Chem's proposed divisions for CRC1, only three of the five ranges were in 4 g/g increments. Code 5 is for SAP with CRC "greater than 38 g/g" – a parameter with no ceiling at all. Code 1 is for SAP with CRC with "No minimum guarantee or minimum guaranteed CRC less than 26 g/g" – a parameter that accounts for a large swath of low CRC products as well as products *of any CRC level* but that do not have a "guarantee." The Department's CRC1 divisions are not even consistent with its purported finding that 4 g/g increments of CRC are commercially significant for SAP.[2]

---

[2]     The very inclusion of "no minimum guarantee" codes in CRC1, AUP, and PERM suggests that these characteristics are not important at all if products are made with no set or target value for these factors. There is little internal consistency to the Department's replacement model match hierarchy characteristics.

The Department erred in concluding that substantial evidence demonstrated that 4 g/g ranges for the CRC characteristic are a commercially meaningful distinction.  No materials from LG Chem support the modified CRC ranges at all, and the Department had to stretch to find outdated and irrelevant references by the Plaintiff to slightly different CRC ranges in an attempt to justify a last-minute and consequential replacement of the CRC model match characteristic.  A reasonable mind cannot conclude that this is a reasonable basis for changing the settled model match hierarchy with respect to CRC.

### b)    AUP and PERM

The Department's evidentiary base for AUP and PERM similarly are problematic.  The Department's primary argument is that AUP and PERM "are typical current SAP characteristics."  *Id.* at 10.  For these characteristics, the Department again has no data to support its conclusions but relies once more on "marketing materials" to conclude that AUP and PERM drive commercially significant price differences.[3]  Specifically, the Department claims that the mention of AUP and permeability properties in a handful of marketing presentations

---

[3]        The Department emphasizes that the characteristics it chose are "current," but the marketing materials provided by LG Chem are undated, with the exception of a slide deck from 2015.  Thus, the marketing materials provide no basis for asserting the supposed currency of LG Chem's preferred characteristics.

represents substantial evidence to justify changing the model match hierarchy in its final determination.

This basis for the Department's decision is incredibly weak and does not reasonably support the rationale for adding new model match characteristics. The marketing materials provided by LG Chem discuss many other factors as much or more than they discuss AUP or permeability properties, suggesting that any commercial significance of these measures is not particular or meaningful relative to the many properties of SAP. For example, 5 of the 21 substantive pages in the 2015 slide deck are devoted to odor control. LG Chem's Rebuttal Model Match Comments at Attachment 1, pp. 18 – 21 and 25 (P.R. 54). No party suggested that odor control is a commercially significant physical characteristic, but it is discussed at length in the marketing materials. The marketing materials also discuss in various levels of detail and attention CRC, absorption speed, odor control, haptics properties, saline flow conductivity ("SFC"), raw materials purity, flow rate, bulk density, particle size distribution, absorption, pH, absorption under pressure, gel bed permeability ("GBP"), residual monomer and extractables, and color. *Id.* at Attachment 1, pp. 3, 13, and 18-21; Attachment 2, Section II "SAP Properties;" Attachment 3, p. 1 and Table 3; Attachment 4; Attachment 5, pp. 9 – 10 and 13 – 14; and Attachment 6, p. 101 (P.R. 54-55).

The Department provides absolutely no explanation as to why AUP, PERM, and a more narrowly defined CRC are significant characteristics and other factors noted in the materials are not.  In other words, the Department's primary consideration in including these characteristics is their mention in marketing materials, but other characteristics are also mentioned in these materials yet were not viewed as commercially significant and appropriately were left out of the model match hierarchy.

In addition to passing mentions in marketing materials, the Department also based its decision to include characteristics for AUP and PERM on a brief response by a domestic industry employee to a Commission staff member who asked for a handful of standards that SAP producers might use to assess the quality of their product.  Specifically, a Commission staff member asked the industry employee to identify "two or three standards that you would look at" for finished SAP before "it can go out the door" of the factory.  Although the Commission staff member initially suggested that permeability is one such characteristic, the industry employee's immediate response was instead to highlight "Centrifuge Retention Capacity" and "absorption speed."  *Id.* at Attachment 6, pp. 100 – 101 (P.R. 55). (To be clear, absorption speed or vortex speed is a time measurement characteristic that is distinct from AUP.)  Only after mentioning these two characteristics did the Evonik employee continue, providing as additional examples "absorbency under

pressure, permeability, and {again} absorption speed." *Id.* From this brief

exchange emphasizing CRC and absorption speed, the Department grasped at the

passing mention of AUP and permeability to claim a substantial evidentiary basis

for adding in two completely new model match characteristics in the final

determination. It did this despite the absence of any data or other record evidence

demonstrating that AUP or PERM have an effect on price or other commercially

significant difference. This is not substantial evidence, and it does not distinguish

AUP or permeability for the myriad of other factors described in the "market

materials."

