# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE THOMAS J. AQUILINO, JR., SENIOR JUDGE

| | |
|---|---|
| THE AD HOC COALITION OF<br>AMERICAN SAP PRODUCERS,<br><br>       Plaintiff,<br><br>       v.<br><br>UNITED STATES,<br><br>       Defendant,<br><br>       and<br><br>LG CHEM, LTD.,<br><br>       Defendant-Intervenor. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Court No. 23-00010<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S
## <u>MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

L. MISHA PREHEIM
Assistant Director

OF COUNSEL:

RACHEL BOGDAN
Senior Attorney
Office of the Chief Counsel
    for Trade Enforcement and Compliance
U.S. Department of Commerce
Washington, D.C.

September 29, 2023

KYLE S. BECKRICH
Trial Attorney
U.S. Dept. of Justice
Civil Division/National Courts
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044

Attorneys for Defendant

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

STATEMENT PURSUANT TO RULE 56.2 ............................................................................ 2

    I.    The Administrative Determination Under Review ................................................. 2

    II.    Issues Presented For Review ................................................................................. 2

STATEMENT OF FACTS ..................................................................................................... 2

SUMMARY OF ARGUMENT ............................................................................................... 7

ARGUMENT ...................................................................................................................... 8

    I.    Standard Of Review ............................................................................................. 8

    II.    Commerce's Model Match Determination Is Supported By Substantial Evidence And In Accordance With Law ............................................................................... 9

        A.    Legal Framework For Selecting Model Match Product Characteristics ... 10

        B.    Commerce Relied On Commercially Significant Price Differences In Determining The Model Match Hierarchy ................................................. 12

            1.    LG Chem's Sales Data Identified Price Differences .................... 12

            2.    Price Differences In AUP, Permeability, And CRC In 4 g/g Increments Are Meaningful From A Commercial Perspective ..... 13

        C.    Commerce Did Not Contravene An Alleged Established Practice By Modifying The Model Match Characteristics In The Investigation .......... 20

        D.    The Revised Model Match Revisions Are Not Distortive Or Easily Manipulated ......................................................................................... 22

    III.    Commerce Relied On Verified Data To Calculate The Dumping Margin For LG Chem .................................................................................................................. 24

    IV.    Commerce's Decision To Revise The Model Match Hierarchy Was Not Arbitrary, Capricious, Or An Abuse Of Discretion ............................................................. 28

CONCLUSION .................................................................................................................. 30

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*A.L. Patterson, Inc. v. United States*,
   585 F. App'x, 778 (Fed. Cir. 2014) ...................................................................20

*Altx, Inc. v. United States*,
   370 F.3d 1108 (Fed. Cir. 2004) .........................................................................8

*American Alloys, Inc. v. United States*,
   30 F.3d 1469 (Fed. Cir. 1994) .........................................................................25

*Bohler Bleche GmbH & Co. KG v. United States*,
   324 F. Supp. 3d 1344 (Ct. Int'l Trade 2018)..............................................passim

*Bowman Transp. v. Ark-Best Freight Sys.*,
   419 U.S. 281 (1974)........................................................................................24

*Burlington Truck Lines v. United States*,
   371 U.S. 156 (1962)........................................................................................28

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966)..................................................................................8, 20

*Fujitsu Gen. Ltd. v. United States*,
   88 F. 3d 1034 (Fed. Cir. 1996) .........................................................................8

*Ghigi 1870 S.p.A. v. United States*,
   547 F. Supp. 3d 1332 (Ct. Int'l Trade 2021)..............................................20, 21

*Hercules, Inc. v. United States*,
   673 F. Supp. 454 (1987)..................................................................................25

*Hyundai Steel Co. v. United States*,
   319 F. Supp. 3d 1327 (Ct. Int'l Trade 2018)....................................................22

*Kerr–McGee Chem. Corp. v. United States*,
   739 F. Supp. 613 (1990)..................................................................................25

*Koyo Seiko Co. v. United States*,
   66 F.3d 1204 (Fed. Cir. 1995) .........................................................................11

*Koyo Seiko Co. v. United States*,
   31 F. Supp. 2d 1512 (Ct. Int'l Trade 2007)......................................................28

*Manchester Tank & Equip. Co. v. United States*,
   483 F. Supp. 3d 1309 (Ct. Int'l Trade 2020)..............................................10, 21

*Micron Tech., Inc. v. United States*,
    117 F.3d 1386 (Fed. Cir. 1997) ............................................................ 24, 25, 26

*Mitsubishi Heavy Indus., Ltd. v. United States*,
    275 F.3d 1056 (Fed. Cir. 2001) ................................................................... 9

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................ 28, 29

*NMB Singapore Ltd. v. United States*,
    557 F.3d 1316 (Fed. Cir. 2009) ................................................................. 24

*NTN Bearing Corp. v. United States*,
    74 F.3d 1204 (Fed. Cir. 1995) ............................................................... 22, 23

*PAM, S.p.A. v. United States*,
    582 F.3d 1336 (Fed. Cir. 2009) .............................................................. 8, 16

*Pesquera Mares Australes, Ltda. v. United States*,
    266 F.3d 1372 (Fed. Cir. 2001) .......................................................... 10, 11, 29

*PPG Indus., Inc. v. United States*,
    978 F.2d 1232 (Fed. Cir. 1992) ................................................................. 24

*SKF USA Inc.*,
    263 F.3d 1369 (Fed. Cir. 2001) ................................................................. 10

*Torrington Co. v. United States*,
    68 F.3d 1347 (Fed. Cir. 1995) ................................................................... 24

*United States v. Eurodif S.A.*,
    555 U.S. 305 (2009) ................................................................................... 8

*Wheatland Tube Co. v. United States*,
    161 F.3d 1365 (Fed. Cir. 1998) .............................................................. 28, 29

## Statutes

19 U.S.C. § 1677b ........................................................................................ 10

19 U.S.C. § 1677m ....................................................................................... 24

## Regulations

19 C.F.R. § 351.307 ................................................................................ 25, 26

19 C.F.R. § 351.309 ...................................................................................... 22

**Other Authorities**

*Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances*, 87 Fed. Reg. 37,833 (Dep't of Commerce June 24, 2022) ........................................................................................................................21

*Carbon And Alloy Steel Wire Rod From the Republic of Korea: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 83 Fed. Reg. 13,228 (Dep't of Commerce March 28, 2018) ...................................................18

*Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China*, 75 Fed. Reg. 59,217 (Dep't of Commerce Sept. 27, 2010)....27

*Certain Cold-Rolled Steel Flat Products from the United Kingdom: Final Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 49,929 (Dep't of Commerce July 29, 2016)...............11

*Certain Superabsorbent Polymers From the Republic of Korea: Antidumping Duty Order*, 87 Fed. Reg. 77,794 (Dep't of Commerce Dec. 20, 2022) ...........................................................2

*Certain Superabsorbent Polymers From the Republic of Korea: Final Determination of Sales at Less Than Fair Value,* 87 Fed. Reg. 65,035 (Dep't of Commerce October 27, 2022)............2, 7

*Certain Superabsorbent Polymers From the Republic of Korea: Initiation of Less-Than-Fair-Value Investigation*, 86 Fed. Reg. 67,915 (Dep't of Commerce Nov. 30, 2021).......................3

*Certain Superabsorbent Polymers From the Republic of Korea: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 87 Fed. Reg. 34,647 (Dep't of Commerce June 7, 2022)...6

## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE THOMAS J. AQUILINO, JR., SENIOR JUDGE

| | |
|---|---|
| ———————————————————— ) | |
| THE AD HOC COALITION OF ) | |
| AMERICAN SAP PRODUCERS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | Court No. 23-00010 |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| LG CHEM, LTD., ) | |
| ) | |
| Defendant-Intervenor. ) | |
| ———————————————————— ) | |

## <u>ORDER</u>

Upon consideration of the motion for judgment upon the agency record, responses thereto, reply, and all other papers, it is hereby

ORDERED that the motion is denied, and it is further

ORDERED that judgment shall enter in favor of the United States.


