*NON-CONFIDENTIAL VERSION*

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE THOMAS J. AQUILINO, JR., SENIOR JUDGE

| | |
|---|---|
| THE AD HOC COALITION OF AMERICAN SAP PRODUCERS )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>LG CHEM, LTD., )<br><br>Defendant-Intervenor. ) | **NON-CONFIDENTIAL VERSION**<br><br>**Court No. 23-00010**<br><br>**Contains Business Proprietary Information removed from pages 29 and 37.** |

## LG CHEM, LTD.'S RESPONSE BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT UPON THE AGENCY RECORD

ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 942-5000
Fax: (202) 942-5999

J. David Park
Henry D. Almond
Kang Woo Lee
Gina M. Colarusso
Archana Rao P. Vasa

*Counsel to LG Chem, Ltd.*
*Defendant-Intervenor*

Eric Johnson
*Consultant to LG Chem, Ltd.*

Dated: September 29, 2023

## <u>TABLE OF CONTENTS</u>

I. **INTRODUCTION**................................................................................1

II. **STATEMENT PURSUANT TO RULE 56.2**...........................................1

  A. Administrative Determination Under Review ........................................1

  B. Issue Presented for Review .................................................................2

III. **STATEMENT OF FACTS** .................................................................2

IV. **SUMMARY OF ARGUMENT**..........................................................14

V. **STANDARD OF REVIEW** ...............................................................16

VI. **ARGUMENT** .................................................................................18

  A. Substantial Record Evidence Supports Commerce's Model Match Characteristics ....................................................................................18

    1. *Commerce has Considerable Discretion in Establishing the Model Match Hierarchy* ............................................................ 19

    2. *Commerce Supported its Chosen Model Methodology with Substantial Evidence and a Reasoned Explanation* ...................... 20

    3. *Commerce Correctly Determined that Commercially Significant Differences Exist in LGC's Proposed Model Match Methodology* .......... 26

    4. *LGC's Reported Sales and Cost Data Also Support Commerce's Model Match Characteristics* ............................................... 29

  B. Commerce Acted Lawfully When It Revisited Its Model Match Methodology ....................................................................................31

  C. There is No Basis in Plaintiff's Assertion that Commerce Relied on Unverified Alternative Cost and Sales Files to Calculate the Dumping Margin for LGC ..............................................................................34

  D. Commerce Did Not Err as Plaintiff Suggests for Incorporating LGC's Proposed Model Match Criteria...........................................................39

  E. Plaintiff Lacks Any Basis to Argue that Commerce Acted Arbitrarily and Capriciously or Otherwise Abused Its Discretion...................................44

VII. **CONCLUSION** ............................................................................47

## TABLE OF AUTHORITIES

Page(s)

**Federal Statutes and Regulations**

19 U.S.C. § 1516a(b)(1)(B)(i)..................................................................16

19 U.S.C. § 1677(16)(A)..............................................................20, 27

19 U.S.C. § 1677b(a) ...................................................................19

19 U.S.C. § 1677m(i)....................................................................39

19 C.F.R. § 351.309(c)(2)...............................................................33

**Federal Cases**

*Am. Silicon Techs. v. United States,*
    261 F.3d 1371 (Fed. Cir. 2001)....................................................18

*Atl. Sugar, Ltd. v. United States,*
    744 F.2d 1556 (Fed. Cir. 1984)..............................................16, 30

*Auer v. Robbins,*
    519 U.S. 452 (1997)..............................................................17

*Bohler Bleche GmbH & Co. KG v. United States,*
    324 F. Supp. 3d 1344 (Ct. Int'l Trade 2018) ........................... *passim*

*Bohler Bleche GmbH & Co. KG v. United States,*
    362 F. Supp. 3d 1377 (Ct. Int'l Trade 2019)........................................28

*Bowles v. Seminole Rock & Sand Co.,*
    325 U.S. 410 (1945)..............................................................17

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
    467 U.S. 837 (1984)..............................................................17

*Consol. Edison Co. of New York v. N.L.R.B.,*
    305 U.S. 197 (1938)..............................................................16

*Corus Staal BV v. United States,*
    259 F.Supp.2d 1253 (Ct. Int'l Trade 2003) ................................16, 30

*Gerritsen v. Shirai,*
    979 F.2d 1524 (Fed. Cir. 1992).............................................18, 45

*Manchester Tank & Equip. Co. v. United States*,
483 F. Supp. 3d 1309 (Ct. Int'l Trade 2020) ................................................20

*Mansato v. United States*,
698 F.Supp. 275 (Ct. Int'l Trade 1988) ................................................35, 38

*Micron Tech., Inc. v. United States*,
117 F.3d 1386 (Fed. Cir. 1997) ................................................35

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006) ................................................16, 18, 30

*Olympia Indus., Inc. v. United States*,
7 F. Supp. 2d 997 (Ct. Int'l Trade 1998) ................................................17, 30

*Pesquera Mares Australes, Ltda. v. United States*,
266 F.3d 1372 (Fed. Cir. 2001) ................................................20, 27, 43

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
659 F.3d 1142 (Fed. Cir. 2011) ................................................18, 45

*SKF USA, Inc. v. United States*,
537 F.3d 1373 (Fed. Cir. 2008) ................................................27

*Sterling Fed. Sys., Inc. v. Goldin*,
16 F.3d 1177 (Fed. Cir. 1994) ................................................17, 45

*Tokyo Kikai Seisakusho, Ltd. v. United States*,
529 F.3d 1352 (CAFC 2008) ................................................31

*Trujillo v. Gen. Elec. Co.*,
621 F.2d 1084 (10th Cir.1980) ................................................32

*Ugine and ALZ Belgium v. United States*,
551 F.3d 1339 (Fed. Cir. 2009) ................................................34

## <u>Admnistrative Determinations</u>

*Acrylonitrile-Butadiene Rubber from France: Final Affirmative Determination of
Sales at Less Than Fair Value, and Final Affirmative Determination of
Critical Circumstances, in Part; 2020-2021*, 87 Fed. Reg. 37,833 (Dept.
Comm. June 24, 2022) ................................................32

*Certain Carbon and Alloy Steel Cut-To-Length Plate From Austria: Final
Determination of Sales at Less Than Fair Value and Final Affirmative
Determination of Critical Circumstances;* 2015-2016; 82 Fed. Reg. 16,366-01
(Dept. Comm. April 4, 2017) ................................................25

*NON-CONFIDENTIAL VERSION*

*Certain Superabsorbent Polymers From the Republic of Korea: Final Determination of Sales at Less Than Fair Value*, 87 Fed. Reg. 65,035 (Dept. Comm., Oct. 27, 2022).................................................................... *passim*

*Certain Superabsorbent Polymers from the Republic of Korea: Initiation of Less-Than-Fair-Value Investigation,* 86 Fed. Reg. 67915 (Dept. Comm., Nov. 30, 2021) ...............................................................................................2, 3, 4

*Steel Propane Cylinders from Thailand: Final Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 29,168 (June 21, 2019) ..........................................................33

## I.      **INTRODUCTION**

Defendant-Intervenor LG Chem, Ltd. ("LGC") respectfully submits this response to Plaintiff, Petitioner in the underlying investigation, The Ad Hoc Coalition of American SAP Producers' Rule 56.2 Motion for Judgment on the Agency Record and accompanying memorandum in support.  *See* The Ad Hoc Coalition of American SAP Producers' Motion for Judgment on the Agency Record, July 14, 2023, ECF No. 20 ("Pet. Br.").  Plaintiff challenges certain aspects of the U.S. Department of Commerce's ("Commerce") final determination and resulting antidumping duty order in the antidumping duty ("AD") investigation of *Certain Superabsorbent Polymers from the Republic of Korea*.  Plaintiff's motion should be denied because the aspects of Commerce's determination that they seek to challenge are supported by substantial evidence and otherwise lawful.

## II.     **STATEMENT PURSUANT TO RULE 56.2**

### A.      **Administrative Determination Under Review**

The final determination at issue in this appeal is *Certain Superabsorbent Polymers From the Republic of Korea: Final Determination of Sales at Less Than Fair Value*, 87 Fed. Reg. 65,035 (Dept. Comm., Oct. 27, 2022) ("*Final Determination*") (P.R. 188), and accompanying Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Superabsorbent Polymers from the Republic of Korea, dated October 20, 2022 ("*Final IDM*") (P.R. 184); *Certain Superabsorbent Polymers From the Republic of Korea: Antidumping Duty Order*, 87 Fed. Reg. 77,794 (Dept. Comm., Dec. 20, 2022) ("Order") (P.R. 196).[1]

---

[1] All citations to the administrative record take the form "P.R.__" or "C.R.__".

B.      **Issue Presented for Review**

In its affirmative Rule 56.2 Brief, Plaintiff presents the Court with a single question for review:  Whether Commerce's model match and product characteristics determination was supported by substantial evidence and otherwise in accordance with law.  While Plaintiff presents this issue to the Court as five separate issues and questions, the Court should view the issue as a single question.

III.    <u>**STATEMENT OF FACTS**</u>

On November 30, 2021, Commerce initiated an investigation into imports of superabsorbent polymers ("SAP") from Korea, the final administrative outcome of which is at issue in this appeal.  *See Certain Superabsorbent Polymers from the Republic of Korea: Initiation of Less-Than-Fair-Value Investigation,* 86 Fed. Reg. 67915 (Dept. Comm., Nov. 30, 2021) ("*Initiation Notice*") (P.R. 34).  SAP is a synthetic polymer made from cross-linked sodium polyacrylate that can absorb and retain large volumes of liquids.  *See Final Determination* at 65,037 (P.R. 188); *see also* Petition Volume I (Nov. 2, 2021) ("Petition") at 1 (C.R. 2, P.R. 2).  SAP can take the form of granules, pellets, powder fibers, flakes, liquids, or gel. *Final Determination* at 65,037 (P.R. 188).  SAP products can also incorporate additives for anticaking, anti-odor, and other similar purposes.  *Id.*  SAP is primarily used in downstream hygiene products that require fluid absorption, including baby diapers, and, to a lesser extent, other personal products whose principal function is to absorb fluids.  On December 21, 2021, Commerce selected LGC, a Korean manufacturer of SAP products, as the sole mandatory respondent in its investigation of SAP from Korea.  *See* Commerce Memorandum "Less-Than-Fair-Value Investigation of Superabsorbent Polymers from the Republic of Korea: Respondent Selection" (Dec. 21, 2021) (C.R. 23, P.R. 47).

*NON-CONFIDENTIAL VERSION*

In its *Initiation Notice*, Commerce notified parties of an opportunity to comment on the appropriate physical characteristics of SAP to be reported in response to Commerce's initial questionnaire and used to group and compare subject SAP products.  *See Initiation Notice* at 67,916 (P.R. 34).  Specifically, as part of Commerce's standard practice in market economy antidumping cases, Commerce establishes a uniform hierarchy of physical characteristics to group and identify products (this framework is generally referred to as the "model match" hierarchy or methodology).  Respondent companies report details on the physical characteristics of each variant of the subject merchandise sold in the home and U.S. markets, and report a code for each characteristic, combining those characteristic codes into a concatenated code accounting for each of the physical characteristics in what is known as the "Control Number" or "CONNUM."