The Department's unwarranted reliance on all of these theoretical pieces of

evidence is further laid bare by the strong resistance by other producers from both

Korea and the United States. As noted above, the other Korean producer in this

case, Sumitomo Seika, fundamentally disagreed with LG Chem's proposal as to

CRC ranges. Sumitomo Seika agreed with Plaintiff that there should be three CRC

ranges – not five – and that they are best characterized as "low capacity,"

"intermediate capacity," and "high capacity." Sumitomo Seika Model Match

Rebuttal Comments at 2 (P.R. 53). Sumitomo Seika also agreed with Plaintiff's

proposed specific ranges as a general matter, although it proposed a range of 30 to

42 g/g for the intermediate capacity category rather than 30 to 36 g/g. *Id.* at 3. But

this shows that Sumitomo Seika felt that *broader* CRC ranges better represent industry categories rather than the narrower ranges proposed by LG Chem.

Moreover, Sumitomo Seika agreed with Plaintiff that AUP and PERM do not represent commercially significant differences, explicitly stating that it "does not believe the inclusion of AUP or permeability is necessary to differentiate between its different models of {SAP}."  *Id*. at 2 – 3.  Thus, three U.S. producers and one Korean producer all agree that CRC should be the only model match characteristic for SAP and that it should be broken into three relatively broad ranges, and there is no evidence to support the Department's determination to the contrary.  Accordingly, the Court should remand the Contested Determination to the Department with appropriate instructions.

### B. The Department's Decision To Use The Replacement Model Match Characteristics Is Not In Accordance With Law Because This Contravened Its Established Practice

As discussed above, the Department considered interested party comments, rebuttal comments, and requests for reconsideration with respect to the appropriate model match characteristics at a very early stage in the investigation. After due consideration, the Department decided to adopt CRC as the physical characteristic in the model match hierarchy, with the coding for CRC being split into three categories corresponding to low, intermediate, and high CRC SAP.  The Department maintained this approach in the preliminary determination as well.

Indeed, choosing the model match early in an investigation and using it throughout the proceeding is critical because it forms the basis for all respondent reporting, petitioner review, and Department scrutiny and analysis. Thus, in replacing the model match hierarchy at the end of the investigation, the Department contravened its existing practice of using the hierarchy chosen at the outset of an investigation. The Department's action was not in accordance with law, and the Court should remand the Contested Determination for correction by the Department.

There is no question that the Department must hew to its established practices, with limited exceptions. The Federal Circuit has explained that "Commerce is obligated to follow prior precedent absent some legitimate reason for departing from it." *Ugine and ALZ Belgium v. United States*, 551 F.3d 1339, 1349 (Fed. Cir. 2009). *See also NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1328 (Fed. Cir. 2009) ("If Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom"). In cases where the Department deviates from an established practice, "it must at least acknowledge the change and show that there are good reasons for the new policy." *Pakfood Public Co. v. United States*, 35 C.I.T. 60, 68-69, 753 F. Supp. 2d 1344, 1441-42 (Ct. Int'l Trade 2011). Where the Department either fails to acknowledge or fails to provide a reasonable explanation for a departure from precedent, the Court should remand

for additional consideration by the agency.  *Taian Ziyang Food Co. v. United States*, 33 C.I.T. 828, 881-82, 637 F. Supp. 2d 1093, 1140-41 (Ct. Int'l Trade 2009).

The Department's practice is not to revise CONNUM definitions, once established, during the course of an investigation.  *See* Petitioner Response To LG Chem's Request For Reconsideration Of The Model Match Determination (Jan. 31, 2022) (P.R. 94).  This Court has observed that "{c}hanges to Commerce's model-match method are not undertaken lightly."  *Ghigi 1870 S.p.A. v. United States*, 547 F. Supp. 3d 1332, 1343 (Ct. Int'l Trade 2021).