Dated: _____, 2023          _____
              New York, NY                              JUDGE

# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE THOMAS J. AQUILINO, JR., SENIOR JUDGE

_____
| | )
THE AD HOC COALITION OF | )
AMERICAN SAP PRODUCERS, | )
| )
      Plaintiff, | )
| )
      v. | )
| )
UNITED STATES, | )     Court No. 23-00010
| )
      Defendant, | )
| )
      and | )
| )
LG CHEM, LTD., | )
| )
      Defendant-Intervenor. | )
_____)

## DEFENDANT'S RESPONSE TO PLAINTIFF'S
## MOTION FOR JUDGMENT ON THE AGENCY RECORD

      Pursuant to Rule 56.2 of this Court's Rules, defendant, the United States, respectfully

submits this response to the motion of plaintiff, The Ad Hoc Coalition of American SAP

Producers (the Coalition), for judgment on the agency record challenging the Department of

Commerce's (Commerce) final determination in the less-than-fair-value investigation of certain

superabsorbent polymers SAP from the Republic of Korea.  As demonstrated below,

Commerce's determination is supported by substantial evidence and is otherwise in accordance

with law.  Accordingly, we respectfully request that the Court deny the Coalition's Rule 56.2

motion and sustain Commerce's determination.

# STATEMENT PURSUANT TO RULE 56.2

## I.     The Administrative Determination Under Review

The administrative determination under review is the antidumping order from the less-than-fair-value investigation of certain superabsorbent polymers (SAP) from Korea, published as *Certain Superabsorbent Polymers From the Republic of Korea: Final Determination of Sales at Less Than Fair Value,* 87 Fed. Reg. 65,035 (Dep't of Commerce October 27, 2022) and the accompanying Issues and Decision Memorandum (IDM). *See Certain Superabsorbent Polymers From the Republic of Korea: Antidumping Duty Order* (*Order*), 87 Fed. Reg. 77794 (Dep't of Commerce Dec. 20, 2022) (P.R. 196); *see also* IDM (P.R. 184). The period of investigation is October 1, 2020, through September 30, 2021.

## II.     Issues Presented For Review

1.     Whether Commerce's model match hierarchy was based on substantial evidence.

2.     Whether Commerce's final determination relied on verified information regarding the revised model match hierarchy and was therefore lawful.

3.     Whether Commerce's model match criteria determination was arbitrary and capricious.

## STATEMENT OF FACTS

On November 2, 2021, Commerce received a petition from the Coalition requesting the imposition of antidumping duties on imports of SAP. *See Petition for the Imposition of Antidumping Duties on Imports of Certain Superabsorbent Polymers from the Republic of Korea* (*Petition*) (P.R. 1). On November 30, 2021, Commerce published notice of its initiation of investigation where it requested comments from all interested parties on how to characterize "general product characteristics" and "product comparison criteria" for purposes of defining the

control numbers (CONNUMs) in the proceeding to identify identical or similar merchandise in making accurate product comparisons to calculate dumping margins. *Certain Superabsorbent Polymers From the Republic of Korea: Initiation of Less-Than-Fair-Value Investigation*, 86 Fed. Reg. 67,915, 67,916 (Dep't of Commerce Nov. 30, 2021) (P.R. 34).

LG Chem, Ltd. and the Coalition responded to the notice and provided a hierarchy of physical characteristics they found most important to distinguish SAP products. *See Certain Superabsorbent Polymers from the Republic of Korea – Model Match Comments of LG Chem, Ltd.* (LG Chem Model Match Comments) (Dec. 13, 2021) (P.R. 43); *see also Certain Superabsorbent Polymers from the Republic of Korea – Comments on Model Match Product Characteristics* (Petitioner Model Match Comments) (Dec. 13, 2021) (P.R. 42); Petitioner Rebuttal Comments on Model Match Product Characteristics (Dec. 23, 2021) (P.R. 49); LG Chem Rebuttal Comments on Model Match Product Characteristics (Dec. 23, 2021) (P.R. 54-55). Both parties agreed that the model match criteria should include a characteristic for the ability for superabsorbent polymer products to hold liquid, which is recognized within the industry as centrifugal retention capacity (CRC). *See id.* Because CRC is measured in grams of saline solution retained per gram of SAP (g/g), each party asserted that Commerce should establish specified CRC ranges. *Id.* LG Chem recommended that Commerce establish the five following ranges of 4 g/g increments:

(1) No minimum guarantee or minimum guaranteed CRC less than 26 g/g;

(2) Minimum guaranteed CRC equal to or more than 26 g/g and less than 30 g/g;

(3) Minimum guaranteed CRC equal to or more than 30 g/g and less than 34 g/g;

(4) Minimum guaranteed CRC equal to or more than 34 g/g and less than 38 g/g; and

(5) Minimum guaranteed CRC equal to or more than 38 g/g.

LG Chem Model Match Comments at 3 (P.R. 43).  In addition, the Coalition advocated for a

CRC range of 6 g/g between low-capacity and high-capacity grades:

(1) < 30 g/g;

(2) ≥ 30 g/g but < 36 g/g; and

(3) ≥ 36 g/g.

*See* Petitioner Model Match Comments at 2 (P.R. 42).

LG Chem also requested that Commerce adopt two additional product characteristics for

model match purposes of guaranteed performance levels: (1) absorbency under pressure (AUP);[1]

and (2) permeability, or the ability with which liquid passes between superabsorbent polymer

particles.  LG Chem Model Match Comments at 4-7 (P.R. 43).  The Coalition did not

recommend that Commerce adopt AUP or permeability as characteristics necessary to

distinguish SAP products.

A non-individually examined respondent, Sumitomo Seika Polymers Korea Co., Ltd.

(Sumitomo), submitted comments that indicated support for the selection of CRC as the sole

product characteristic, but requested that Commerce not adopt the Coalition's requested 6 g/g

CRC range.  *See* Sumitomo Rebuttal Comments on Model Match Product Characteristics (Dec.