In the initial questionnaire, Commerce identifies the most commercially significant product characteristics for the purpose of establishing a "model match" methodology.  Applying this methodology, Commerce groups various products that are subject to its investigation into subgroups of identical products, or products with very minor commercial differences.  In other words, products that are grouped together within the same CONNUM should not have commercially significant differences.  Each group of identical products is assigned a control number (known as a "CONNUM").  *See Bohler Bleche GmbH & Co. KG v. United States*, 324 F. Supp. 3d 1344, 1347 (Ct. Int'l Trade 2018) ("*Bohler I*").

In terms of the relevance of these CONNUM codes, Commerce views products within the same CONNUM to be identical products for purposes of price comparisons between foreign-like products and products sold in the United States.  That is, Commerce's calculations seek to compare the U.S. price of a sale of a particular CONNUM to the companion home market price

of the same CONNUM.  Absent "matches" of the same CONNUM, Commerce's calculations seek to compare the U.S. price to the most similar available home market CONNUM, and failing that, Commerce compares the U.S. price to the constructed value of that particular CONNUM.

In response to Commerce's request set forth in the *Initiation Notice*, interested parties, including both LGC and Plaintiff, submitted extensive affirmative and rebuttal comments on the physical characteristics of SAP that Commerce should consider in establishing its model match hierarchy.  Korean SAP producer Sumitomo Seika Polymers Korea Co., Ltd. ("SSPK") also submitted rebuttal model match comments after requesting that Commerce treat SSPK as a voluntary respondent in Commerce's investigation.  *See* Letter from SSPK to Commerce, "SSPK's Rebuttal Comments on Model Match Characteristics" (Dec. 23, 2021) ("SSPK's Rebuttal Model Match Comments") (P.R. 53); Letter from SSPK to Commerce, "SSPK's Request for Voluntary Respondent Treatment" (Dec. 23, 2021) (P.R. 52).  While SSPK voluntarily submitted preliminary information on its organization, accounting practices, markets, and merchandise in its Section A Response, *see* SSPK's Section A Response (Jan. 19, 2022) (C.R. 24-27; P.R. 67-70).  Shortly after submitting its Section A response and before providing any cost or sales data in a Sections B-D response, SSPK withdrew its request to participate as a voluntary respondent.  *See* Letter from SSPK to Commerce, "Withdrawal of SSPK's Request for Voluntary Respondent Treatment" (Jan. 25, 2022) (P.R. 91).  Thereafter, SSPK did not participate in Commerce's investigation.

In particular, LGC filed detailed comments explaining that SAP has three commercially meaningful product characteristics that Commerce should take into account within its model match methodology.  *See* Letter from LGC to Commerce, "LGC's Comments on Model Match Product Characteristics" (Dec. 13, 2021) ("LGC's Affirmative Model Match Comments") at 2

(P.R. 43).  The first is Centrifugal Retention Capacity ("CRC"), which both Plaintiff and LGC

agreed was "{t}he first and most important criterion for distinguishing SAP products" during the

underlying investigation.  *Id*. at 2.  CRC measures a SAP product's ability to hold liquid and is

accordingly a determinative characteristic in SAP's downstream use in diapers and other hygiene

products.  CRC is measured in grams per gram (*i.e.*, "g/g") and measures the amount (in grams)

of 0.9% saline (*i.e.*, NaCl) solution that each gram of SAP can retain.  *Id*. *See also* Letter from

Petitioner to Commerce, "Petitioner's Comments on Model Match Product Characteristics"

(Dec. 13, 2021) ("Petitioner's Affirmative Model Match Comments") at 1 (P.R. 42).  In its

comments, LGC recommended that Commerce establish minimum specified CRC ranges of 4

g/g, a proposal that was based on traditional classifications in the market that account for

significant commercial differences between CRC grades.  LGC suggested that each range (*i.e.*,

numbers 1, 2, 3, etc. listed below) group products within a 4 g/g range, as follows:

> 1 = No minimum guarantee or minimum guaranteed CRC less than 26 g/g;
> 2 = Minimum guaranteed CRC equal to or more than 26 g/g and less than 30 g/g;
> 3 = Minimum guaranteed CRC equal to or more than 30 g/g and less than 34 g/g;
> 4 = Minimum guaranteed CRC equal to or more than 34 g/g and less than 38 g/g;
> 5 = Minimum guaranteed CRC equal to or more than 38 g/g

LGC's Affirmative Model Match Comments at 3 (P.R. 43) (the "g/g," or gram per gram,

indicates the weight of water that each gram of SAP can retain; for example, one gram of SAP

with a 26 g/g rating could retain 26 grams of water).  Plaintiff proposed that Commerce measure

CRC in just three broader 6 g/g increments to essentially identify SAP as "low," "intermediate,"

and "high" CRC capacity grades as follows:

> 1 = CRC of less than 30 g/g;
> 2 = Minimum CRC equal to or more than 30 g/g and less than 36 g/g; and
> 3 = Minimum CRC equal to or more than 36 g/g.

Petitioner's Affirmative Model Match Comments at 1-2 (P.R. 42).

Plaintiff's proposal at this stage of Commerce's investigation differed from what the domestic U.S. industry proposed in the Petition for purposes of the International Trade Commission's ("ITC") parallel injury analysis. *See* Petition at 18 (C.R. 2, P.R. 2); *see also* Letter from LGC to Commerce, "LGC's Rebuttal Comments on Model Match Product Characteristics" (Dec. 23, 2021) ("LGC's Rebuttal Model Match Comments")" at 5 (P.R. 54). In contrast, in the ITC investigation, the domestic industry requested pricing data for three separate products with CRC ranges between (1) 27-33 g/g; (2) 34-42 g/g; and (3) 26-33 g/g. *See* Petition at 18 (C.R. 2, P.R. 2). These three products, which were presented to the ITC as distinct "representative SAP products," would all fall under the same CONNUM (and thus be considered identical products) under Plaintiff's proposed model match in the antidumping proceedings before Commerce. Overall, Plaintiff argued that Commerce should consider CRC to be the only noteworthy physical characteristic of SAP, an approach that treated as identical various SAP products that Petitioner itself marketed as commercially distinct. *See* LGC's Rebuttal Model Match Comments at 4, n. 5, and Attachment 1 at pages 5 and 9 (P.R. 54) (providing Petitioner BASF's marketing materials, which demonstrate that BASF markets two products as commercially distinct that would be considered identical under Plaintiff's preferred model match).

In its initial model match comments, LGC also explained that "{t}he second-most important physical criterion for SAP is its absorbency under pressure," known as "AUP." *See* LGC's Affirmative Model Match Comments at 4 (P.R. 42). AUP is critical to downstream products' ability to withstand pressure as a wearer moves. Thus, for example, diapers are worn and therefore subjected to a relatively greater pressure, which means the SAP in diapers often requires a higher AUP. *Id.* Like CRC, AUP is also measured in grams per gram ("g/g"). In the case of AUP, the specified g/g minimum is the amount of saline (NaCl) solution that is retained

*NON-CONFIDENTIAL VERSION*

per gram of SAP for one hour under constant pressure.  In line with "{t}raditional standards within the hygienic sector," LGC proposed that Commerce's model match measure AUP as follows:

    1 = No minimum guarantee
    2 = Minimum guaranteed AUP (0.3psi) less than 15 g/g
    3 = Minimum guaranteed AUP (0.3psi) equal to or more than 15 g/g
    4 = Minimum guaranteed AUP (0.7psi) less than 15 g/g
    5 = Minimum guaranteed AUP (0.7psi) equal to or more than 15 g/g
    6 = Minimum guaranteed AUL (0.9psi) less than 15 g/g
    7 = Minimum guaranteed AUL (0.9psi) equal to or more than 15 g/g

Finally, LGC proposed that Commerce include permeability, a third key physical characteristic, in its model match.  Permeability refers to the ability with which liquid passes between SAP particles and the measurement "g/g" also refers to the weight of water that each gram of SAP can retain.  *Id.* at 5.  LGC explained that this characteristic is important to consider because a higher permeability corresponds to greater overall usage of SAP particles included in the final product, which overall impacts the degree of effectiveness of the final downstream product in absorbing and retaining liquid.  *Id.*  Permeability is measured as the degree of saline solution passing through the top-most SAP layer when liquid is poured from above, after applying a certain pressure to sufficiently swollen SAP in a specific type of container for one hour.  *Id.*  Generally, customers require minimum guarantees for permeability under different types of conditions, which were reflected in LGC's proposed ranges of permeability as follows:

    1 = No minimum guarantee
    2 = Minimum guaranteed Gel Bed Permeability ("GBP") less than 40 (u.o.m. =
        Darcy ($10^{-8}$cm$^2$))
    3 = Minimum guaranteed GBP equal to or more than 40 (Darcy($10^{-8}$cm$^2$))
    4 = Minimum guaranteed Gel Permeability Under Pressure ("GPUP") or Saline Flow
        Conductivity ("SFC") less than 15 ($10^{-7}$ cm$^3$sec/g)
    5 = Minimum guaranteed GPUP or SFC equal to or more than 15 ($10^{-7}$ cm$^3$sec/g)
    6 = Minimum guaranteed Permeability Dependent Absorbency Under Pressure
        ("PDAUP") less than 10 (g/g)

7 = Minimum guaranteed PDAUP equal to or more than 10 (g/g)

*Id*. at 6.[2]

LGC proposed that Commerce incorporate AUP and permeability within its model match to promote greater accuracy in Commerce's dumping calculations, as these commercially meaningful characteristics have impacts on the effectiveness of downstream products and on customer preferences. *Id*. LGC further supplemented its alternative model match proposal in rebuttal model match comments, in which LGC supported its position that Plaintiff's proposal to consider only one product characteristic (CRC) measured in broad increments (6 g/g) would result in Commerce grouping products with significant commercial difference into a single CONNUM, therefore erroneously considering such products identical for the purposes of Commerce's dumping analysis. Specifically, LGC supplied record evidence showing that both LGC's and Plaintiff's marketing materials emphasize the importance of both AUP and permeability as key physical properties with an impact on the efficacy of downstream products such as diapers. *See* LGC's Rebuttal Model Match Comments at 7, Attachments 1-3 (P.R. 54-55).

Key personnel representing Plaintiff in parallel proceedings before the ITC also identified AUP and permeability as important performance parameters of SAP, particularly with respect to the balance of CRC, AUP, and permeability. *Id*. at 9, and Attachment 6 at p. 101:9-13 (P.R. 54-55) (testimony from Petitioner's representative noting that the "key performance parameters" of SAP included CRC, AUP, and permeability). Indeed, in its rebuttal model match comments, Plaintiff acknowledged that a "customer's preference" will depend upon "balancing" CRC, AUP,

---

[2] GBP is a measurement under which no pressure is placed on the SAP in the swelling stage. GPUP and SFC are measurements under which 0.3 psi pressure is placed on the SAP in the swelling stage. Finally, PDAUP is a measurement under which 0.7 psi pressure is placed on the SAP in the swelling stage. *See* LGC's Affirmative Model Match Comments at 6 (P.R. 42).

and permeability.  *See* Letter from Petitioner to Commerce, "Petitioner's Rebuttal Comments on Model Match Characteristics" (Dec. 23, 2021) ("Petitioner's Rebuttal Model Match Comments") at 4 (P.R. 49).