The Department contends that it has not established a practice regarding the replacement of the model match hierarchy at the end of an investigation.  The Department cites *Acrylonitrile-Butadiene Rubber from France* ("*ABR from France*") in support of this position.  LG Chem Br. at 6 (C.R. 258, P.R. 174).  That case, however, is *sui generis* and does not undermine the broader principle that the Department does not modify the model match at a late stage in an investigation.  Indeed, identifying a single instance over decades of practice merely emphasizes that *ABR from France* is the rare exception to the established practice of maintaining the settled CONNUM definition.

Moreover, *ABR from France* involved adding a simple, binary characteristic to distinguish grades "with BKF stabilizer" from those "with non-

BKF stabilizer." *ABR from France*, 87 Fed. Reg. 37833 (June 24, 2022) (final

determination) at Comment 1.  It did not involve the wholesale replacement of an

existing model match, as the Department has done here, and for which there is no

precedent whatsoever.  Particularly given the lack of evidence showing

commercially meaningful cost or price differences related to the alternative

characteristics preferred by LG Chem, there is no compelling reason to depart from

established practice in this case.  As a policy matter, sustaining the Department's

decision to accept LG Chem's alternative reporting at the end of the investigation

would only encourage future game-playing by other respondents and would

undermine the benefits of finalizing the model match at the start of each

investigation.

        This established practice is also consistent with the Department's

practice in administrative reviews.  At the start of each administrative review, the

Department will not reconsider the model match hierarchy established in the

original investigation absent "compelling reasons" and "convincing evidence," a

standard more stringent than substantial evidence.  *Ghigi 1870*, 547 F. Supp. 3d at

1343, *citing Manchester Tank & Equip. Co. v. United States*, 483 F. Supp. 3d

1309, 1315 (2020).  The standard should be at least as high – if not higher – for

changes to the selected model match hierarchy at the *final stage* of an original

investigation.  Otherwise, respondents can simply push for replacement model

match characteristics that "fit" their sales and cost database profile to obscure or

minimize dumping behavior.  For this reason – among others – the Department has

an established practice not to disturb the model match hierarchy at the very end of

an investigation.  Here, the Department contravened that established practice, and

remand is warranted.

C.   **The Department's Decision To Use The Replacement Model Match Characteristics Is Not In Accordance With Law Because The Department Relied On Unverified Alternative Cost And Sales Files To Calculate The Dumping Margin For LG Chem**

The Department's use of LG Chem's proposed model match product

characteristics is not in accordance with law because the Department did not verify

the information in the unsolicited sales and cost databases including LG Chem's

new model match hierarchy.  This Court has explained that "{t}hrough

verification, Commerce tests the information provided by a party for accuracy and

completeness so that Commerce can justifiably rely upon that information."

*Coalition for Preservation of American Brake Drum and Rotor Aftermarket Manufacturers*, 23 C.I.T. 88, 93 (Ct. Int'l Trade 1999).

The statute requires the Department to "verify all information relied upon in

making" its "final determination in an investigation."  19 U.S.C. § 1677m(i).

Although the Department need not examine every piece of data from a

questionnaire response in order for that response to be considered "verified,"

*unsolicited alternative responses are considered unverified* unless the Department

specifically examines them at verification.  *See, e.g.*, *Taiwan Semiconductor Mfg. Co., Ltd. v. United States*, 25 C.I.T. 324 (Ct. Int'l Trade 2001) (sustaining the Department's decision not to verify unsolicited comments and data).[4]  Indeed, this Court has been explicit that "{u}nder § 1677m(i), Commerce is obligated only to verify information it uses in making a final determination."  *Hyundai Steel Co. v. United States*, 282 F. Supp. 3d 1332, 1350 (Ct. Int'l Trade 2018).  In other words, the Department is obligated to verify information it uses in the final determination, and cannot use such information unless it is verified.  Absent verification of the physical characteristics underpinning the dumping margin analysis, there cannot be substantial evidence permitting the Department to rely on such information for its dumping margin analysis.  *See, e.g.*, *JTEKT Corp. v. United States*, 33 C.I.T. 1797, 1851 (Ct. Int'l Trade 2009) (Department findings regarding information about