23, 2021) (P.R. 53).  Rather, Sumitomo requested that Commerce not adopt pre-established gram

to gram ranges of CRC, but instead require that respondents explain in the narrative how they

define grades of low, medium, and high capacity when making sales of SAP in the normal course

of business.  *Id.* at 2-3.  Alternatively, if Commerce determined to use pre-established ranges to

---

[1] This trait is also referred to within the industry and parties' submissions to Commerce as "Absorbency Against Pressure" or "Absorbency Under Load."  *See* LG Chem Request for Reconsideration (Jan. 28, 2022) at 7 n.13 (P.R. 93).

define the CRC characteristic, Sumitomo requested that Commerce adopt the following ranges that it uses in its normal course of business: (1) < 30 g/g; (2) > 30 g/g but < 42 g/g; and (3) > 42 g/g.[2] *Id.* at 3.

After analyzing the parties' comments, Commerce preliminarily adopted the Coalition's proposed product characteristics including only CRC and a CRC range of 6 g/g as the set of physical characteristics to establish control numbers and match home market and U.S. sales of superabsorbent polymers. *See Less-Than-Fair-Value Investigation of Certain Superabsorbent Polymers from the Republic of Korea: Product Characteristics Hierarchy* (Jan. 21, 2022) (P.R. 89).

LG Chem submitted a request for reconsideration of Commerce's model match determination, arguing that the 6 g/g range was overly broad and that the reliance on CRC as the sole physical characteristic for model matching purposes did not adequately account for commercially significant differences between the SAPs subject to the investigation. *See* LG Chem Request for Reconsideration (P.R. 93).

Nonetheless, consistent with Commerce's initial model match hierarchy, LG Chem submitted sales and cost databases to satisfy the CONNUMs selected for the preliminary determination. *See* LG Chem's Sections B-D Questionnaire Response (Feb. 11, 2022) at D-41-43 and Exhibits B-9-12,C-7-10 (C.R. 59-60, 67-70, 105). LG Chem also provided alternative sales and cost databases that reported CRC in increments of 4 g/g and included the additional physical characteristics of AUP and permeability, consistent with the hierarchy it recommended.

---

[2] In its comments, Sumitomo also requested to be selected as a voluntary respondent. *See* Sumitomo Rebuttal Comments on Model Match Product Characteristics (P.R. 53). Sumitomo later withdrew this request. *See* Withdrawal of SSPK's Request for Voluntary Respondent Treatment (Jan 25, 2022) (P.R. 91).

*See id.* In making its preliminary determination, Commerce only relied on the data submitted in accordance with its initial model match hierarchy. *See* Decision Memorandum for the Preliminary Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Superabsorbent Polymers from the Republic of Korea (P.R. 150). Commerce preliminarily calculated a 28.74 percent dumping margin for LG Chem. *Certain Superabsorbent Polymers From the Republic of Korea: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures (Preliminary Determination)*, 87 Fed. Reg. 34647 (June 7, 2022) (P.R. 154). Commerce then verified the sales and cost data that LG Chem provided, including the AUP and permeability levels that LG Chem also provided in the alternative databases. *See Verification of Sales Responses of LG Chem, Ltd. in the Antidumping Investigation of Superabsorbent Polymers from the Republic of Korea* (LG Chem's Sales Verification Report) (Sept. 1, 2022) (P.R. 173); *see also Verification of the Cost Response of LG Chem, Ltd. in the Antidumping Duty Investigation of Certain Superabsorbent Polymers from the Republic of Korea* (LG Chem's Cost Verification Report) (Aug. 30, 2022) (P.R. 171).

After the issuance of Commerce's preliminary determination, LG Chem submitted a case brief requesting that Commerce re-evaluate and revise the product characteristics to include AUP, permeability, and narrower CRC ranges of 4 g/g increments. *See* LG Chem Case Brief (Sept. 9, 2022) (P.R. 174). The Coalition submitted a rebuttal brief requesting that Commerce continue to adopt CRC as the sole product characteristic. *See Certain Superabsorbent Polymers from the Republic of Korea: Petitioner's Rebuttal Brief* (Rebuttal Brief) (Sept. 19, 2022) (P.R. 178). After reviewing the arguments brought before Commerce in the briefs and reexamining record evidence, Commerce revised the model match hierarchy to include AUP and

permeability, and amended CRC reporting to increments of 4 g/g because Commerce determined there are commercially significant differences between SAP produced with these characteristics. *See Certain Superabsorbent Polymers from the Republic of Korea*: *Final Determination at Less Than Fair Value*, 87 Fed. Reg. 65,035 (Dep't of Commerce Oct. 27, 2022) and accompanying IDM (P.R. 184). After adding AUP and permeability and amending CRC measurements to 4 g/g increments, Commerce calculated a 17.64 percent margin using LG Chem's dumping margin using LG Chem's alternative cost and sales databases for the final determination. *See id.*

After publication of the *Order*, the Coalition commenced this action.

## SUMMARY OF THE ARGUMENT

In its Final Determination, Commerce determined that its model match hierarchy should include AUP, permeability, and CRC reporting in increments of 4 g/g. This determination was supported by substantial evidence and otherwise in accordance with law.

As shown below, the record contains information from both LG Chem and the Coalition showing that those three characteristics are commercially significant and not merely inversely related to one another. Further, in making its determination, Commerce did not contravene any established policy. Indeed, Commerce has no established policy that renders it unable to modify the model match methodology from a preliminary determination to a final determination *within* an investigation.

Contrary to the Coalition's argument, Commerce's hierarchy is also not easily manipulated or distortive. As the record shows, SAP products are tested in accordance with the needs of customers – not as a means of avoiding antidumping duties. Likewise, the Coalition's argument that Commerce relied on unverified data should be rejected. Commerce verified LG

Chem's cost accounting data, which include the characteristics at issue in the case. Commerce has the discretion to spot-check the data and did not rely on data that was wholly unverified.

Commerce's decision was not arbitrary or capricious or an abuse of discretion, was supported by substantial evidence and in accordance with law, and should be sustained.

## ARGUMENT

### I.    Standard Of Review

In reviewing Commerce's antidumping duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion' found by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F. 3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)).  "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).  "Substantial evidence" amounts to "more than a mere scintilla" of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009) (citations omitted).  Substantial evidence is also "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent {Commerce's} finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

The question before the Court is not whether the Court agrees with Commerce's decision or whether the Court would have reached the same decision.  Rather, a determination will be affirmed if it is "reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion." *Altx, Inc. v. United States*, 370 F.3d 1108, 1121

(Fed. Cir. 2004) (citation omitted).  A party challenging a determination under the substantial evidence standard "has chosen a course with a high barrier to reversal."  *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001).

## II.     Commerce's Model Match Determination Is Supported By Substantial Evidence And In Accordance With Law

Commerce's determination is supported by substantial evidence and in accordance with law because the record demonstrates there are commercially significant differences in the product characteristics of AUP, permeability, and CRC in the 4 g/g increments proposed by LG Chem.  Namely, to support the addition of AUP and permeability and revision of CRC increments to 4 g/g ranges, Commerce concluded that the record indicates that there were substantial price differences between SAP with certain guaranteed levels of AUP and permeability and SAP with CRC ranges reported in 4 g/g.  *See* IDM at 10-12.  Further, these differences were meaningful from a commercial perspective and the characteristics were recognized by the broader industry of subject merchandise.  *Id.*  In concluding that the price differences were commercially meaningful, Commerce relied on: (1) petitioner's own marketing materials; (2) a technical paper from BASF Corporation, one of the petitioner's member companies; (3) a brochure from Evonik Superabsorber LLC, one of petitioner's member companies; and (4) petitioner's statements to the International Trade Commission.  *See* IDM at 7-14.  In totality, Commerce determined this evidence identifies CRC, AUP, and permeability as integral aspects of modern diapers and support a narrower range of 4 g/g increments in measuring CRC ranges.  *See id.*  Commerce's determination is supported by substantial evidence and in accordance with law.