On January 21, 2022, Commerce issued a three-page memorandum establishing the initial model match in the investigation, which contained only a single characteristic CRC, measured in the 6 g/g ranges proposed by Plaintiff in its affirmative model match comments (*i.e.*, 1 = <30 g/g; 2 = ≥ 30 g/g but < 36 g/g; and 3 = ≥ 36 g/g).  Commerce did not address any of the specific arguments either LGC or Plaintiff had raised.  *See* Department Memorandum "Less-Than-Fair-Value Investigation of Certain Superabsorbent Polymers from the Republic of Korea: Product Characteristics Hierarchy" (Jan. 21, 2022) ("Commerce's Initial Model Match Hierarchy") (P.R. 89).

Following the establishment of Commerce's initial product characteristics hierarchy for the purposes of collecting information through the initial questionnaire, LGC continued to advocate, first, that Commerce should establish minimum specified CRC ranges of 4 g/g within its model match methodology, and second, that Commerce's model match was incomplete without accounting for AUP and permeability.  Specifically, LGC requested again that Commerce revisit the product characteristics and CONNUM issue based on the record evidence developed throughout the proceeding, given LGC's observation that it was "unaware of any other case" adopting just three CONNUMs since Commerce adopted the practice of establishing product characteristics through its current model match methodology.  *See* Letter from LGC to Commerce, "LGC's Request for Reconsideration of Model Match Determination" (Jan. 28, 2022) ("LGC's Model Match Reconsideration Request") at 2 (C.R. 53, P.R. 93).  In its submission, LGC continued to supplement the record with information supporting its position

that CRC should be measured in narrower 4 g/g increments and that AUP and permeability were commercially significant and thus important to include in Commerce's model match.  *See generally id*.  Plaintiff opposed LGC's request.  *See* Petitioner's Response to LGC's Request for Reconsideration of the Model Match Determination (Jan. 31, 2022) ("Petitioner's Response to LGC's Model Match Reconsideration Request") (P.R. 94).

However, in compliance with Commerce's instructions, LGC reported its sales and cost data in accordance with Commerce's initially established model match.  *See* LGC's Section B Response (Feb. 11, 2022) ("LGC's Section B Response") at B-10-B-12 (C.R. 98, P.R. 97); LGC's Section C Response (Feb. 11, 2022) ("LGC's  Section C Response") at C-8-C-10 (C.R. 100, P.R. 97); and LGC's Section D Response (Feb. 11, 2022) ("LGC's Section D Response") at D-41-43 (C.R. 105, P.R. 97).  LGC nonetheless also provided for Commerce's consideration comprehensive sales and cost data applying the model match criteria outlined in LGC's affirmative model match comments (*i.e.*, measuring CRC in increments of 4 g/g and including AUP and permeability as key physical characteristics).  *Id*.  After responding to each of Commerce's questionnaires, LGC provided comments summarizing all of the necessary record evidence and sales and cost data available for Commerce's review and model match determination.  *See generally* Letter from LGC to Commerce, "LGC's Pre-Preliminary Comments" (May 13, 2022) ("LGC's Pre-Preliminary Comments") (C.R. 178, P.R. 142).

In its *Preliminary Determination*, Commerce continued to apply the model match initially proposed by Plaintiff in its affirmative model match comments and in Commerce's initial product characteristics hierarchy.  Again, this model match considered CRC, measured in 6 g/g ranges, to be the only commercially significant product characteristic of SAP.  As a result, Commerce only established three CONNUMs, in effect identifying just three possible SAP

products out of the range of possible SAP products described above.  Commerce did not address

any of LGC's arguments or the extensive evidence placed on the record within the two

paragraphs dedicated to discussing model match product comparisons within its *Preliminary*

*Determination*.  *See* Commerce Memorandum, Decision Memorandum for the Preliminary

Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Superabsorbent

Polymers from the Republic of Korea (May 31, 2022) ("Prelim. IDM") at 7-8 (P.R. 150).

Indeed, Commerce simply stated that it had selected a single characteristic, CRC, to serve as the

sole basis for product comparisons between different SAP products.  *Id*.  Indeed, Commerce did

not comment on the CRC ranges it applied, nor did it offer any explanation as to why it

continued to exclude AUP and permeability.

Following its *Preliminary Determination*, Commerce verified LGC's reported sales and

cost data.  *See* Commerce Memorandum "Verification of the Cost Response of LG Chem, Ltd. in

the Antidumping Duty Investigation of Certain Superabsorbent Polymers from the Republic of

Korea" (Aug. 29, 2022) ("Cost Verification Report") (C.R. 256, P.R. 171); Commerce

Memorandum "Verification of the Sales Response of LG Chem, Ltd. in the Antidumping Duty

Investigation of Certain Superabsorbent Polymers from the Republic of Korea" (Sept. 1, 2022)

("Sales Verification Report") at (C.R. 257, P.R. 173).  Following a complete verification of

LGC's reported sales and cost data, Commerce provided interested parties an opportunity to

comment on any issues relevant to the final determination.  S*ee* Commerce Memorandum

"Decision Memorandum for the Final Determination in the Less-Than-Fair-Value Investigation

of Certain Superabsorbent Polymers from the Republic of Korea" (Oct. 19, 2022) ("*Final IDM*")

at 9 (P.R. 184).

LGC continued to request that Commerce revise its model match in accordance with LGC's proposals at length within its case brief, underscoring that SAP is a complex product that requires more detailed product characteristic information within Commerce's model match to yield more accurate product comparisons and thus more accurate dumping calculations. LGC's Sept. 8, 2022 Case Brief and Request for Closed Hearing ("LGC Case Br.") at 4-25 (C.R. 258, P.R. 174). In addition to identifying the specific record evidence related to each of LGC's alternate model match proposals related to CRC, AUP, and permeability, LGC urged Commerce to consider all evidence available to it and use its established authority to make necessary revisions to capture all meaningful product characteristics within its model match methodology. *Id*. (C.R. 258, P.R. 174). LGC also provided two new analyses based on existing record information showing wide price variations among its proposed model match as compared to Plaintiff's model match proposal, which Commerce preliminarily adopted. *Final IDM* at 9 (P.R. 184); LGC Case Br. at 20-21 (C.R. 258, P.R. 174). Plaintiff subsequently submitted a rebuttal brief addressing model match issues. Petitioner's Sept. 18, 2022 Rebuttal Brief (C.R. 259, P.R. 178). On October 5, 2022, Plaintiff and LGC discussed these model match issues in a public hearing before Commerce. *See* Transcript, Public Hearing in the Matter of: the Anti-Dumping Duty Investigation of Superabsorbent Polymers from South Korea (Oct. 5, 2022) (P.R. 180).

Relying upon extensive record information supplied by interested parties, including both LGC and Plaintiff, Commerce issued its *Final Determination* on October 27, 2022, addressing relevant arguments raised by both LGC and Plaintiff during the investigation. In its *Final Determination*, Commerce noted that "throughout this investigation, LGC has disagreed with {Commerce's model match} reporting requirements" and provided the necessary "alternative sales and cost databases" and product characteristic data. *Final IDM* at 3 (P.R. 184). After

completing a review of all available record evidence and carefully "weigh{ing} the totality of the evidence," Commerce ultimately agreed with LGC's proposed model match, and included AUP and permeability as physical characteristics relevant to Commerce's margin calculations. *Id*. at 7 (P.R. 184). Commerce also agreed that "CRC should be measured in 4 g/g increments instead of g/g increments." *Id*.

In the *Final Determination*, Commerce supported its model match determination at length, considering all relevant arguments raised by Plaintiff and LGC during the course of the investigation, and summarizing and citing all relevant model match submissions. Commerce also described its analysis of the ample record evidence LGC and Plaintiff provided throughout the investigation, including price and cost analysis and supporting documentation provided in LGC's case brief and rebuttal model match comments. In particular, Commerce found that LGC's analysis was supported by record evidence demonstrating meaningful commercial differences between products that Commerce had preliminarily determined were identical under Plaintiff's proposed model match. *Id*. at 10-12 (P.R. 184). To support this conclusion, Commerce not only assessed the price and cost analyses provided by LGC, but also performed its own independent analysis of LGC's reported costs, noting that {p}rice and cost differences alone are an insufficient basis to change {its} model matching methodology." *Id.* at 9.

Thus, to fully address arguments raised by both LGC and Plaintiff, and to explain its reasoning, Commerce also described the agency's model match practice at length. *See Final IDM* at 9-10 (P.R. 184). Commerce also addressed its broad discretion conferred by statute and confirmed by this Court and the Court of Appeals for the Federal Circuit to not only establish product comparisons though its model match methodology, but to alter its model match as necessary within the final determination. *Id.* at 8. Finally, Commerce addressed the concern

Plaintiff raised in its rebuttal brief that Commerce had not verified LGC's reported alternative

cost and sales data, confirming that Commerce had indeed "verified LGC's reporting of the

alternative product characteristics on a sample basis." *Id*. at 13-14. Following Commerce's

*Final Determination*, Plaintiff filed the instant appeal.

## IV.    **SUMMARY OF ARGUMENT**

Plaintiff raises a single issue for the Court's consideration—whether Commerce's model

match hierarchy and control number established in the investigation were supported by

substantial record evidence and in accordance with law. Despite raising but a single issue,

Plaintiff casts the argument as five distinct arguments at Sections VI.A through VI.E of its Rule

56.2 Brief. The Court should view the issue as a single, straightforward question of whether the

agency supported its determination with substantial evidence and did so in accordance with law.

On that basis, the record is clear that Commerce's determination was supported, lawful, and

reasonable. The Court should therefore sustain Commerce's determination without remand.

With respect to the record evidence supporting Commerce's decision, as discussed in

Section VI.A of this brief, Commerce developed a fulsome record regarding the product, its

physical characteristics, and the market differentiators that justify classifying SAP using multiple

product characteristics. In its *Final Determination*, Commerce fully explained its reasoning with

reference to record facts. Commerce fully discharged its duties to gather and evaluate the facts,

and as the expert fact finder, this Court should not disturb Commerce's determination.

Regarding Plaintiff's principal claim that Commerce's determination was contrary to law,

at Section IV.B, Plaintiff essentially argues that Commerce was bound by its initial model match

determination and could not alter that decision later in the case. Of course, there is no legal

precedent that would so severely handcuff Commerce in it reaching its decisions, and the Court

should find that it was within Commerce's discretion to modify its determination in the *Final*

*Determination* to account for product characteristics that Commerce itself determined were significant and appropriate to include in the control number.  Moreover, regarding Plaintiff's claim that Commerce did not adequately explain its rationale, Plaintiff overlooks Commerce's detailed seven-page explanation and analysis in the *Final Determination*.  In short, Commerce satisfied its obligation to support and explain its decision.

At Section IV.C, Plaintiff also claims that Commerce impermissibly relied on unverified data.  This line of reasoning not only ignores the broad discretion afforded to the agency in tailoring its verification procedures, but also ignores the fact that Commerce did verify LGC's reported product characteristic data, including the data presented on the basis of the control number Commerce used in the Final Determination.  Petitioner's claim that the data was unverified is therefore baseless and does not justify the Court remanding the issue to Commerce for further consideration.