---

[4]      The Department's practice is consistent with this principle.  *See, e.g., Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses From the People's Republic of China*, 75 Fed. Reg. 59217 (Sept. 27, 2010) (final determination) ("*Coated Paper from China*") at Comment 7 ("With respect to APP-China's argument that key elements of its ME questionnaire responses have been verified by the Department, neither the verification outline nor the verification report indicate that the Department intended to verify, or conducted verification of, APP-China's unsolicited ME questionnaire response.  We followed the standard NME verification outline and verified APP-China's corporate structure, accounting, sales information, and FOPs, as noted in the Verification Report.  While APP-China argues that the Department examined its SAP sales and distribution ('SD') module, from which its U.S. sales and home market sales databases were derived, again, the verifiers did not specifically examine home market sales information reported to the Department in its unsolicited ME questionnaire response.  The Department verified APP-China's accounting system, U.S. sales information, as well as information with respect to the products subject to the investigation as part of examining the SD module.  The Department did not verify any part of APP-China's unsolicited ME questionnaire response.  See, generally, APP-China Verification Report.").

physical characteristics "was not supported by substantial evidence on the record" where the Department did not verify such information).

The Department conducted an on-site cost verification, but the agency did not examine LG Chem's unsolicited "lgcop02_alt" file based on the alternative characteristics reported by LG Chem.  Cost Verification Report (Aug. 29, 2022) (C.R. 256, P.R. 171).  Accordingly, the Department did not verify that LG Chem appropriately allocated materials, labor, and overhead among products as defined in the CONNUM2 field.  *Id.*  The Department also conducted an on-site sales verification but did not examine LG Chem's unsolicited reporting of the alternative CRC1, AUP, or PERM fields.  Sales Verification Report (Sep. 1, 2022) (C.R. 257, P.R. 173).  Thus, the Department did not verify that LG Chem appropriately reported such characteristics for any U.S. or home market sales.  *Id.*

Because LG Chem's alternative, unsolicited reporting of different product characteristics and the related sales and cost file data were not verified, the statute prohibits its use in this investigation.  Specifically, the Department did not "verify all information relied upon in making" its final determination as required by 19 U.S.C. § 1677m(i).  But the Department *did* rely on this information, which is not in accordance with law.

The Department stretches credulity in its post-hoc effort to claim that it did, in fact, verify the sales and costs databases based on the new product

characteristics and resulting new CONNUM2s provided by LG Chem.  The
Department characterizes LG Chem's new cost databases simply as an expression
of the company's accounting system and argues that the relevant analysis is
whether data from that system "should be allocated and presented in a different
way."  IDM at 13.  The Department claims that this is not like verifying other types
of data that requires "completely different reporting bases and types of
information."  *Id*.  But this is exactly what LG Chem submitted and what the
Department used in the final determination: different types of information in the
form of different model match characteristics.  Moreover, even if the Department
were correct in its reference to allocations of otherwise verified cost information,
the Department never verified the allocation of data among CONNUM2s within
the new databases.

The Department also asserts that in reviewing LG Chem's monthly product-
specific cost of manufacturing statement, it "examined the costs included in the
alternative cost database on a sample basis at verification."  *Id*.  But again, even if
the Department verified overall costs, it did not verify the allocation of those costs
among the new CONNUM2s.

With respect to the new sales data, the Department explains that it "reviewed
the certificate of analysis for each selected sale, compared that to the information
reported in the {home market} sales database and found no discrepancies."  *Id*. at

13 – 14.  According to the Department, these certificates refer to the new product characteristics proposed by LG Chem, and thus the Department "verified LG Chem's reporting of the alternative product characteristics on a sample basis." IDM at 14.  But it did not review the sales traces to determine if CRC1, AUP, or PERM had been reported accurately – it looked at CRC only, and the Department's finding of "no discrepancies" does not apply to the other characteristics that were not reported in the verified databases.  Sales Verification Report at 10 (C.R. 257, P.R. 173).  Thus, the Department did not conduct verification with respect to the very core of the dumping margin analysis.

The Department's excuses are all bureaucratic doublespeak to paper over the agency's failure to follow the law in implementing a new model match hierarchy. At verification, the Department completely ignored the new sales and cost databases based on CONNUM2s.  It did not "verify all information relied upon in making" its "final determination in an investigation."  19 U.S.C. § 1677m(i).  As a result, the Court should remand the Contested Determination consistent with this Motion.