### A.   Legal Framework For Selecting Model Match Product Characteristics

Commerce determines whether the subject merchandise is being sold, or is likely to be sold, at less than fair value by comparing the export (or constructed export) price with the normal value of the product.  *See* 19 U.S.C. § 1677b(a).  The statute outlines that normal value is typically based on the adjusted home-market price of "foreign like product" (*i.e.*, the price at which the foreign like product is sold for consumption in the exporting country).  19 U.S.C. § 1677b(a)(1)(B).

The statute defines "foreign like product" as merchandise that is either identical with, or similar to, subject merchandise, according to a hierarchy of characteristics.  *Id.* § 1677(16)(A)-(C).  However, the statute does not provide a standardized methodology for Commerce in identifying identical or similar merchandise.  Thus, Commerce is afforded considerable discretion when developing its methodology.  *See Pesquera Mares Australes, Ltda. v. United States*, 266 F.3d 1372, 1384 (Fed. Cir. 2001) ("the phrase 'identical in physical characteristics,' 19 U.S.C. § 1677(16)(A), remains ambiguous, and, as we have discussed above, under *Chevron* Commerce has discretion to define the term); *see also SKF USA Inc.,* 263 F.3d 1369, 1381 (Fed. Cir. 2001) (noting that Commerce has "considerable discretion in defining 'foreign like product.'"); *see also Manchester Tank & Equip. Co. v. United States*, 483 F. Supp. 3d 1309, 1316 (Ct. Int'l Trade 2020) (When "Commerce develops a model-match methodology {*i.e.*, how to identify identical or similar merchandise} in an investigation, it is afforded 'considerable discretion' and need only support the methodology with substantial evidence and a reasoned explanation.").

To ensure that the merchandise sold in the U.S. market is being compared "with a suitable home-market product" for purposes of calculating antidumping duties, Commerce

establishes a model match hierarchy and requires respondents to report sales in accordance with these criteria. *Koyo Seiko Co. v. United States*, 66 F.3d 1204, 1209 (Fed. Cir. 1995); *see also* 19 U.S.C. § 1677(16)(C)(iii). This hierarchy of characteristics is used to create a control number, or CONNUM, for each unique SAP product. CONNUMs are comprised of digits, and each digit is a "code" for a physical characteristic of the product.

 "Commerce has concluded that merchandise should be considered to be identical despite the existence of minor differences in physical characteristics, *if those minor differences are not commercially significant*. We conclude that this standard adopted by Commerce constitutes 'a permissible construction of the statute.'" *See Pesquera Mares*, 266 F.3d at 1384 (internal citations omitted) (emphasis added). The commercial significance of a difference in physical characteristics is a case-by-case determination "but at the very least it is a feature that is recognized in the broader industry of the subject merchandise." *Bohler Bleche GmbH & Co. KG v. United States*, 324 F. Supp. 3d 1344, 1350 (Ct. Int'l Trade 2018) (citing *Pesquera Mares*, 266 F.3d at 1385).

In examining whether differences are commercially significant, Commerce requires that any price and cost differences be meaningful from a commercial perspective. *See e.g.*, *Certain Cold-Rolled Steel Flat Products from the United Kingdom: Final Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 49,929 (Dep't of Commerce July 29, 2016) and accompanying Issues and Decision Memorandum at Comment ("{D}ifferences in costs are sometimes attributable to factors other than the physical characteristics of the products, such as differences in production quantities or differences {in} the timing of production."). In other words, Commerce will look to differences linked to product characteristics that "customers would

view . . . as distinct in utility and value" and which are a "feature that is recognized in the broader industry of the subject merchandise." *Bohler*, 324 F. Supp. 3d at 1350.

### B. Commerce Relied On Commercially Significant Price Differences In Determining The Model Match Hierarchy

#### 1. LG Chem's Sales Data Identified Price Differences

Commerce determined that LG Chem's alternative database which reported sales using the product characteristics of CRC at 4 g/g increments, AUP, and permeability indicated that these product characteristics created price differences in SAP products that appear to be commercially significant. IDM at 9. In doing so, Commerce first examined two analyses provided by LG Chem in its administrative case brief: one related to price variations among LG Chem's preferred product characteristics and those preferred by the Coalition (as utilized at the preliminary determination) and a similar analysis related to cost variations. *Id.* These analyses showed that the price and cost differences provided in LG Chem's analyses could be substantial. *Id.* (citing LG Chem's Case Brief at 20 and 21 (P.R. 174)). Accordingly, Commerce conducted its own analysis of costs and prices reported in LG Chem's home market databases. *Id.* (citing LG Chem's Final Calculation Memorandum (P.R. 187, C.R. 260)).

With respect to cost differences, LG Chem only pointed to cost differences between CONNUMs selected at the preliminary determination and those reported in accordance with its preferred physical characteristics; LG Chem provided no other evidence that the differences in costs are associated with the additional physical characteristics. *Id.* Thus, without more, Commerce did not find the cost differences to be instructive in determining that the differences were related to these physical characteristics because differences in costs, in and of themselves, are not necessarily meaningful in determining if the differences are due to the additional physical characteristics proposed by LG Chem. *Id.* The Coalition does not dispute this finding, *see* Pl.'s

Br. at 9-10, nor does this finding detract from the substantial evidence that otherwise supports Commerce's determination, as described below.

With respect to price differences, Commerce found that the weighted-average home market prices between the database submitted using the product characteristics selected at the preliminary determination and the database submitted using LG Chem's preferred characteristics differed from fifteen to as high as twenty percent. *Id.* (citing LG Chem's Final Calculation Memorandum (P.R. 187, C.R. 260)). Thus, contrary to the Coalition's argument, Pl. Br. at 19, LG Chem's sales data supported Commerce's conclusion that the differences in physical characteristics of AUP, permeability, and CRC ranges of 4 g/g increments are reflected in sales prices to LG Chem's customers.

The Coalition cites to an attachment to support its assertion that there is no significant correlation between prices and AUP, permeability, and CRC at 4 g/g increments in LG Chem's alternative U.S. sales database. Pl. Br. at 20, Attachment 1. However, the attachment misappropriately identifies prices for each characteristic – CRC at 4 g/g increments, permeability, and AUP – separately. This methodology does not accurately reflect the foreign like product, which consists of all three product characteristics *collectively*. *See* IDM at 11 n.82. Thus, Commerce analyzed the prices together to identify a more reflective sales price of the foreign like product. *See id.*

> **2.      Price Differences In AUP, Permeability, And CRC In 4 g/g Increments Are Meaningful From A Commercial Perspective**

Commerce also determined that the price differences highlighted by LG Chem have a commercial basis that is "recognized in the broader industry of subject merchandise" and therefore are commercially significant. IDM at 10; *see also Bohler,* 324 F. Supp. 3d at 1350.