With respect to Plaintiff's argument at Section IV.D of its brief, that Commerce did not adequately remedy or address purported manipulation concerns, this is essentially a question of policy rather than law or fact.  Moreover, Plaintiff's concerns about potential manipulation are misplaced, as LGC's proposed control number incorporated commercially significant product characteristics, based on the actual products sold, actual testing requirements demanded by LGC's customers, and actual testing parameters and results.  These commercially significant factors cannot be subject to manipulation, consistent with Commerce's standard aim of applying a control number that accounts for the key commercially significant characteristics of the product at issue.

Finally, at Section IV.E, Plaintiff rehashes elements of the arguments presented at Sections IV.A through IV.D and presents them not as a question of substantial evidence or

consistency with law, but instead claims that the same considerations amount to an arbitrary and capricious abuse of discretion. This is a heavy allegation to direct towards Commerce, but there is nothing in the record or case law to indicate that Commerce's reasoned analysis of the facts and considerations in this case rise to this level. The Court should disregard this claim and simply find that the agency's decision was supported by substantial record evidence and in accordance with law.

## V.    STANDARD OF REVIEW

The Court will hold Commerce's determinations unlawful in an antidumping duty proceeding where they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938). The substantial evidence standard of review essentially asks whether, given the evidence on the record as a whole, the agency's conclusion was reasonable. *See Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006). As Commerce ultimately bears the responsibility of weighing the evidence and the Court may not substitute its judgment for that of the agency. *See Corus Staal BV v. United States,* 259 F.Supp.2d 1253, 1260 (Ct. Int'l Trade 2003). Even if there is some evidence that detracts from the agency's conclusions, the Court need only determine whether Commerce's conclusions are substantially supported by the record. *See, e.g., Atl. Sugar, Ltd. v. United States,* 744 F.2d 1556, 1563 (Fed. Cir. 1984); *Olympia Indus., Inc. v. United States,* 7 F. Supp. 2d 997, 1000 (Ct. Int'l Trade 1998).

Commerce acts contrary to law where it acts arbitrarily or based on an impermissible interpretation of its statutory authority. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837, 842–43 (1984). When reviewing Commerce's interpretation of the antidumping

*NON-CONFIDENTIAL VERSION*

statute, the Court first determines "whether Congress has directly spoken on the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the {C}ourt, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Id.*  Where, on the other hand, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Id.* at 843.

As the Federal Circuit has explained, where "the statute's text does not explicitly address the precise question, {the Court does} not at that point simply defer to the agency.  {The Court's} search for Congress's intent must be more thorough than that."  *Id*. at 882.  "Beyond the statute's text, those tools include the statute's structure, canons of statutory construction, and legislative history."  *Id*. (citation omitted).  Further, the Court will not uphold Commerce's interpretation of its regulations if the interpretation is "plainly erroneous or inconsistent with the regulation."  *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945); *see also Auer v. Robbins*, 519 U.S. 452, 461 (1997).

When reviewing an agency decision for abuse of discretion, the Court examines whether the decision: "1) is clearly unreasonable, arbitrary or fanciful; 2) is based on an erroneous conclusion of law; 3) rests on clearly erroneous fact findings; or 4) follows from a record that contains no evidence on which the {agency} could rationally base its decision."  *Sterling Fed. Sys., Inc. v. Goldin*, 16 F.3d 1177, 1182 (Fed. Cir. 1994) (quoting *Gerritsen v. Shirai*, 979 F.2d 1524, 1529 (Fed. Cir. 1992)); *see also Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1147–48 (Fed. Cir. 2011) (noting that "{a} clear error of judgment occurs when" an agency action is "arbitrary, fanciful, or clearly unreasonable.").

VI.    <u>ARGUMENT</u>

A.    **Substantial Record Evidence Supports Commerce's Model Match Characteristics**

The crux of Plaintiff's argument is that because the record evidence does not support Commerce's determination that there are commercially significant differences among the physical characteristics used in Commerce's model match hierarchy, Commerce's chosen model hierarchy in the *Final Determination* is not supported by substantial evidence. *See* Pet. Br. at 16. Plaintiff presents what appears to be a single issue as five separate counts alleging that Commerce's determination was not supported by substantial evidence or otherwise not in accordance with law. Plaintiff also asserts without any additional substantial arguments that Commerce's determination was arbitrary and an abuse of discretion. *See id*. at 45.

As LGC demonstrates in this brief, substantial record evidence supports Commerce's model match methodology. Commerce as the expert fact finder evaluated the extensive record developed in the underlying investigation and fully explained its rationale for its chosen model match methodology. "Even if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent {Commerce's} determination from being supported by substantial evidence." *Nippon Steel*, 458 F.3d at 1358 (quoting *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001)).

Furthermore, Commerce did not deviate from its established practice as Plaintiff suggests when Commerce revised its model match characteristics in the *Final Determination*. *See* Pet. Br. at 29. It was well within Commerce's discretion to determine the appropriate model match characteristics, and, in fact, Commerce precedent confirms that it can and does revisit the model matching hierarchy and definition of CONNUMs as late as in the final determination as long as substantial record evidence supports Commerce's decision.

Record evidence also does not support Plaintiff's assertion that Commerce's chosen model match methodology introduces a substantial risk of distortion and manipulation into Commerce's dumping margin analysis.  Commerce's methodology captures meaningful physical characteristics that are widely recognized as the industry standards for the SAP products at issue, as Commerce found in the *Final Determination*.  The mere fact that Commerce's chosen model match methodology results in a lower antidumping margin, without more, cannot constitute substantial evidence of manipulation.  To the contrary, Commerce's methodology incorporates physical characteristics that are significant from a commercial perspective and including them was necessary to promote greater accuracy in Commerce's margin calculations.

In the *Final Determination*, Commerce fully explained its rationale for its chosen model match methodology citing to the extensive record developed in the underlying investigation, including comments and supporting documents it received from all interested parties, reports from its verification of LGC's sales and cost data, and written arguments from interested parties. Plaintiff's argument that "there is not substantial evidence on the record to support {Commerce}'s determination" is therefore simply baseless.

1.     *Commerce has Considerable Discretion in Establishing the Model Match Hierarchy*

The statute requires Commerce to conduct a "fair comparison" between normal value and export price or constructed export price for its dumping margin analysis.  19 U.S.C. § 1677b(a). Commerce is to calculate normal value based on the adjusted price of the foreign like product, which the statute defines as "{t}he subject merchandise and other merchandise which is identical in physical characteristics."  19 U.S.C. § 1677(16)(A).  Commerce interprets the word "identical" to mean the same with minor differences in physical characteristics that are commercially insignificant.  *See Final IDM* at 8 (P.R. 184) (citing *Pesquera Mares Australes,*

*Ltda. v. United States*, 266 F.3d 1372, 1384 (Fed. Cir. 2001)).  Whether a minor difference is commercially significant "is determined on a case-by-case basis, but at the very last it is a feature that is recognized in the broader industry of the subject merchandise."  *Bohler I*, 324 F. Supp. 3d at 1349.

To make this comparison, Commerce employs a "model match" methodology.  This methodology first identifies a hierarchy of characteristics, variations in which result in commercially significant differences within products.  Commerce applies this hierarchy to group "identical" products and assigns each group a control number (known as a CONNUM).  *Id.* at 1347.  Based on these CONNUM groupings, Commerce can then match home market sales of foreign like product with U.S. sales.  *Id.*

This Court held that, "where Commerce develops a model-match methodology {*i.e.,* how to identify identical or similar merchandise} in an investigation, it is afforded 'considerable discretion' and need only support the methodology with substantial evidence and a reasoned explanation."  *See Manchester Tank & Equip. Co. v. United States*, 483 F. Supp. 3d 1309, 1316 (Ct. Int'l Trade 2020) (citing *Bohler I*).

### 2.   *Commerce Supported its Chosen Model Methodology with Substantial Evidence and a Reasoned Explanation*

Plaintiff does not dispute the fact that Commerce has discretion in establishing the model match hierarchy or that Commerce's determination with respect to its model match methodology is a fact-intensive inquiry.  *See* Pet. Br. at 16.  However, Plaintiff takes issue with Commerce's determination because Plaintiff claims it was based on "suggestion and inference from a sparse record."  *Id.* at 16.  Plaintiff misconstrues the record facts and Commerce's determination.

Commerce solicited and received extensive comments from all interested parties and reached a reasoned conclusion with respect to its chosen model match methodology.  Commerce

dedicated fourteen pages of its forty-page memorandum summarizing interested parties' arguments and explaining the basis of its model match determination. The record evidence forming the basis of Commerce's determination is far from being "sparse" as Plaintiff suggests.

At the outset of the investigation, Commerce solicited comments on the appropriate physical characteristics of SAP reported in response to Commerce's initial questionnaire. Initiation Notice at 67,916 (P.R. 34). Interested parties timely filed comments, specifying the characteristics that each viewed as significant from a commercial and cost perspective in defining particular models of SAP. *See* LGC's Affirmative Model Match Comments (P.R. 43); Petitioner's Affirmative Model Match Comments (P.R. 42); LGC's Rebuttal Model Match Comments (P.R. 54); and Petitioner's Rebuttal Model Match Comments (P.R. 49).

Upon receipt and review of these comments, Commerce issued a memorandum establishing the initial model match, which contained only a single characteristic, centrifugal retention capacity ("CRC"), which Commerce described as "the amount of saline solution . . . that the SAP can retain under free swelling conditions when surface water has been removed in a centrifuge." Commerce's Initial Model Match Hierarchy at 3 (P.R. 89). Plaintiff contended that consideration of a single characteristic in Commerce's model match is sufficient to capture physical characteristics of SAP and proposed a range of 6 g/g to categorize each type of SAP product (*i.e.,* 1 = <30 g/g; 2 = ≥ 30 g/g but < 36 g/g; and 3 = ≥ 36 g/g). Petitioner's Affirmative Model Match Comments") at 2 (P.R. 42); Petitioner's Rebuttal Model Match Comments at 6 (P.R. 49). While LGC in its comments agreed that CRC is the most important product characteristic, LGC proposed a model match that included additional characteristics, which LGC argued accounted for additional commercially significant differences and attributes of different

grades of SAP. *See generally* LGC's Affirmative Model Match Comments (P.R. 43); LGC's

Rebuttal Model Match Comments (P.R. 54).

In particular, LGC argued that Plaintiff's proposal was overly broad and essentially

treated SAP as a homogeneous product that comes in three forms: high, medium, and low. *See*

LGC's Rebuttal Model Match Comments" at 3 (P.R. 54); LGC Case Br. at 9 (C.R. 258, P.R. 174).

*See also* Pet. Br. at 3 ("Plaintiff proposed that the model match hierarchy consist of the physical

characteristics CRC broken out into "low," "intermediate," and "high" capacity ranges.").

Because the CRC of a SAP product corresponds directly to the absorbency of diapers and other

finished products using SAP, Plaintiff's proposal did not account for the fact that even a slight

difference in CRC can have commercially meaningful differences between different grades of

SAP products. Under Plaintiff's proposal, commercially significant differences would exist

among products falling under the same category (and, hence, the same CONNUM, where there is

but one characteristic constituting the CONNUM).