PUBLIC VERSION

**D.     The Department Erred By Failing To Remedy Or Address The Distortive And Easily Manipulated Nature Of The Replacement Model Match Characteristics**

      **1.     The Department's use of LG Chem's preferred model match criteria introduces a substantial risk of distortion and manipulation into the dumping margin analysis**

The Court consistently has found that model match revisions are appropriate to the extent they lead to more accurate matching of products for the antidumping analysis.  *See, e.g.*, *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1379 (Fed. Cir. 2008) (sustaining a model match hierarchy because it "yields more accurate results").  Moreover, the Court has strongly cautioned against adopting methodologies that "would risk market manipulation for antidumping purposes." *Pesquera Mares*, 266 F.3d at 1385.  In addition, the Court has held that relying on a "company-specific dataset" can introduce "the risk of manipulation of sales information by the respondent."  *La Molisana,* Slip Op. 23-59 at 8, citing *Pesquera Mares* at 1385.

Here, however, the Department's eleventh-hour modification of the model match hierarchy distorts the antidumping analysis and makes it *less* accurate.  The new model-match characteristics of AUP and PERM used by the Department for the final determination introduce a substantial risk of manipulation and distortion. As discussed in more detail below, by using LG Chem's preferred characteristics, the Department created a hierarchy in which a respondent can categorize unique

products in more than one CONNUM.  The Department should have considered

this argument and rejected the characteristics proposed by LG Chem on this basis.

     Even if it were appropriate to capture AUP and permeability in the model

match (which it was not), it was distortive to adopt LG Chem's reporting of those

characteristics.  As fashioned by LG Chem, the categories within the AUP and

PERM fields do not necessarily represent different physical characteristics; the

same SAP product could be coded into multiple different categories depending on

how LG Chem happened to perform the relevant testing.

     For example, a single grade with AUP or AUL of less than 15 g/g could be

coded in the CONNUM2 by LG Chem as "1," "2," "4," or "6," depending on

whether there was no guaranteed minimum, or the minimum was based on testing

at 0.3 psi, 0.7 psi, or 0.9 psi.  Section B Response at B-11 (C.R. 60, P.R. 97).  In

other words, a given product could be reported as being in different categories, at

LG Chem's discretion, based on how it elected to conduct its testing or whether the

company decided to provide a guaranteed minimum for AUP or AUL.

     Similarly, for PERM, LG Chem reported codes that vary depending on

whether measurements are based on Gel Bed Permeability ("GBP"), Gel

Permeability Under Pressure ("GPUB"), Saline Flow Conductivity ("SFC"), or

Permeability Dependent Absorbency Under Pressure ("PDAUP").  *Id.* at B-11-12

(C.R. 60-61, P.R. 97).  And again, sales of the very same product could fall within

multiple different codes depending on how LG Chem elected to carry out its testing or whether it provides a guaranteed level (regardless of the actual level). This creates a significant potential for manipulation, because where – as here – a sale could be categorized in multiple CONNUMs.  In such a situation, nothing prevents a respondent from reporting AUP and permeability characteristics to create favorable (or avoid unfavorable) matchups in the dumping calculations.

This Court has also found that "the risk of manipulation of sales information by the respondent" is heightened where model match characteristics are based on a "company-specific dataset." *See, e.g.*, *Pesquera Mares*, 266 F.3d at 1385 (noting that model match characteristics specific to one company's grades "would risk market manipulation for antidumping purposes"); *La Molisana*, Slip Op. 23-59 at 8.  The Department explained in its final determination that LG Chem's "grade codes and CONNUM2s proposed by LG Chem tracked perfectly" as purported evidence that LG Chem's preferred model match hierarchy captures commercially significant differences among the products.[5]  IDM at 11 (P.R. 184).  As noted above, LG Chem's preferred physical characteristics do not reflect commercially significant differences.  Thus, the Department's observation that the CONNUM2s

---

[5]     This statement itself is a sweeping assumption with little evidentiary basis, as the Department itself acknowledged: "LG Chem did not provide a key to its grade codes and, thus, we cannot determine to what extent LG Chem accounts for these characteristics in its grades." IDM at 11 (P.R. 184).