This was evidenced by the Coalition's own marketing materials which state that: (1) AUP and permeability, in addition to CRC, are typical current SAP characteristics and an integral part of modern diapers; and (2) with the advancement of production methods, SAP producers are able to "break{} the normal restrictions of CRC and {AUP} interdependency" (*i.e.*, with advanced production methods, CRC and AUP do not have fixed simple relationships such that accounting for CRC would necessarily account for any differences in AUP and permeability). IDM at 10 (citing LG Chem Model Match Comments at Attachments 2-5 (P.R. 43)). Specifically, in a technical paper, one of the Coalition's member companies, BASF, lists CRC, AUP, and permeability as "{t}ypical current SAP {c}haracteristics," and an information sheet from BASF describes CRC, AUP, and permeability as "an integral part of modern diapers." *Id.* In addition, another one of the Coalition's member companies, Evonik Superabsorber LLC, discusses its products as featuring "different basic characteristics," which include "absorption, retention, absorption under pressure, {and} permeability." *Id.* Further, BASF's marketing materials emphasize that one product is meaningfully distinct from another product due to a ten percent improvement in CRC and results in a seven percent improvement of the downstream diaper product—a distinction that the methodology proposed by the Coalition would not make. *Id.* Essentially, in the Coalition's own words, SAP "depends on the customer's preference for balancing" CRC, AUP, and permeability. *Id.* (citing Petitioner's Rebuttal Case Brief at 2 (P.R. 178)); *see also* Pl. Br. at 18-19. A customer would thus view these products "as distinct in utility and value." *Bohler*, 324 F. Supp. 3d at 1350.

Further, the Coalition's statements to the International Trade Commission support Commerce's determination. During a preliminary phase staff conference, the Coalition stated that there are "generally four key performance parameters" of SAP, which include CRC, AUP,

and permeability.  IDM at 11.  In addition, a vice president and general manager of Evonik Superabsorber LLC explained that specific performance parameters for SAP consist of AUP, permeability and absorption speed, in addition to CRC, and how these are balanced per product is generally specific to the grade.  *Id.* at 12 (citing LG Chem Rebuttal Model Match Comments at 9, Attachment 6 (P.R. 55)).

 Similarly, LG Chem's product brochure demonstrated that LG Chem also views AUP and permeability, in addition to CRC, as basic properties of SAP.  *Id.* at 11 (citing LG Chem's Rebuttal Model Match Comments at 8-9 (P.R. 54); LG Chem's Initial Section A Questionnaire Response (Jan. 19, 2022) at A-27 (P.R. 71, C.R. 29), Exhibit A-25 (P.R.77-78, C.R. 41)).  LG Chem markets SAP as distinct products depending on certain grades the product retains based on CRC, AUP, and permeability.  *Id.*  Commerce was able to analyze LG Chem's home market sales database to determine to what extent LG Chem accounts for CRC, AUP, and permeability in grades.  *Id.*  Commerce found that that the grade codes and the CONNUMs LG Chem proposed tracked perfectly; in other words, each grade code fell into only one CONNUM.  *Id.* This indicates that LG Chem defines its SAP grades using both AUP and permeability and that customers purchase SAP with expectations based on these product characteristics.  *See id.*

With respect to CRC in 4 g/g increments, the Coalition requested the International Trade Commission collect pricing data for products with CRC ranges that differ from those proposed in Commerce's investigation, suggesting ranges of 27-33 g/g; 34-42 g/g; and 26-33 g/g.  *Id.* (citing LG Chem's Case Brief at 12 (P.R. 174)).  The ranges identified at the International Trade Commission all overlap within the same proposed 6 g/g range of >30 g/g but ≤ 36 g/g, which suggests that the Coalition considers there to be price differences that are meaningful within the CRC ranges that it defined for Commerce.  *See id.*  Thus, the Coalition's stance on the

appropriate CRC ranges is inconsistent with the suggested categorization of the same products in the parallel International Trade Commission proceeding. *Id.*

Further, the Coalition's marketing materials indicate SAP products are marketed as distinct due to a small percentage difference in CRC. *Id.* at 10 (citing LG Chem Model Match Comments at Attachment 1 at 5-6 (P.R. 43)). Like the Coalition, BASF also markets two distinct products based on a ten percent improvement in CRC, but under the Coalition's proposed CRC ranges of 6 g/g increments, these separate products would be indistinguishable even though the marketing materials distinguish them as two distinct products. *See id.* The Coalition attempts to discredit this evidence by highlighting the marketing material is from 2015. However, the date of such marketing materials does not indicate this characteristic is not "recognized in the broader industry of the subject merchandise" or otherwise invalidate Commerce's reliance on this evidence, in addition to other evidence, to support its conclusion that CRC at the ranges of 4 g/g increments is commercially significant. *See PAM, S.p.A*, 582 F.3d at 1339 ("Substantial evidence" amounts to "more than a mere scintilla" of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."); *see also Bohler*, 324 F. Supp. 3d at 1350.

Commerce also reasonably concluded that LG Chem uses more advanced technologies to achieve SAP with the right balance of CRC, AUP, and permeability; a guarantee of CRC alone would be insufficient to assure a customer that SAP will meet its specifications. *See* IDM at 12. A technical paper from BASF stated that "{f}or more than 20 years, SAP formulator's {sic} and diaper designers have been constrained by the limitations of these three parameters. . . . In general, if any one property requires improvement, then some other property must be sacrificed . . . . BASF has developed technology that breaks this paradigm in several ways."

IDM at 12 (citing LG Chem's Rebuttal Model Match Comments at Attachment 3 (P.R. 55)).  In addition, BASF's advertising materials state that "{n}ovel BASF chemistry breaks the normal restrictions of the CRC & {AUP} interdependency."  *Id.* (citing LG Chem's Rebuttal Model Match Comments at Attachment 1 (P.R. 54)).

Thus, when the record evidence is viewed as a whole, Commerce reasonably determined that different guaranteed levels of AUP and permeability and CRC ranges in 4 g/g increments are commercially significant to downstream producers, and that these differences are reflected in the sales price to LG Chem's customers.  *Id.*  Therefore, Commerce's determination to refine CRC with a narrower range and to add AUP and permeability to the model match hierarchy is supported by substantial evidence on the record.

Despite ample evidence on the record that supports Commerce's revisions to the model match hierarchy, the Coalition argues Commerce made "eleventh-hour modification{s}" to the product characteristic hierarchy that were unsupported by substantial evidence.  Pl. Br. at 38.  As an initial matter, the model match hierarchy was an issue from the start of the investigation and parties submitted comments on the product characteristics at multiple points, including in administrative case briefs.  *See, e.g.*, LG Chem Model Match Comments (P.R. 43); Petitioner Model Match Comments (P.R. 42); Petitioner Rebuttal Comments on Model Match Product Characteristics (P.R. 49); LG Chem Rebuttal Comments on Model Match Product Characteristics (P.R. 54-55); LG Chem Case Brief (P.R. 174).  To argue that a modification, based on substantial evidence, is an "eleventh-hour" modification mischaracterizes the circumstances because Commerce carefully considered the issue throughout the proceeding.