For instance, BASF Corporation's (a member of Plaintiff Ad Hoc Coalition of American

SAP Producers) marketing materials emphasized that one product is meaningfully distinct from

another product due to a ten percent improvement in CRC and results in a seven percent

improvement of the downstream diaper product. LGC's Rebuttal Model Match Comments at 4

and Attachment 1 (P.R. 54); LGC Case Br. at 10 (C.R. 258, P.R. 174). In other words, assuming

the CRC of these products fell within a range from 30 to 40 g/g, a ten percent improvement

would not exceed 4 g/g. *Id.* In distinguishing its own products by such a small change in CRC,

Plaintiff itself demonstrates that a ten percent difference has a commercially meaningful impact

on physical characteristics and performance. In fact, the ranges Plaintiff proposed would include

products with as much as a twenty percent range of CRC within the same group (*i.e.*, > 30 g/g

but < 36 g/g).  LGC Case Br. at 11 (C.R. 258, P.R. 174).  Such a range is significantly broader

than what is recognized as commercially significant on the market, even by Plaintiff's own

standards.

Further, Plaintiff's proposal was inconsistent with what the domestic U.S. industry

proffered in the Petition for purposes of the ITC's injury analysis.  Specifically, in parallel ITC

injury investigation, the domestic industry requested pricing data for three separate products with

CRC ranges between (1) 27-33 g/g; (2) 34-42 g/g; and (3) 26-33 g/g.  *See* LGC's Rebuttal Model

Match Comments at 5 (P.R. 54); and Petition at 18 (C.R. 2, P.R. 2).  These proposed CRC ranges,

which purport to capture three different "representative SAP products," all overlap within the

same CONNUM (*i.e.*, 30-36 g/g) in Plaintiff's proposal.  Plaintiff's claim that three

categorization levels are sufficient reduces the entire scope of SAP products to only three

categories and is inconsistent with its suggested categorization of the same products in the

parallel ITC proceeding.  LGC's own data, as further discussed in section VI.A.4 below,

indicated that there are significant price differences *within* single CONNUM categories.

In addition, Plaintiff's proposed model match characteristics omitted two key

characteristics—absorbency under pressure and permeability.  Absorbency under pressure,

known within the industry as "AUP" is a trait that is generally inversely related to CRC.  In other

words, SAP with a high CRC may have high AUP, and conversely, SAP with a low CRC may

also have a low AUP.  LGC's Affirmative Model Match Comments at 4 (P.R. 43); LGC's

Rebuttal Model Match Comments at 8 and Attachment 2 (P.R. 54-55) (providing an LGC

presentation highlighting.  The specific traits of the SAP will vary depending on the ultimate

intended use of the downstream product.  LGC Case Br. at 14-16 (C.R. 258, P.R. 174).  For

example, diapers are worn and therefore subjected to relatively greater pressure as the wearer

moves, and therefore SAP incorporated into diapers will generally have a relatively higher AUP. LGC's Rebuttal Model Match Comments at 7-8 and Attachment 2 (LGC SAP Basics PowerPoint Presentation demonstrating what product characteristics are key to high performance in diapers) (P.R. 54-55).

Permeability refers to the ability with which liquid passes between SAP particles.  LGC's Affirmative Model Match Comments at 5 (P.R. 43).  The higher the permeability, the greater overall usage of SAP particles included in the final product (*e.g.*, by allowing SAP particles positioned throughout the final product to contact the liquid), and thus the higher degree of effectiveness of the final product in absorbing and retaining liquid.  *Id*. (P.R. 43).

In other words, AUP and permeability are properties that are emphasized in addition to CRC in the broader SAP industry.  High CRC alone is insufficient to guarantee that SAP's performance will meet a customer's specifications.  Instead, the physical properties of the diaper vary depending on how CRC, AUP, and permeability are balanced.  Indeed, in its technical paper, BASF lists CRC, AAP, and permeability as "Typical current SAP Characteristics;"  LGC's Rebuttal Model Match Comments at 8 and Attachment 3 (BASF technical paper titled "Innovation and Advancement for Hygiene Articles") (P.R. 54-55); an information sheet from BASF describes CRC, AAP, and permeability as "an integral part of modern diapers" *Id*. at 8-9 and Attachment 4 (BASF product information sheet); and a brochure from U.S. SAP producer Evonik Superabsorber LLC discusses its entire FAVOR® product range as featuring "different basic characteristics" which includes "absorption, retention, absorption under pressure, {and} permeability."  *Id*. at 9 and Attachment 4 (Evonik product information sheet).  In other words, Plaintiff's own marketing materials demonstrate that AUP and permeability are properties that

are emphasized as commercially significant properties of SAP in addition to CRC, which both parties agreed was one of the defining characteristics of SAP.

Moreover, at the ITC preliminary phase staff conference, when asked for the "specific performance parameters" of SAP, Ms. Sonja Cauble (Vice President, Global Business Management, Evonik Superabsorber, and General Manager, Evonik Superabsorber LLC), replied that in addition to CRC, "…there's absorbency under pressure, permeability, and absorption speed.  These are generally the four key performance parameters of superabsorbent polymers, and how each of those are *balanced* per product category is generally specific to the grade."  *Id.* at 9 and Attachment 6 at p. 101:9-13 (emphasis added) (P.R. 54-55).

Commerce initially chose the model match that Plaintiff proposed, *i.e.*, a single physical characteristic, CRC, with a range of 6 g/g.  *See* Commerce's Initial Model Match Hierarchy (P.R. 89).  LGC requested that Commerce reconsider its decision, *see* LGC's Model Match Reconsideration Request (C.R. 53, P.R. 93)., and Plaintiff submitted comments objecting to LGC's request.  *See* Petitioner's Response to LGC's Model Match Reconsideration Request (P.R. 94).  Despite LGC's multiple submissions prior to and following Commerce's model match decision, and Commerce's "long-standing practice of developing product characteristics…in consultation with interested parties," *see Certain Carbon and Alloy Steel Cut-To-Length Plate From Austria: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances;* 2015-2016; 82 Fed. Reg. 16,366-01 (April 4, 2017), and accompanying IDM at cmt. 1, Commerce did not further address LGC's arguments in the *Preliminary Determination*.  Instead, although Commerce asserted that it had "considered the comments that were submitted," Prelim. IDM at 7 (P.R. 150), notably referencing LGC's Pre-Preliminary Comments (C.R. 178, P.R. 142), Commerce simply stated that it "identified one

25

physical characteristic of the subject merchandise: centrifuge retention capacity." Prelim. IDM at 7 (P.R. 150). Commerce did not comment on the CRC ranges it applied, nor did it offer any explanation as to why it continued to exclude AUP and permeability. Rather, the record showed no sign of any further "consider{ation}" of LGC's comments submitted subsequent to Commerce's model match determination.

LGC fully complied with Commerce's initial model match determination but also provided alternative sales and cost databases that used a methodology that LGC advanced in its submissions. In particular, LGC maintained that there are commercially significant differences between SAP produced with more precisely-defined levels of CRC, as well as certain guaranteed levels of AUP and permeability. LGC's Affirmative Model Match Comments at 2-6 (P.R. 43); LGC's Rebuttal Model Match Comments at 2-11 (P.R. 54); and LGC's Pre-Preliminary Comments at 3-16 (C.R. 178, P.R. 142). Thus, LGC reported CRC in increments of 4 g/g (*i.e.,* CRC1H/U), and it also included additional physical characteristics for various guaranteed levels of AUP and permeability (*i.e.,* AUPH/U and PERMH/U, respectively). *See* LGC's Section B Response at B-9-B-12 (C.R. 98, P.R. 97) and LGC's Section C Response at C-7-C-10 (C.R. 100, P.R. 97). This resulted in alternative home market and U.S. market CONNUMs (*i.e.,* CONNUM2H and CONNUM2U, respectively) that incorporate the revised CRC increments and include the additional physical characteristics. *See Final IDM* at 9 (P.R. 184).

> 3. *Commerce Correctly Determined that Commercially Significant Differences Exist in LGC's Proposed Model Match Methodology*

Following its *Preliminary Determination*, Commerce verified LGC's reported sales and cost data and provided interested parties an opportunity to comment on any issues relevant to the final determination *See Final IDM* at 9 (P.R. 184). LGC requested again that Commerce revisit the product characteristics and CONNUM issue based on the record evidence developed

throughout the proceeding.  LGC's Model Match Reconsideration Request (C.R. 53, P.R. 93).  In

the *Final Determination*, Commerce found, upon further review, that "record evidence

demonstrates that revising the CONNUMs to include AUP and permeability, as well as revising

CRC reporting to increments of 4 g/g, is commercially significant and promotes greater accuracy

in Commerce's margin calculations.  *See Final IDM* at 9 (P.R. 184).

Plaintiff argues that Commerce determination is not supported by substantial evidence

"because there are no commercially significant price or cost differences related to such

characteristics."  Pet. Br. at 15.  However, as Commerce explained in its *Final IDM*, Commerce

did not solely rely on price and cost differences.  In fact, Commerce stated at the outset that

"{p}rice and cost differences alone are an insufficient basis to change {its} model matching

methodology." *Id* (P.R. 184).  Rather, Commerce required that such differences be "meaningful

from a commercial perspective."  *Id*. at 9-10.  As this Court noted in *Bohler I*:

> In identifying "merchandise which is identical in physical characteristics" to
> subject merchandise, 19 U.S.C. § 1677(16)(A), Commerce may select products
> with "minor differences in physical characteristics, if those {minor} differences
> are not commercially significant." What is considered a "commercially
> significant" factor is determined on a case-by-case basis, but at the very least it is
> a feature that is recognized in the broader industry of the subject merchandise. At
> the end of the day, {Commerce's} methodology must be faithful to the statutory
> directive that a "fair comparison shall be made."

*Bohler I*, 324 F.Supp.3d at 1350 (citations omitted, quoting *SKF USA, Inc. v. United States*, 537

F.3d 1373, 1375 (Fed. Cir. 2008); and *Pesquera Mares Australes*, 266 F.3d at 1384).  There, the

Court found that Commerce's methodology treated as identical products that "customers would

view… as commercially distinct in both utility and value."  *Id*. at 1350.  On remand, the Court

sustained Commerce's revised model match, which used respondent's proposed alterative model

match, as reasonable.  *See Bohler Bleche GmbH & Co. KG v. United States*, 362 F. Supp. 3d

1377, 1380 (Ct. Int'l Trade 2019).

In other words, Plaintiff's argument focusing on LGC's sales and cost data is misplaced. Commerce was not required to "point to any direct (or inverse) relationships between prices and its replacement physical characteristics" as Plaintiff suggests. Pet. Br. at 19. Rather, as this Court observed, Commerce looks to see if there is any commercial basis, which is "recognized by the broader industry of subject merchandise." *Bohler I*, 324 F.Supp.3d at 1350. Thus, if a particular characteristic (CRC at a singular level) or a combination of product characteristics (CRC, AUP, and permeability) would make a product "distinct in both utility and value," as in the case here, such a characteristic could form the basis for being "commercially significant." *Id*.