"tracked perfectly" with LG Chem's assumed grades actually highlights the ability of LG Chem to manipulate the model match hierarchy by insisting on a framework particular to its sales profile.  It is not surprising that LG Chem proposed model match characteristics specific to its preferred SAP profile and that would substantially reduce its margin.  Indeed, it is for this reason that this Court has found a risk of manipulation where company-specific datasets have been used. *See, e.g.*, *Ghigi 1870*, 547 F. Supp. 3d at 1342-43, *discussing La Molisana*, Slip. Op. 23-59 (observing that the Department does not change model match hierarchies to accommodate company-specific factors).

In stark contrast to LG Chem's preferred characteristics, the CRC characteristic that the Department used throughout nearly the entire investigation does not assign different categories based on different testing regimes.  *See* Model Match Determination (P.R. 89).  Rather, it contemplates that all grades will be tested using a consistent standard, such that the appropriate category depends only on the product's capacity and not the respondent's choice of testing methodology. *See id.*  On the other hand, LG Chem's proposed AUP and PERM characteristics define categories based on which tests were used or whether a guaranteed level was provided (rather than strictly based on physical characteristics).  Those proposed new fields, therefore, create the potential for distortion and manipulation

in a way that the CRC field employed in the Department's model match simply does not.

The Court has directed the Department to reconsider its model match approach in situations like this one where products "could be classified according to more than one design type." *JTEKT Corp. v. United States*, 35 C.I.T. 510, 539 (Ct. Int'l Trade 2011), *discussing JTEKT Corp. v. United States*, 675 F. Supp. 2d 1206, 1221 (Ct. Int'l Trade 2009) *("JTEKT I")*.  In *JTEKT I*, the Court agreed with the plaintiff that the Department's modified model match methodology could permit a given product to fall within a number of design characteristics for ball bearings.  The Department did not explain its reasoning and was directed by the Court to reconsider its methodology for building CONNUMs, which allowed a unique product to fall into more than one CONNUM.  *Id*.  Here, the Court likewise should remand this case to the Department for further proceedings consistent with the Court's favorable consideration.

> **2.    The Department did not consider material evidence and arguments regarding the risk of manipulation and distortion from test-based physical characteristics used in the model match for the final determination**

As discussed above, this Court considers the risks of manipulation and distortion when ruling on the propriety of model match physical characteristics, and it was incumbent upon the Department to consider this as well in the proceeding below.  But the Department did not consider Plaintiff's arguments

regarding the risks of manipulation and distortion associated with LG Chem's preferred physical characteristics.  This failure is not in accordance with law.

Moreover, the Department's use of the replacement model match hierarchy is not reasonable under the substantial evidence standard because the agency did not consider the evidence and arguments on this important point.  This Court has explained that "{a}lthough Commerce is not required to address all the evidence submitted," the agency "must address any arguments made by the parties that are material to Commerce's determination."  *Suzano S.A. v. United States*, 589 F. Supp. 3d 1225, 1233 (Ct. Int'l Trade 2022) *citing Itochu Bldg. Prods., Co., Inc. v. United States*, 163 F. Supp. 3d 1330, 1337 (Ct. Int'l Trade 2016).  "An argument is material if it is a 'focal point' of a party's argument or if a final determination cannot be 'sufficiently reviewed without specific discussion of the issue.'"  *Id.*, quoting *Asociacion Colombiana de Exportadores de Flores v. United States*, 12 C.I.T. 1174, 1177 (Ct. Int'l Trade 1988).

There is no question that the arguments and evidence raised by Plaintiff are material to the final determination.  Indeed, the Department's decision to wholly replace the model match hierarchy at the very end of the investigation was a major factor in the dumping margin's drop from 28.74 percent in the preliminary determination to 17.64 percent in the final determination.  This issue was a "focal point" of Plaintiff's arguments during the investigation.  In the proceeding below,

Plaintiff explained in great detail the possibility for manipulation introduced by LG Chem's new model match characteristics.  Petitioner Rebuttal Model Match Comments at 5 – 6 (P.R. 49); Petitioner Response to LG Chem's Request for Reconsideration (Jan. 31, 2022) at 3 (P.R. 94); Petitioner Rebuttal Brief at 6 – 7 (C.R. 259, P.R. 178).