Further, the Coalition argues that Commerce did not point to any evidence of a relationship between price and the revised product characteristics.  Pl. Br. 20.  However, the

Coalition ignores the numerous citations to record evidence to support Commerce's conclusion, as discussed above, including LG Chem's sales databases, the Coalition's (and its members) marketing materials, and the Coalition's statements to the International Trade Commission. *See* IDM at 9-12; IDM at 9 n.67 (citing LG Chem's Final Calculation Memorandum (P.R. 187, C.R. 260)); IDM at 10-12 n.72-n.76, n.78, n.88-n.89 (citing LG Chem's Rebuttal Model Match Comments (P.R. 54-55)); IDM at 11 n.78-n.79 (citing LG Chem's Initial Section A Questionnaire Response at A-27 (P.R. 71, C.R. 29), Exhibit A-25 (P.R.77-78, C.R. 41)); IDM at 9 n.66, 11-12 n.83-n.86 (citing LG Chem's Case Brief (P.R. 174)). Commerce specifically found price differences from 15- 20 percent between prices reported in LG Chem's home market database using the Coalition's preferred product characteristics and the prices reported in LG Chem's home market database that accounted for AUP and permeability and CRC in 4 g/g increments. IDM at 9 n.67 (citing LG Chem's Final Calculation Memorandum (P.R. 187, C.R. 260)) ("Specifically, we noted that the weighted-average home market prices, by CONNUM2, ranged from a low of 15 percent below the average prices for the corresponding CONNUMH, to a high of 20 percent above the CONNUMH prices.").

The Coalition also attempts to downplay the marketing materials Commerce relied on to support its determination as merely "anecdotal" pieces of evidence. *See* Pl.'s Br. at 21. However, Commerce reasonably considered the Coalition's marketing materials to evaluate product characteristics that "customers would view . . . as distinct in utility and value." *See Bohler*, 324 F. Supp. 3d at 1350; *see also Carbon And Alloy Steel Wire Rod From the Republic of Korea: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 83 Fed. Reg. 13,228 (Dep't of Commerce March 28, 2018) and accompanying Issues and Decision Memorandum at Comment 4 (examining product

brochures in determining whether to add certain product characteristics to a model match hierarchy).

The Coalition also argues the International Trade Commission product ranges Commerce relied upon in making its final determination are irrelevant because the Commission does not use a model match hierarchy when conducting their analysis. Pl. Br. at 23. However, merely because the Commission does not use a model match hierarchy does not mean information presented to the Commission by the Coalition regarding the SAP industry cannot serve as relevant evidence for Commerce's purposes in evaluating whether product characteristics are significant from a commercial perspective.

In addition, the Coalition asserts that Commerce's selection of AUP and permeability for model matching purposes was erroneous because these characteristics were presented alongside other physical characteristics in LG Chem's marketing materials that Commerce did not determine were commercially significant. Pl. Br. at 26. However, Commerce did not include other characteristics in the model match hierarchy because no party argued on the record that such additional characteristics should be included or that such characteristics are commercially significant; indeed, no party argued LG Chem's sales data or other information on the record indicated those product characteristics were commercially meaningful.

Further, that *one* foreign company supported a model match hierarchy that only contains CRC does not render Commerce's determination unreasonable considering the substantial evidence that otherwise supports its determination, as detailed above. *See* Pl. Br. at 28-29. In fact, that foreign company *disagreed* with the Coalition's proposed CRC ranges of 6 g/g increments, undermining the Coalition's reliance on this foreign company's position regarding the model match hierarchy. *See* Sumitomo Rebuttal Comments on Model Match Product

Characteristics (P.R. 53) (requesting that Commerce not adopt pre-established gram to gram ranges of CRC, but instead require respondents explain in the narrative how they define grades of low, medium, and high capacity when making sales of superabsorbent polymers in the normal course of business or, if Commerce determined to use pre-established ranges to define the CRC characteristic, that Commerce adopt the following ranges that it uses in its normal course of business: (1) < 30 g/g; (2) > 30 g/g but < 42 g/g; and (3) > 42 g/g.). Moreover, Commerce is afforded significant discretion in its model match determinations, and the substantial evidence standard allows for Commerce to make a conclusion based on the record as a whole even though there may be other inconsistent conclusions drawn from the same record. *See A.L. Patterson, Inc. v. United States*, 585 F. App'x, 778, 782 (Fed. Cir. 2014) (citing *Consolo,* 383 U.S. at 620).

Lastly, the Coalition finds fault with Commerce's revision to the CRC ranges because they have no maximum and no minimum guaranteed CRC at the highest and lowest codes. Pl. Br. at 24. The Coalition asserts that the lack of a minimum guarantee in the codes for CRC, AUP, and permeability indicate that the characteristics are not important at all. *Id.* However, as detailed above, evidence indicates that these ranges are commercially significant. Moreover, the Coalition's proposed grades of CRC in 6 g/g increments similarly contain no floor or ceiling. *See* Petitioner Model Match Comments at 2 (P.R. 42).

### C. Commerce Did Not Contravene An Alleged Established Practice By Modifying The Model Match Characteristics In The Investigation

Contrary to the Coalition's assertion, Commerce does not have an established or "existing practice of using the hierarchy chosen at the outset of an investigation" in a final determination. Pl. Br. at 30. In support of its claim, the Coalition cites *Ghigi 1870 S.p.A. v. United States* for the proposition that "changes to Commerce's model-match method are not undertaken lightly." 547 F. Supp. 3d 1332, 1343 (Ct. Int'l Trade 2021). However, this case is

inapposite because it involved changes to a model match hierarchy *after* it was established in an investigation. *See id.* "This Court and the Federal Circuit 'have looked for 'compelling reasons' when Commerce modifies a model-match methodology *in a review* after having used that methodology in previous segments of the proceeding.'" *Id.* (citing *Manchester Tank & Equip. Co. v. United States*, 483 F. Supp. 3d 1309, 1315 (2020)) (emphasis added). Thus, *Ghigi* supports the position that there is an established practice that Commerce will not modify the model match established from an investigation to a review absent a compelling reason, not that Commerce is unable to modify the model match from a preliminary determination to final determination *within* an investigation.

Beyond this misapplied case, the Coalition points to no other evidence that Commerce has an established or an existing practice of not modifying the model match during an investigation. In fact, Commerce recently changed the model match criteria during the course of an investigation in *Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances* (*AB Rubber from France*), 87 Fed. Reg. 37,833 (Dep't of Commerce June 24, 2022). There, Commerce added a product characteristic in the final determination, adopting a respondent's proposed alternative CONNUM and modifying its initial model match from the preliminary determination. *See AB Rubber from France* Issues and Decision Memorandum at Comment 1. The Coalition contends that *AB Rubber from France* is *sui generis* but provides no evidence to explain why that would be the case. Pl. Br. at 31. Further, to distinguish Commerce's modification in the case at hand from *AB Rubber from France*, the Coalition argues that the addition of AUP and permeability and narrower CRC ranges were a "wholesale replacement" of the existing model match criteria and not a "simple, binary characteristic." Pl. Br. at 31-32. However, this is a mischaracterization of Commerce's

determination.  The modifications to the method match criteria merely refined the CRC ranges and added two characteristics after further examination of record evidence, much like the addition of a product characteristic in *AB Rubber from France.*  Thus, Commerce did not contravene its established practice.