LGC demonstrated throughout the proceeding by providing SAP industry marketing materials and studies that CRC, AUP, and permeability are commercially significant characteristics that would make a particular SAP product "distinct in both utility and value" from other SAP products. For instance, as Commerce found, Plaintiff's own marketing materials support LGC's proposed model match: "(1) CRC, AUP, and permeability are typical current SAP characteristics and an integral part of modern diapers; (2) SAP producers are able to break the normal restrictions of CRC and AUP independently; and (3) SAP products are marketed as distinct due to a small percentage difference in CRC." *Final IDM* at 10 (P.R. 184) (citing LGC's Rebuttal Model Match Comments at Attachments 2-5 (P.R. 55)). In addition, LGC's product brochure showed CRC, AUP, and permeability as basic properties of a SAP product, and in line with its marketing materials, LGC sells SAP by grade, which is based on the physical characteristics of the product. In other words, ample record evidence supports Commerce's determination that LGC's proposed model match that Commerce ultimately adopted in the *Final Determination* appropriately captures identical or similar products for fair comparison and "increases the accuracy of the final dumping margin computed for LGC." *Final IDM* at 7.

4.  *LGC's Reported Sales and Cost Data Also Support Commerce's Model Match Characteristics*

In addition, LGC's reported sales and cost data support the revised model match that Commerce adopted in the *Final Determination*.  For example, as LGC demonstrated in its case brief, when examining Commerce's CONNUMs under Plaintiff's proposal, there is wide variation in costs within Plaintiff's overly broad CONNUM.  *See* LGC Case Br. at 20 (showing the difference in total manufacturing cost for a given CONNUM that ranges from [      ]% to [      ]%) (C.R. 258, P.R. 174).  An analysis of LGC's foreign like product prices also showed that Plaintiff's proposed model match is not sensitive to meaningful differences between different SAP products.  When comparing different products within just one of Plaintiff's three proposed CONNUMs, CONNUMH = 1, these products range to products defined under LGC's alternative CONNUM2H.  As a result, there is a [   ]% range in period of investigation ("POI") average prices among the individual products within this range.  *Id*. at 21 (C.R. 258, P.R. 174).  In the second of Plaintiff's proposed CRC's ranges, the CONNUMH = 2 range, there is an astronomical [      ]% difference in POI average prices between two products, CONNUM2Hs [      ] and [      ].  *Id*. at 21 (C.R. 258, P.R. 174).  LGC's proposed model match, which includes narrower CRC ranges and accounts for differences in AUP and permeability, better distinguishes between products that are so different as to have such wide variations in price.  These variations, while somewhat less pronounced, exist as well in the U.S. sales database (*e.g.*, with a nearly [ ]% range within the CONNUMU = 1), and such differences in U.S. prices have a significant margin effect.  *Id*. (C.R. 258, P.R. 174).

Commerce also conducted its own analysis of LGC's sales and cost data.  For the reported LGC's home market database, Commerce found that "the price differences could be as much as 20 percent."  *Final IDM* at 9 (P.R. 184).  Specifically, Commerce noted that the

weighted-average home market prices by CONNUM2, ranged from a low of 15 percent below

the average prices for the corresponding CONNUMH, to a high of 20 percent above the

CONNUMH prices.  *Id*. at 9, n. 67.  With respect to the reported costs, Commerce could not

conclusively find that the differences are due to differences related to the additional physical

characteristics.  Nonetheless, Commerce concluded that differences in costs are not meaningful

in determining if the differences are due to the additional physical characteristics, "as cost

differences would potentially arise from many other factors (*e.g.,* timing, production quantity,

etc.)."*Id*. at 12 (C.R. 258, P.R. 174).

Where, as here, "so long as there is adequate basis in support of {Commerce's} choice of

evidentiary weight," the Court must defer to Commerce's determination.  *Nippon Steel*, 458 F.3d

at 1359.  Commerce, as the expert fact finder, ultimately bears the responsibility of weighing the

evidence and the Court may not substitute its judgment for that of the agency.  *See Corus

Staal*, 259 F.Supp.2d at 1260.  Even if there is some evidence which detracts from the agency's

conclusions, the Court need only determine whether Commerce's conclusions are substantially

supported by the record.  *See, e.g., Atl. Sugar* 744 F.2d at 1563; *Olympia Indus.*, 7 F. Supp. 2d at

1000.  Here, the record evidence overwhelmingly supports Commerce's determination that

LGC's proposed model match, as Commerce adopted in the *Final Determination*, meaningfully

distinguished commercially different products so as to promote greater accuracy in Commerce's

margin calculations.

Plaintiff is simply seeking to have this Court insert Plaintiff's judgement in place of

Commerce's.  This approach is inconsistent with the standard of review and deference that this

Court owes to Commerce when evaluating Commerce's factual determinations and

methodologies to use in its duty calculations.  Accordingly, the Court should uphold

Commerce's determination as supported by substantial record evidence and in accordance with law.  Moreover, having reached a determination on this threshold question, the Court should easily dismiss the remainder of Plaintiff's claims at Sections VI.B through E, as none of the arguments in those sections would justify remanding Commerce's decision that is otherwise supported by substantial evidence.

### B.    Commerce Acted Lawfully When It Revisited Its Model Match Methodology

Plaintiff argues that because Commerce departed from its practice of using the model match hierarchy established at the outset of an investigation, Commerce acted contrary to law. As an initial matter, there is no legal basis for Plaintiff's argument.  Plaintiff claims without any support that "{Commerce's} practice is not to revise CONNUM definitions, once established, during the course of an investigation."  Pet. Br. at 31.  Commerce's explanations of its own practice in its *Final IDM* demonstrate that Plaintiff's assertion is incorrect.

Moreover, Plaintiff's base level theory supporting its assertion that Commerce's decision was contrary to law is that once Commerce issued a short memorandum at the outset of the case establishing the initial model match hierarchy, Commerce was legally barred from revisiting its determination at any later point in the investigation.  This argument is unsupported, as Plaintiff points to no such practice or judicial authority which would handcuff Commerce to this degree and bind the agency to an initial decision that it later determined was contrary to the weight of record evidence.  Indeed, it is well established that "{t}he power to reconsider is inherent in the power to decide."  *Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1360 (CAFC 2008) (citing *Trujillo v. Gen. Elec. Co.*, 621 F.2d 1084, 1086 (10th Cir.1980) ("the power to decide in the first instance carries with it the power to reconsider.")).  This is exactly what happened in this case—Commerce issued a decision as to the appropriate model match hierarchy, a decision which was well within Commerce's powers to decide, and subsequently reconsidered

its prior decision.  The Court should not disturb Commerce's reasoned reconsideration of its

prior determination.

Moreover, Commerce itself explained why its reconsideration was not a departure from

established practice, as Plaintiff suggests.  In particular, in the *Final Determination*, Commerce

explained that while it has "historically been *hesitant* to revise the CONNUM once established,

*there is no procedural bar against such changes*."  *Final IDM* at 13 (emphasis added) (P.R. 184).

In other words, Commerce can and does revisit its initial model match determination if the

record developed in the underlying investigation warrants it, including adding additional

characteristics in its final determination.  For instance, in *AB Rubber from France*, Commerce

included an additional characteristic in its final determination, ultimately accepting respondent's

proposed alternative CONNUM and revising its initial model match.  *See Acrylonitrile-*

*Butadiene Rubber from France: Final Affirmative Determination of Sales at Less Than Fair*

*Value, and Final Affirmative Determination of Critical Circumstances, in Part; 2020-2021*, 87

Fed. Reg. 37,833 (June 24, 2022) and accompanying IDM at cmt. 1 (altering the preliminary

model match to include an additional physical characteristic after consideration of the same

general types of information (including physical, cost, and price differences) provided by LGC in

this investigation).  There, Commerce added the additional characteristic because it found that it

was "commercially significant" and that inclusion of the additional characteristic would

"promote{} greater accuracy in Commerce's margin calculations."  *Id.*

Likewise, in *Steel Propane Cylinders from Thailand*, Commerce revised the product

matching criteria that was established at the outset of the investigation.  There, Commerce added

the code for zinc coating to the product matching criteria, although the change resulted in a

different criteria than was applied in the China antidumping investigation covering the same

product.  Commerce explained that zinc coating is a commercially significant characteristic

because the record showed that customers request zinc coated cylinders because of their unique

ability to withstand rust in humid climates and zinc-coated cylinders cost more to produce.  *Steel*

*Propane Cylinders from Thailand: Final Determination of Sales at Less Than Fair Value*, 84

Fed. Reg. 29,168 (June 21, 2019), and accompanying IDM at cmt 2.

In addition to its own precedent, Commerce also found its procedural authority in its own

regulations:

> Under 19 CFR 351.309(c)(2), parties have the opportunity to submit any
> arguments that they view to be relevant to the final determination; consistent with
> our statutory and regulatory obligations, we carefully weigh those arguments in
> light of the facts on the record.  To refuse to consider arguments raised in the case
> brief, or to prejudge the issue and refuse to change our preliminary decisions
> where warranted, would be inconsistent with this obligation.

*Final IDM* at 13 (P.R. 184).  Here, as Commerce explained, accepting LGC's proposed model

match did not result in a "wholesale replacement" of the matching hierarchy, as Plaintiff alleges.

*See* Pet. Br. at 32.  Rather, Commerce considered it "a refinement of the existing model match by

adding two product characteristics, the adoption of which has been the subject of much comment

during this investigation, and adds precision to a range of an already present product

characteristics."  *Final IDM* at 13 (P.R. 184).  Thus, pursuant to "Commerce's practice,"

Commerce evaluated the record evidence and comments it received and refined the CRC

characteristic and included AUP and permeability as physical characteristics and as part of the

CONNUM.  Doing so would "recognize{} the significant and physical and price differences in

SAP produced."  *Id* at 14 (P.R. 184).

Plaintiff's reliance on the Federal Circuit cases in its brief is also misplaced.  Plaintiff

claims that under Federal Circuit precedent, Commerce is "obligated to follow prior precedent

absent some legitimate reason for departing from it."  Pet. Br. at 30 (citing *Ugine and ALZ*

*Belgium v. United States*, 551 F.3d 1339, 1349 (Fed. Cir. 2009)).  However, Commerce's prior

precedent shows that Commerce can revise its prior model matching criteria under its well-

developed framework.  As Commerce was not departing from any prior precedent, Commerce

was under no obligation to provide any legitimate reason.  Nonetheless, Commerce did not "fail

to acknowledge" or "fail to provide a reasonable explanation for a departure from precedent."

Pet. Br. at 30.  Commerce acknowledged and corrected Plaintiff's incorrect recitation of

Commerce's practice.  *See Final IDM* at 13 ("We disagree with the petitioner that Commerce

may not revisit the model matching hierarchy and definition of CONNUMs at this point in this

proceeding.") (P.R. 184).  Thus, while LGC does not concede that Commerce departed from past

practice, to the extent the Court believes that Commerce may have departed from established

precedent, Commerce satisfied its obligation to explain its "legitimate reason" for doing so.  In

short, Commerce acted well within its legal limits to reconsider its initial model match decision

and fully explained its reasons for doing so, consistent with prior practice.  This Court should

uphold Commerce's determination as in accordance with law.