As noted earlier, the risk of manipulation is an important consideration for the Department in its antidumping analysis, including with respect to the model match hierarchy.  The Court in *Pesquera Mares*, for example, noted that the Department expressly considered and addressed manipulation concerns related to the model-match hierarchy selection.  *Pesquera Mares* explains that model-match hierarchy determinations consider whether the selection of particular physical characteristics "would risk market manipulation for antidumping purposes." *Pesquera Mares*, 266 F.3d at 1385.  Thus, it is critical that the Department consider argument and evidence of such manipulation in this case to satisfy the statute's requirements, but the agency did not do so in this case.  As a result, the Contested Determination must be remanded to the Department for consideration of this compelling argument and evidence.

The Department did not address Plaintiff's arguments regarding the potential for distortion and manipulation with respect to AUP and PERM.  Although the Department need not address each minor point of argument or evidence, it must

consider each argument that is material and assess evidence that fairly detracts

from its conclusions.  The Department did not do that here – the Contested

Determination is devoid of any consideration, analysis, or discussion of this

important and consequential argument and the related evidence.  Consequently,

this Court must remand the Contested Determination and direct the Department to

consider this argument and the strong evidence supporting it.

> **E.    For The Foregoing Reasons, The Department's Decision To Use
> The Replacement Model Match Characteristics Was Arbitrary
> And Capricious And Constituted An Abuse Of Discretion**

This Court has ruled that it will not defer to the Department where agency

action is "arbitrary, capricious, or manifestly contrary to the statute."  *Koyo Seiko*

*Co., Ltd. v. United States*, 31 C.I.T. 1512, 1515 (Ct. Int'l Trade 2007), *citing*

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984).

For each of the foregoing reasons, the Department's decision to use the

replacement model match characteristics was arbitrary, capricious, and manifestly

contrary to the statute.

For example, adopting the AUP and PERM characteristics allows a

respondent to report a unique product in more than one CONNUM2 based on the

selected test methodology for CONNUM2 characteristics.  The Department's

adoption and implementation of these characteristics is arbitrary because there may

not be a single, unique CONNUM2 available for a given product to permit

accurate sales matches.  Likewise, the Department's adoption of CRC1 ranges in increments of 4 g/g without any factual basis or data or information from the respondent's own experience to support this framework is entirely arbitrary and without a reasoned basis or evidence.  And it was arbitrary for the Department to assert that differences in prices among CONNUM2s were commercially significant when there was no correlation between price and the physical characteristics and no concrete evidence such as pricing lists, negotiation records, or other documentation showing that sales prices changed when AUP, PERM, and the narrower CRC1 ranges changed.  This Court should find that the Department's decision to replace the model match hierarchy with LG Chem's preferred CRC1, AUP, and PERM physical characteristics was arbitrary, capricious, and manifestly contrary to the statute, and remand the Contested Determination to the Department on this basis.

# CONCLUSION AND PRAYER FOR RELIEF

For the reasons set forth above, the Plaintiff requests that the Court enter judgment on the administrative record in its favor and remand the *Contested Determination* with instructions for the Department to reconsider its use of CRC1, AUP, and PERM physical characteristics in the model match hierarchy.

Respectfully submitted,

July 14, 2023
Date

/s/ Stephen J. Orava
Stephen J. Orava
Jamieson L. Greer
Daniel L. Schneiderman

King & Spalding LLP
1700 Pennsylvania Avenue, NW
Washington, DC  20006-4706
(202) 737-0500

Counsel for Plaintiff

## CERTIFICATE OF COMPLIANCE
## WITH WORD COUNT LIMITATIONS

Pursuant to paragraph 2(B)(2) of the U.S. Court of International Trade's

*Standard Chambers Procedures*, the undersigned certifies that this brief complies

with the word count limitations set forth in the Court's scheduling order.

Exclusive of the exempted portions, as provided in paragraph 2(B)(1), this brief

includes 10,386 words.  In preparing this certificate, the undersigned has relied

upon the word count feature of the word-processing system used to prepare the

submission.

/s/ Jamieson L. Greer
Jamieson L. Greer

KING & SPALDING LLP
1700 Pennsylvania Avenue, NW,
Washington, DC 20006
(202) 737-0500

*Counsel For The Ad Hoc Coalition Of
American SAP Producers*

July 14, 2023

ATTACHMENT 1

PUBLIC VERSION

### Average Unit Sales Values For "CONNUM2" Characteristics, By Market

**Home Market**

**United States**

[                                                                                                ]

Source: LGCHM01.sas7bdat

Source: LGCUS03.sas7bdat