Additionally, the Coalition's argument presumes that Commerce may not make modifications between the preliminary determination and the final determination.  However, under 19 C.F.R. § 351.309(c)(2), parties can submit any arguments that they view to be relevant to the final determination.  Commerce then carefully weighs those arguments in light of the facts on the record.  Accepting the Coalition's argument would render Commerce's obligation to solicit comments and parties' opportunity to submit comments on this issue futile.  Indeed, as this Court has recognized, "{p}reliminary determinations are 'preliminary' precisely because they are subject to change." *Hyundai Steel Co. v. United States*, 319 F. Supp. 3d 1327, 1343 (Ct. Int'l Trade 2018) (citing *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995)).

**D.     The Revised Model Match Revisions Are Not Distortive Or Easily Manipulated**

The Coalition next contends that the addition of AUP and permeability in the model match hierarchy distorts Commerce's antidumping analysis because LG Chem can categorize products in more than one product characteristic depending on how LG Chem decided to perform the SAP product's testing and thus, results can be easily manipulated.  Pl. Br. at 39.  For example, the Coalition argues that a single grade of AUP of less than 15 g/g could be coded by LG Chem as 1, 2, 3, 4, or 6 depending on whether there was no guaranteed minimum, or the minimum was based on testing at 0.3 psi, 0.7 psi, or 0.9 psi.  *Id.*  So, sales of the same product,

the Coalition asserts, could fall within multiple different codes depending on how LG Chem elected to carry out testing.  *Id.*

However, the central premise of the Coalition's argument is incorrect because LG Chem subjects its SAP products to testing based off specific customer preferences.  *See* IDM at 11 (explaining that "customers purchase SAP with expectations related to these characteristics").  As explained above, even the Coalition concedes that SAP sales "depend{} on the customer's preference for balancing."  *See* IDM at 10-11 (quoting Rebuttal Brief at 2 (P.R. 178); *see also* LG Chem Case Brief (P.R. 174) ("the classifications that LGC has proposed are the classifications . . . that are consistent with customer expectations" and "the permeability guaranteed grade customers require is increasing as compared to past sales.").  Thus, because customers have particular preferences and LG Chem conducts tests to satisfy customers' expectations and preferences, it would be difficult to manipulate testing as the Coalition has suggested.  In addition, the Coalition did not propose alternative coding for Commerce to consider with respect to these characteristics to address the Coalition's manipulation concerns.  Instead, the Coalition requested that Commerce simply ignore commercially significant physical characteristics in SAP products and not add AUP and permeability to the model match hierarchy.

The Coalition's assertion that Commerce did not address the manipulation and distortion argument in making its final determination is also unpersuasive.  Although Commerce did not expressly use the terms "manipulation" or "distortion" in discussing the model match hierarchy issue in the final determination, Commerce explained that the home market sales database suggests that LG Chem defines its SAP grades using both AUP and permeability "and that customers purchase SAP with expectations related to these characteristics."  IDM at 11.  Commerce also discussed how achieving different guaranteed levels of AUP and permeability,

completed through relevant testing, is commercially significant to downstream customers. *See*
IDM at 11 (explaining that the home market sales database suggests that LG Chem defines its
SAP grades using both AUP and permeability "and that customers purchase SAP with
expectations related to these characteristics"); *see also* IDM at 12 (explaining that "LGC uses
more advanced technologies to achieve SAP with the right balance of CRC, AUP, and
permeability"). Thus, there was a reasonably "discernable path" to conclude that Commerce
considered and addressed potential concerns of distortion or manipulation. *See NMB Singapore
Ltd. v. United States*, 557 F.3d 1316, 1321-22 (Fed. Cir. 2009) (explaining that the Court must
sustain a determination "of less than ideal clarity" where Commerce's decisional path is
reasonably discernible) (quoting *Bowman Transp. v. Ark-Best Freight Sys.*, 419 U.S. 281, 286
(1974)).

## III. Commerce Relied On Verified Data To Calculate The Dumping Margin For LG Chem

Commerce's model match determination was also in accordance with law because it
relied on verified data to calculate LG Chem's dumping margin. Commerce is required to
"verify all information relied upon in making . . . a final determination in an investigation." 19
U.S.C. § 1677m(i)(1). However, "Congress has not further defined what successful verification
under section 1677e(b) entails." *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1394 (Fed.
Cir. 1997). Therefore, the Federal Circuit has provided broad discretion to Commerce to
determine its processes when Congress is silent. *See Torrington Co. v. United States*, 68 F.3d
1347, 1351 (Fed. Cir. 1995) ("In antidumping cases, we accord substantial deference to
Commerce's statutory interpretation, as the International Trade Administration is the 'master' of
the antidumping laws"); *see also PPG Indus., Inc. v. United States*, 978 F.2d 1232, 1238 (Fed.
Cir. 1992) (Commerce has "the discretionary authority to determine the extent of investigation

and information it needs"). Thus, "Congress has implicitly delegated to Commerce the latitude

to derive verification procedures ad hoc," and the Court reviews "verification procedures

employed by Commerce in an investigation for abuse of discretion." *Micron Tech., Inc.*, 117

F.3d at 1396; s*ee also American Alloys, Inc. v. United States*, 30 F.3d 1469, 1475 (Fed. Cir.

1994) (noting that "the statute gives Commerce wide latitude in its verification procedures");

*Hercules, Inc. v. United States*, 673 F. Supp. 454, 469 (1987) ("The decision to select a particular

methodology rests solely within Commerce's sound discretion"); *Kerr–McGee Chem. Corp. v.

United States*, 739 F. Supp. 613, 628 (1990) ("Congress intended that ITA have latitude in its

verification procedures and that it not be required to comply with all requests for specific types

of investigation"). Commerce's regulations similarly grant latitude to Commerce with respect to

verification. *See* 19 C.F.R. § 351.307 ("As part of the verification, employees of the Department

will request access to all files, records, and personnel *which the Secretary considers relevant to

factual information submitted . . . .*") (emphasis added).

Commerce indicated in the verification report that it verified LG Chem's cost accounting

data, the basis of the alternative databases that reflect its proposed product characteristics. IDM

at 13 (citing LG Chem's Cost Verification Report at 10-11 (C.R. 256)). Commerce also stated in

its cost verification report that LG Chem's monthly product-specific cost of manufacturing

statement was reviewed on a product-specific basis and products are identified by certain product

codes, which identifies different physical characteristics and technical specifications. *See* LG

Chem's Cost Verification Report at 5,7 (C.R. 256). Commerce then examined the costs included

in the alternative cost database on a sample basis at verification. *See* IDM at 13 (citing LG

Chem's Cost Verification Report at 5 (C.R. 256).