> **C.      There is No Basis in Plaintiff's Assertion that Commerce Relied on
> Unverified Alternative Cost and Sales Files to Calculate the Dumping Margin
> for LGC**

As discussed above, Commerce's decision was both supported by substantial record

evidence and in accordance with law.  There is therefore no basis to overturn Commerce's

determination.  Plaintiff nonetheless argues that Commerce's determination to use LGC's sales

and cost data prepared based on LGC's proposed CONNUM was not in accordance with law

because Commerce did not specifically verify data presented on the basis of LGC's proposed

CONNUM.  *See* Pet. Br. at 33.  As an initial matter, verification is a spot check and is not

intended to be an exhaustive examination of the respondent's records.  *See Mansato v. United

States*, 698 F.Supp. 275, 281 (Ct. Int'l Trade 1988).  Furthermore, the courts have noted that

Congress has given Commerce wide latitude in formulating its verification procedures. *See, e.g.,*

*Micron Tech., Inc. v. United States,* 117 F.3d 1386, 1396 (Fed. Cir. 1997).  Though these cases

afford Commerce wide latitude in conducting verification, the Court should not interpret LGC's

references to these cases to suggest that Commerce's verification was somehow questionable or

incomplete.  To the contrary, Commerce conducted a full and robust verification, and specifically

verified LGC's product characteristics at both the sales and cost verifications, and did so on the

basis of both the initial control number and the control number LGC proposed.  The Court

should not interfere with Commerce's determination as to what information it verified and what

information to rely upon.

Indeed, the Court does not need to look further than Commerce's own verification reports

and its decision memorandum to confirm the adequacy and completeness of Commerce's

verification of LGC's reported product characteristic data.  Moreover, Commerce also considered

and responded to this argument, as Plaintiff raised a similar baseless complaint in its rebuttal

brief before the agency.  There, Plaintiff argued that Commerce should consider LGC's

alternative sales and cost databases "unusable" because they were not verified.  *See* Petitioner's

Rebuttal Brief at 5-6 (C.R. 259, P.R. 178).  As Commerce explained in its *Final Determination*:

> {W}e verified LGC's cost accounting data, which are the basis of the alternative
> databases that reflect its proposed product characteristics.  For example,
> Commerce stated in its cost verification report that we reviewed LGC's monthly
> product-specific cost of manufacturing statement.  Since this statement was done
> on a product-specific basis and products are identified by certain product codes,
> which identifies different physical characteristics and technical specifications, we
> examined the costs included in the alternative cost database on a sample basis at
> verification.

*Final IDM* at 13 (P.R. 184).  Plaintiff attempts to overcomplicate this issue in its brief, focusing

on the "allocation of data among CONNUM2s within the new databases."  Pet. Br. at 36.  Yet,

the record is clear that Commerce verified LGC's costs on a product-code specific basis, and verified the total costs, both of which feed into the cost database under any alternative.

Plaintiff's only discernible complaint is that Commerce did not separately and independently verify the weight averaging of those product-code specific costs on a CONNUM-specific basis, yet this claim too is undermined by the facts.  In particular, in verifying LGC's costs, Commerce examined materials that demonstrated how the individual products that were included in each CONNUM, both on the basis of Commerce's original CONNUM and LGC's proposed CONNUM.  *See* Cost Verification Report; LGC's Cost Verification Exhibits (July 29, 2023) ("LGC's Cost Verification Exhibits") at Exhibit 5 (pages 1-3 and 63-64) and Exhibit 6 (pages 1-3 and 46) (providing cost build-up materials to verify all of the costs LGC incurred to produce subject SAP, including information used to verify LGC's product characteristics reporting) (C.R. 231-38, P.R. 168).  These materials include details on the products included the CONNUM (both variations) and sample certificates of analysis, which include data supporting the product characteristics (for both variations of the CONNUM).  To suggest that Commerce did not verify this information is simply incorrect.

With respect to LGC's reported sales data, Commerce reviewed the certificates of analysis for each selected sale.  The certificate of analysis, as Commerce explained, "contains LGC's proposed product characteristics (CRC in increments of 4 g/g, AUP, and permeability)."  *Final IDM* at 14 (P.R. 184).  In other words, Commerce "verified LGC's reporting of the alternative product characteristics on a sample basis" for CRC, AUP, and permeability through its sales-tracing exercise.  *Id*. (P.R. 184); *see also* LGC Case Br. at 15-16 (C.R. 258, P.R. 174) (citing LGC's Sales Verification Exhibits (Jul. 22, 2022) ("LGC's Sales Verification Exhibits") at Exhibit 10F at page 14 (C.R. 207, P.R. 167) (providing a certificate of analysis verifying

LGC's CONNUM reporting for CRC, AUP, and permeability).  The fact of the matter is that the

very same document Commerce needed to verify the data reported under Commerce's original

CONNUM is the same exact document needed to verify the "alternate" CONNUM.  Plaintiff's

claim that Commerce "looked at CRC only" makes no sense, given that the AUP and

permeability information is included on the *same, single-page document*.  To illustrate this point,

below LGC provides an excerpt from LGC's Sales Verification Exhibit 10F (page 13):

(C.R. 207, P.R. 167).  As shown, the three data points are right next to each other on a single

chart, and tie directly to the reported alternative CONNUM2 data.  This is not some extra or

complicated verification step Plaintiff claims Commerce did not take, all Commerce had to do

was look at a few simple datapoints all contained on a single page.

Tellingly, Plaintiff, who has access to all of the same certificates of analysis that

Commerce has, points to no actual discrepancy in the reporting.  This is because those

certificates of analysis Commerce reviewed at verification fully support LGC's reporting.  By

suggesting Commerce did not verify this information, Plaintiff is telling the Court that

Commerce looked only at one part of a piece of paper while ignoring the rest. There is no support for that conclusion, and the Court should not disturb Commerce's own recognition that it verified the data.

Again, as this Court recognized, verification is "a spot check and is not intended to be an exhaustive examination of a respondent's business." *See Mansato*, 698 F.Supp. at 281. Indeed, Commerce fulfilled this obligation during LGC's sales and cost verifications in this investigation when it verified LGC's reported alternative product characteristics. Commerce reviewed LGC's cost and sales data with respect to LGC's proposed product characteristics on a sample basis, verifying LGC's reported product characteristics, including LGC's alternative CONNUM reporting. After thoroughly reviewing this information as a part of its verification, Commerce ultimately found no discrepancy in LGC's reported data. *See* LGC's Sales Verification Exhibits at Exhibits 10A through 11F (demonstrating Commerce verified LGC's alternative CRC, AUP, and permeability reporting in each of the selected sample sales that were used to verify all of LGC's sales data) (C.R.202-207, P.R. 167); *see also* LGC's Cost Verification Exhibits at Exhibits 5-6 (demonstrating Commerce verified LGC's alternative CRC, AUP, and permeability reporting as a part of its verification of LGC's reported costs) (C.R. 231-38, P.R. 168).

Plaintiff recognizes that Commerce need not examine every piece of data from a questionnaire response for that response to be considered "verified." Pet. Br. at 33. However, Plaintiff complains that LGC's alternative cost and sales data constituted "unsolicited alternative responses," which cannot be considered verified, unless Commerce specifically examined these responses at verification. *Id*. at 34. As just noted above, Commerce did specifically examine LGC's alternative cost and sales data on a sample basis. This included reviewing certificates of analysis included in twelve U.S. and home market sample sales and LGC's monthly product-

specific cost of manufacturing statement which was prepared on a product-specific basis, as well as the build-up of individual product costs that make up the reported CONNUM costs (on the basis of both CONNUM alternatives).  *See* Sales Verification Report at 14-16 (C.R. 257, P.R. 173); Cost Verification Report at13-23  (C.R. 256, P.R. 171).  Plaintiff cannot reasonably argue that Commerce failed to meet its obligation to verify LGC's cost and sales data.

Plaintiff's chief complaint stems from its interpretation of the statute that Commerce "verify *all* information relied upon in making" its "final determination in an investigation."  Pet. Br. at 33 (citing 19 U.S.C. § 1677m(i)).  However, courts have interpreted this provision of the statute as requiring Commerce to "spot check" submitted responses under a procedure that Commerce finds reasonable.  Plaintiff essentially argues that Commerce should have verified all instances of product permutations as theoretically possible pursuant to Commerce's model match methodology, which this Court found as simply not required under the statute.  In sum, Plaintiff has no legal or factual support for the argument that Commerce's model match should be disregarded on the basis that LGC's alternative product characteristic reporting was "unverified."

### D.     Commerce Did Not Err as Plaintiff Suggests for Incorporating LGC's Proposed Model Match Criteria

Plaintiff argues that Commerce's "eleventh-hour modification of the model match hierarchy distorts the antidumping analysis and makes it *less* accurate."  Pet. Br. at 38 (emphasis original).  As Commerce made clear in its *Final Determination*, Commerce's determination with respect to its chosen model methodology was based on the evaluation of comments it received throughout the investigation and its own analysis of LGC's reported cost and sales data. Describing Commerce's determination as a "eleventh-hour modification" is simply inaccurate, as LGC demonstrated above.  Indeed, Plaintiff's focus on its claimed "eleventh-hour" modification would render each and every determination point in a final determination that resulted in a

39

change from the preliminary calculations subject to legal challenge. To the contrary, Commerce routinely modifies its analysis and calculations as part of its final determinations; this is the very purpose of a final determination, and numerous decisions are often not finalized until Commerce issues its final determination in any given case. Again, there is nothing unusual or unlawful with Commerce's determination in this case.

Furthermore, there is no record evidence that would support Plaintiff's suggestion that Commerce's chosen methodology would make its dumping calculation any less accurate. Plaintiff tries to characterize what Commerce ultimately adopted in the *Final Determination* as LGC's "preferred characteristics," Pet. Br. at 28, but the product characteristics developed in the investigation were simply a reflection of the model match criteria that best reflect the market reality of the SAP industry.

For instance, Plaintiff argues that the categories within the AUP and permeability fields "do not necessarily represent different physical characteristics." Pet. Br. 39. However, the domestic U.S. industry's own marketing materials and the statements that the representatives of the domestic industry made during the ITC hearing confirm that AUP and permeability are indeed separate and key performance parameters of SAP. LGC's Rebuttal Model Match Comments at 8 and Attachment 3 (BASF technical paper titled "Innovation and Advancement for Hygiene Articles") (P.R. 54-55); *Id*. at 8-9 and Attachment 4 (BASF product information sheet) (P.R. 54-55); *Id*. at 9 and Attachment 4 (Evonik product information sheet) (P.R. 54-55); *Id*. at 9 and Attachment 6 at p. 101:9-13  (P.R. 54-55) (testimony from U.S. domestic industry confirming the importance of all three performance parameters of SAP).

Plaintiff tries to paint a picture that a product could be reported as being in different categories at LGC's "discretion" based on its own testing requirements or measurements. *See*

Pet. Br. at 39. Specifically, Plaintiff argues that for AUP, a single grade with AUP can be coded

differently "depending on whether there was no guaranteed minimum, or the minimum was

based on testing at 0.3 psi, 0.7 psi, or 0.9 psi." *Id.* For the permeability characteristic, Plaintiff

asserts that products reported under LGC's proposed model match could vary depending on

whether measures are based on GBP, GPUP, SFC, or PDAUP, each of which is discussed *supra*

at Section II.