Additionally, Commerce stated "{w}e reviewed the certificate of analysis for each selected sale, compared that to the information reported in the HM sales database and found no discrepancies." IDM at 13-14 (citing LG Chem's Sales Verification Report at 10-11 (C.R. 257)). These certificates contained the LG Chem proposed CONNUMs of CRC in increments of 4 g/g, AUP, and permeability. *Id.* (citing LG Chem's Sales Verification Report at Exhibits 10A-11F (C.R. 202-209)). Thus, Commerce also verified LG Chem's reporting of the alternative product characteristics on a sample basis. *See* LG Chem's Sales Verification Report at 14-15 (C.R. 257) ("We reviewed sales trace data for the HM and U.S. sales identified in Attachments 2-3 of the verification outline . . . The sales data examined included product characteristics . . . We found no discrepancies with the reported transaction-specific sales information in the reviewed sales trace data"). The Federal Circuit has held that the sampling (or "spot-checking") method, like the method Commerce used in verifying LGC, is a permissible application of its requirement. *See Micron Tech., Inc.,* 117 F.3d at 1396 ("{W}e agree with the government that the methodology of a spot check of HEI's and LGS's financial figures was reasonable. . . . {W}e decline to impose a requirement on Commerce to trace every figure it chooses to verify back to financial statements prepared in the ordinary course of business.").

Based on the foregoing, the Coalition's assertions that Commerce did not verify the relevant information is incorrect. *See* Pl. Br. at 36. Commerce explained that LG Chem's alternative database containing its preferred product characteristics is from the same accounting system that Commerce verified; it was merely placed in an alternative framework. *See* IDM at 13. Additionally, the Coalition makes the claim that Commerce did not review sales traces to determine if CRC in 4 g/g increments, AUP, or permeability were reported accurately. Pl. Br. at 36-37. However, Commerce reviewed the certificate of analysis for each selected sale, and those

certificates contained the CONNUM characteristics of CRC in increments of 4 g/g, AUP, and permeability. *See* IDM at 13-14 (citing LGC's Sales Verification Report at 10-11 (C.R. 257), and at Exhibits 10A-11F (C.R. 202-209)).

The Coalition's reliance on *Certain Coated Paper* is also unpersuasive because the unsolicited response that the respondent was arguing Commerce verified in that case differed significantly from the data Commerce verified here. *See* Pl. Br. at 34 n.4 (citing *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China*, 75 Fed. Reg. 59,217 (Dep't of Commerce Sept. 27, 2010)). Namely, the respondent there was requesting that Commerce calculate its dumping margin using its market economy methodology in a non-market economy proceeding and provided alternative sales and cost databases pursuant to this methodology. *See Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China*, 75 Fed. Reg. 59,217 (Dep't of Commerce Sept. 27, 2010) and accompanying Issues and Decision Memorandum at Comment 7. However, under the non-market economy methodology, the data included reporting of input quantities alone, whereas under the market economy methodology, the data included reporting of actual cost values. Accordingly, Commerce explained it "did not verify any part of {the respondent's} unsolicited {market economy} questionnaire response." *Id.* Regardless of the model match hierarchy devised here, Commerce would use the same data from LG Chem's accounting system; such data is merely allocated and presented in a different way depending on the model match hierarchy selected. *See* IDM at 13. And the verification reports indicate that Commerce verified LG Chem's cost accounting data, which are the basis of the alternative databases that reflect the proposed characteristics. *Id.* Thus, Commerce's determination to rely on LG Chem's alternative database that aligned with the revised model

match hierarchy is in accordance with law because Commerce relied on verified information to calculate LG Chem's dumping margin.

## IV. Commerce's Decision To Revise The Model Match Hierarchy Was Not Arbitrary, Capricious, Or An Abuse Of Discretion[3]

To determine whether an agency's decision is "arbitrary, capricious, or an abuse of discretion," the Court "look{s} for a reasoned analysis or explanation for {the} decision." *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998). Under the arbitrary and capricious standard, "a reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42 (1983). The Supreme Court has explained that the scope of the "standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* at 42-43 (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Indeed, agency action is:

> arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

---

[3] The Coalition cites to *Koyo Seiko Co. v. United States* for the proposition that agency action should be set aside if it "arbitrary, capricious, or manifestly contrary to the statute." Pl. Br. at 45. *Koyo* was reciting the standard the Court applies under *Chevron* deference. 31 F. Supp. 2d 1512, 1515 (Ct. Int'l Trade 2007). As the Court noted elsewhere in the opinion, the Court "will sustain an agency's findings, conclusions, or determinations unless they are 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Id.* at 1514. Commerce's determination withstands scrutiny under either standard and should be sustained.

*Id.* at 43.

In reiterating its model match hierarchy arguments, the Coalition also challenges that Commerce was arbitrary, capricious, and did not act in accordance with the statute in revising the model match characteristics. Pl. Br. at 45-46 (asserting that Commerce's decision is arbitrary, capricious, and plainly contrary to the statute because: (1) adopting the AUP and permeability characteristics allows a respondent to report a unique product in more than one CONNUM based on the selected test methodology for these characteristics; (2) adopting CRC ranges in increments of 4 g/g was made "without any factual basis"; and (3) Commerce found price differences among these product characteristics were commercially significant with no concrete evidence). However, as detailed above, Commerce extensively examined record evidence and concluded that modifying the model match for the Final Determination allowed for Commerce to calculate a more accurate dumping margin for the respondent in the investigation. *See* IDM at 7-14. Further, Commerce has been afforded significant deference by Congress when defining its model match methodology. *See Pesquera Mares*, 266 F.3d at 1384.

Commerce operated in accordance with law, considered important aspects of the issue, and provided a "reasoned analysis or explanation for {the} decision" that showed a "rational connection between the facts found and the choice made." *See Wheatland Tube Co.*, 161 F.3d at 1369; *see also Motor Vehicle Mfrs.*, 463 U.S. at 42. Moreover, Commerce's decision was by no means "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs.*, 463 U.S. at 43. Therefore, Commerce was not arbitrary or capricious, nor did it abuse its discretion in revising the model match hierarchy.

## CONCLUSION

For these reasons, we respectfully request that the Court deny the Coalitions' Rule 56.2 motion for judgment on the agency record and sustain Commerce's determination.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

RACHEL BOGDAN                          /s/Kyle S. Beckrich
Senior Attorney                        KYLE S. BECKRICH
U.S. Department of Commerce            Trial Attorney
Office of Chief Counsel for            Commercial Litigation Branch
Trade Enforcement and Compliance       Civil Division
1401 Constitution Avenue, NW.          U.S. Department of Justice
Washington, DC 20230-0001              P.O. Box 480
                                       Ben Franklin Station
                                       Washington, DC 20044
                                       Telephone: (202) 616-0463
                                       Email: Kyle.Beckrich@usdoj.gov

September 29, 2023                      *Attorneys for Defendant*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the Rules of this Court and the Court's scheduling order in that it contains 8,448 words, including text, footnotes, and headings.

<u>/s/Kyle S. Beckrich</u>
Kyle S. Beckrich