To be clear, when proposing product categories for the ITC's injury analysis, Plaintiff

included specific measurements for both AUP and permeability. The following excerpt is from

the Petition at page 18 (C.R. 2, P.R. 2):

**Product 1**: Permeable and fast SAP for thin or ultra-thin hygiene products,
pursuant to a long-term contract or agreement of one year or more duration, on an
ex-works $/MT basis in volumes of at least 500 kg, including the following
parameters:

- vortex speed of 45 seconds or less;
- gel bed permeability ("GBP") of 30 or greater; and
- centrifuge retention capacity ("CRC") within a range of 27 to 33 g/g.

**Product 2**: Balanced absorption under pressure ("AAP") SAP for balanced to
thin hygiene products, sold pursuant to a long-term contract or agreement of one
year or more duration, on an ex-works $/MT basis in volumes of at least 500 kg,
including the following parameters:

- AAP 0.7 psi within a range of 18 to 24 g/g;
- GBP of less than 10; and
- CRC within a range of 34 – 42 g/g.

**Product 3**: Permeable and Pressure-resistant SAP for thin or ultra-thin hygiene
products, pursuant to a long-term contract or agreement of one year or more
duration, on an ex-works $/MT basis in volumes of at least 500 kg, including the
following parameters:

- AAP under 0.7 psi ("AAP") within a range of 20 to 30 g/g; and
- CRC within a range of 26 to 33 g/g.

Further, because Plaintiff's proposed CRC characteristic did not specify on what basis

respondents should report CRC, LGC specifically requested that Commerce confirm that relying

on the minimum guaranteed values shown on the certificate of analysis is the appropriate method

to establish the reported CONNUM characteristics. LGC's Rebuttal Model Match Comments at

11 (P.R. 54). This applied not only to the CRC characteristic, but also to AUP and permeability.

While LGC (and, to the best of its understanding, other SAP producers) provides a minimum

41

guaranteed value of each physical property to customers, in the normal course of trade, the *actual* value of the property will vary within a certain range (whether sale-by-sale or even within a single sale), based on minor variations in the product as it was actually produced. Despite these minor variations, the price of a product is determined by the minimum guaranteed values rather than by the actual values.

Defining these three important traits, CRC, AUP, and permeability, based on the minimum guaranteed values is especially important because respondents could otherwise classify the same product into different CONNUMs where the guaranteed value of the product is close to a demarcation point for that characteristic. Moreover, Commerce verified these minimum guaranteed values and the testing methods used to determine these values as listed in the certificates of analysis during its sales and cost verification. Accordingly, just as Commerce routinely relies on mill test certificates in steel cases to establish the reporting of minimum yield strength and tensile strength of a steel product, LGC requested that Commerce apply an analogous methodology here by using the guaranteed value of SAP products as listed in the certificate of analysis. *Id*. at 12 (P.R. 54).

Thus, it is disingenuous to argue that LGC's proposed model match criteria was based on a "company-specific dataset," or could be subject to manipulation as Plaintiff advances was the case here. To the contrary, LGC's proposed model match criteria reflected features—CRC, AUP, and permeability that are tested pursuant to specific testing standards as required by downstream users with or without guaranteed minimums—that were "recognized in the broader industry of the subject merchandise." *Bohler I*, 324 F. Supp. at 1350 (citing *Pesquera Mares*, 266 F.3d at 1384). Indeed, as LGC explained in the underlying proceeding, the classifications that LGC proposed are used in the marketplace in the ordinary course of business and are consistent with

customer preferences and expectations.  *See* LGC Case Brief at 17 (C.R. 258, P.R. 174).  These classifications are based on testing results that are in turn routinely used in the industry, and are required by the customer, as demonstrated by the fact that the certificate of analysis is provided to the customer and is therefore performed on the basis as agreed by the customer.  *Id*. (C.R. 258, P.R. 174).  In short, in relying on industry standard testing categories and methods, and the specific testing requirements applicable to the particular sale and product (as confirmed and communicated with the customer on the certificate of analysis), the product characteristics expressly *cannot* be subject to manipulation as they are required characteristics for the given product and sale.

Based on the above faulty premise, Plaintiff contends that Commerce's ultimate adoption of LGC's proposed model match creates the potential for distortion and manipulation.  Plaintiff cannot point to any record evidence, other than the fact that using Commerce's chosen model match methodology, caused LGC's dumping margin to "drop" in the *Final Determination.*  Pet. Br. at 43.  LGC does not dispute that the risk of manipulation is an important consideration for Commerce in its antidumping analysis.  However, substantial record evidence, as described above, simply does not support Plaintiff's speculation.  Furthermore, any claims of manipulation gloss over the fact that Commerce's investigations look backwards in time.  LGC could not modify its *prior* sales and cost data based on unknown product characteristics that Commerce might adopt, making future manipulation and distortion impossible.  Rather, LGC proposed product characteristics that took into account the commercial attributes of the product at issue, and Commerce ultimately agreed with LGC's proposal.  Finally, Plaintiff raised this argument before Commerce.  *See* Petitioner's Rebuttal Model Match Comments at 5 (P.R. 49).  Commerce considered this argument but ultimately did not find it persuasive.  To accept Plaintiff's

manipulation argument, Commerce would essentially have to discount any proposal advanced by a respondent company under a theory of potential manipulation. Plaintiff's arguments on this point are misplaced and do not demonstrate that Commerce's determination was unsupported by substantial record evidence or not in accordance with law.

### E.      Plaintiff Lacks Any Basis to Argue that Commerce Acted Arbitrarily and Capriciously or Otherwise Abused Its Discretion

Finally, Plaintiff argues that Commerce's determination "was arbitrary, capricious, and manifestly contrary to the statute" such that Commerce's determination was an abuse of discretion. *See* Pet. Br. at 45. When reviewing an agency decision for abuse of discretion, the Court examines whether the decision: "1) is clearly unreasonable, arbitrary or fanciful; 2) is based on an erroneous conclusion of law; 3) rests on clearly erroneous fact findings; or 4) follows from a record that contains no evidence on which the {agency} could rationally base its decision." *Sterling Fed. Sys.*, *Inc. v. Goldin*, 16 F.3d 1177, 1182 (Fed. Cir. 1994) (quoting *Gerritsen v. Shirai*, 979 F.2d 1524, 1529 (Fed. Cir. 1992)); *see also Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1147–48 (Fed. Cir. 2011) (noting that "{a} clear error of judgment occurs when" an agency action is "arbitrary, fanciful, or clearly unreasonable.").

Plaintiff's "catch-all" argument framed under the abuse of discretion standard has no legal basis. Plaintiff merely summarizes the arguments it made in its brief and requests that this Court find that Commerce abused its discretion. Indeed, Plaintiff's baseless argument plainly ignores the significant evidence placed on the record and considered by Commerce during the course of the investigation. As detailed in Section III, LGC and Plaintiff submitted extensive comments addressing model match. Indeed, in response to Commerce's solicitation for information regarding SAP's product characteristics, both LGC and Plaintiff submitted affirmative and rebuttal model match comments. LGC and Plaintiff also each submitted pre-

preliminary comments addressing model match issues.  After Commerce's *Preliminary Determination*, LGC addressed model match issues not only in its case brief and a public hearing, but also submitted a specific letter that Commerce reconsider its model match determination.  Commerce also conducted an extensive two-week verification of LGC's sales and cost data, including LGC's product characteristic reporting.

After assessing the detailed factual and legal information placed on the record, Commerce dedicated over a third of its final issues and decision memorandum explaining its rationale and accounting for the arguments raised by Plaintiff and LGC throughout the investigation.  In short, Plaintiff's argument that Commerce's model match determination is "arbitrary and capricious" ignores the basic context of the underlying investigation.

Rather than being grounded in the voluminous record evidence described above, a number of Plaintiff's arguments in support of its arbitrary and capricious allegation are based on speculation.  For instance, Plaintiff claims that Commerce's adoption and implementation of its own model match is arbitrary, because "there may not be a single, unique CONNUM2 available for a given product to permit accurate sales matches."  Pet. Br. at 45-46.  Plaintiff cannot produce any evidence from LGC's reported data that this is actually the case.  Further, Plaintiff argues that Commerce's adoption of CRC1 ranges in increments of 4 g/g was made "without any factual basis or data or information from the respondent's own experience."  *Id*. at 46.  Again, this assertion is simply not true as LGC demonstrated in section VI.A above, and as Commerce confirmed that CRC reporting in increments of 4 g/g "is commercially significant and promotes greater accuracy in Commerce's margin calculations."  *Final IDM* at 9 (P.R. 184).

Lastly, Plaintiff argues that "it was arbitrary for {Commerce} to assert that differences in prices among CONNUM2s were commercially significant when there was no correlation

between price and the physical characteristics." Pet. Br. at 46. Plaintiff's assertion is simply incorrect as the record evidence demonstrates that there are indeed price differences among CONNUM2s as LGC demonstrated in section VI.3 above and confirmed by Commerce's own analysis of LGC's reported data. *See Final IDM* at 9 (P.R. 184) ("we preformed our own analysis of the prices reported in LGC's home market database and found that the price differences could be as much as 20 percent."). Further, as Commerce explained, its determination was not solely based on price and cost differences. Rather, as Plaintiff also recognized in its rebuttal brief before the agency, it was based on the fact that "SAP 'depends on the customer's preferences for balancing' CRC, AUP, and permeability" *Id.*

Nothing Plaintiff advances would indicate that Commerce's decision was somehow "fanciful," "clearly unreasonable," "arbitrary," or "capricious," given the extensive record and Commerce's thorough analysis. To the contrary, as established throughout this brief and in Commerce's Final Determination materials, Commerce's chosen model match hierarchy, and its procedural and analytical analysis of the issues are supported by substantial record evidence and in accordance with law. There is nothing to suggest that Commerce's decision was arbitrary or the result of an abuse of discretion.

**VII.    CONCLUSION**

For the foregoing reasons, LGC respectfully requests that this Court deny Plaintiff's Rule 56.2 Motion for Judgment Upon the Agency Record because the aspects of Commerce's determination that they seek to challenge are supported by substantial evidence and otherwise lawful.

Respectfully submitted,

/s/ J. David Park
J. David Park
Henry D. Almond
Kang Woo Lee
Gina M. Colarusso
Archana Rao P. Vasa

*Counsel to LG Chem, Ltd.*
*Defendant-Intervenor*

Eric Johnson

*Consultants to LG Chem, Ltd.*
*Defendant-Intervenor*

Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Phone:  (202) 942-5000
Fax:  (202) 942-5999
E-mail:  David.Park@apks.com

**Dated:  September 29, 2023**

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE THOMAS J. AQUILINO, JR., SENIOR JUDGE**

| | |
|---|---|
| THE AD HOC COALITION OF <br> AMERICAN SAP PRODUCERS <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> LG CHEM, LTD., <br><br> Defendant-Intervenor. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Court No. 23-00010 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**CERTIFICATE OF COMPLIANCE WITH CHAMBERS PROCEDURE 2(B)(1)**

The undersigned hereby certifies that the attached Response Brief in Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record, filed on September 29, 2023 contains 13,990 words, inclusive of words contained in images embedded in the brief, and exclusive of the table of contents, table of authorities, and counsel's signature block, according to the word count function of the word-processing system used to prepare this brief, and inclusive of the words in the embedded images, counted manually. This brief therefore complies with the maximum 14,000 word count limitation set forth in the Court's Chambers Procedures.

By:                                           /s/ J. David Park
                                                  J. David Park

**Date: September 29, 2023**