## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE THE HONORABLE THOMAS J. AQUILINO, JR., SENIOR JUDGE

| | | |
|---|---|---|
| THE AD HOC COALITION OF AMERICAN SAP PRODUCERS, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Court No. 23-cv-00010 |
| UNITED STATES, | ) ) | **NON-CONFIDENTIAL VERSION** |
| Defendant, | ) ) | |
| and | ) ) | |
| LG CHEM, LTD., | ) ) | |
| Defendant-Intervenor. | ) ) ) | |

### PLAINTIFF'S REPLY BRIEF

Stephen J. Orava
Jamieson L. Greer
Daniel L. Schneiderman
**KING & SPALDING LLP**
1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 304-8911

*Counsel to The Ad Hoc Coalition of American SAP Producers*

November 13, 2023

**NON-CONFIDENTIAL**

## <u>TABLE OF CONTENTS</u>

I.   COMMERCE ERRED BY DEPARTING FROM ITS ESTABLISHED PRACTICE OF
     USING THE SETTLED MODEL MATCH IN THE FINAL DETERMINATION ............... 1

     A.   Commerce's Practice Is To Use The Established Model Match In The Final
          Determination Of An Investigation ................................................................. 1

     B.   Commerce Failed To Comply With The Necessary Steps For Departing From An
          Established Practice ....................................................................................... 5

II.  COMMERCE DID NOT RELY ON SUBSTANTIAL EVIDENCE IN CHANGING THE
     MODEL MATCH HIERARCHY IN THE FINAL DETERMINATION............................. 6

III. THE GOVERNMENT AND LGC FALSELY ASSERT THAT COMMERCE VERIFIED
     LGC'S UNSOLICITED DATABASES AND REVISED CONNUMS ............................... 14

IV.  COMMERCE DID NOT ADDRESS PLAINTIFF'S ARGUMENT REGARDING
     MANIPULATION OF THE DUMPING MARGIN AS REQUIRED BY LAW ................. 18

     A.   The Government's Brief Offers An Impermissible And Unpersuasive *Post Hoc*
          Rationalization Regarding Manipulation And Inaccuracy ........................... 19

     B.   LGC Does Not Show That Commerce Engaged With Plaintiff's Manipulation
          Argument And Does Not Understand Or Rebut Plaintiff's Core Concern Regarding A
          Unique Product's Potential Classification Under More Than One CONNUM ............ 22

V.   CONCLUSION ...................................................................................................... 24

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Bonney Forge Corp. v. United States*,
 560 F. Supp. 3d 1303 (Ct. Int'l Trade 2022) .................................................19, 21

*CS Wind Viet. Co. v. United States*,
 832 F.3d 1367 (Fed. Cir. 2016)........................................................................10

*Dalian Meisen Woodworking Co v. United States*,
 571 F. Supp. 3d 1364 (Ct. Int'l Trade 2021) ...........................................15

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
 140 S. Ct. 1891 (2020)........................................................................21

*Ghigi 1870 S.p.A. v. United States*,
 547 F. Supp. 3d 1332 (Ct. Int'l Trade 2021) ...........................................3

*Hung Vuong Corp. v. United States*,
 483 F. Supp. 3d 1321 (Ct. Int'l Trade 2020) ...........................................19

*Manchester Tank & Equip. Co. v. United States*,
 483 F. Supp. 3d 1309 (Ct. Int'l Trade 2020) ...........................................3

*Pakfood Public Co. v. United States*,
 753 F. Supp. 2d 1344 (Ct. Int'l Trade 2011) ...........................................5

*Suzano S.A. v. United States*,
 589 F. Supp. 3d 1225 (Ct. Int'l Trade 2022) ...........................................19

*Timken Co. v. United States*,
 630 F. Supp. 1327 (Ct. Int'l Trade 1986) ...........................................3, 22

**Statutes**

19 U.S.C. § 1675(a) ........................................................................23

19 U.S.C. § 1675(c) ........................................................................23

19 U.S.C. § 1677f(i)(3)(A) ........................................................................19

19 U.S.C. § 1677m(i)........................................................................14

**Other Authorities**

19 C.F.R. § 351.411(b) ........................................................................10

**NON-CONFIDENTIAL**

*Certain Superabsorbent Polymers From the Republic of Korea*,
    87 Fed. Reg. 65,035 (Oct. 27, 2022)............................................................................1

*Diamond Sawblades and Parts Thereof from the Republic of Korea*,
    71 Fed. Reg. 29,310 (Dep't Commerce May 22, 2006) ............................................2

*Final Affirmative Determination in the Less Than Fair Value Investigation of*
    *Carbon and Alloy Steel Wire Rod from the Republic of Korea*, 83 Fed. Reg.
    13,228 (Dep't Commerce Mar. 28, 2018)................................................2, 3, 4, 9

*International Trade Administration Policy Bulletin 92.2* (July 29, 1992)....................10

*Steel Propane Cylinders from Thailand: Final Determination of Sales at Less*
    *Than Fair Value*, 84 Fed. Reg. 29,168 (Dep't Commerce June 21, 2019)...........1, 4

*Superabsorbent Polymers from South Korea*,
    USITC Pub. 5388 (Dec. 2020)...........................................................................8, 21

Pursuant to Rule 56.2 of the Rules of this Court, Plaintiff, The Ad Hoc Coalition of American SAP Producers, respectfully submits this reply to the response briefs of Defendant, the United States, and Defendant-Intervenor, LG Chem, Ltd. ("LGC"), in the above-captioned matter.  Below, Plaintiff sets forth relevant law, facts, and analysis replying to issues raised in the response briefs and confirming the court should order a remand, in relevant part, of the final determination of the U.S. Department of Commerce ("Commerce") in the antidumping duty investigation of *Certain Superabsorbent Polymers From the Republic of Korea*, 87 Fed. Reg. 65,035 (Oct. 27, 2022) (P.R. 188) ("Final Determination") and accompanying Issues and Decision Memorandum (Oct. 20, 2022) (P.R. 184) ("IDM") (collectively, "Final Determination").

## I.   COMMERCE ERRED BY DEPARTING FROM ITS ESTABLISHED PRACTICE OF USING THE SETTLED MODEL MATCH IN THE FINAL DETERMINATION

### A.   Commerce's Practice Is To Use The Established Model Match In The Final Determination Of An Investigation

The Government and LGC contend that Commerce does not have an established practice of using the model match chosen at the outset of an investigation in the Final Determination of that investigation.  Government's Response Brief (Sept. 29, 2023) ("Government's Br.") at 20; LGC's Response Brief (Sept. 29, 2023) ("LGC's Br.") at 31.  However, Plaintiff has demonstrated that Commerce does, in fact, have such an established practice.  S*ee* Plaintiff's Brief (July 14, 2023) ("Plaintiff's Br.") at 29-33.  In previous instances where a party sought to change the settled model match criteria in the final stage of an investigation, Commerce has explained in no uncertain terms that "Commerce's practice is to adhere to the product matching criteria it develops at the outset of the investigation."  *Steel Propane Cylinders from Thailand: Final Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 29,168 (Dep't Commerce

1

June 21, 2019) ("*Steel Cylinders from Thailand*"), accompanying Issues and Decision Memorandum ("IDM") at Comment 1.  *See also Final Affirmative Determination in the Less Than Fair Value Investigation of Carbon and Alloy Steel Wire Rod from the Republic of Korea*, 83 Fed. Reg. 13,228 (Dep't Commerce Mar. 28, 2018) ("*SWR from Korea*"), IDM at Comment 3 ("Commerce has a long-standing practice of developing product characteristics and a model-match methodology in the early stages of each proceeding, and in consultation with the interested parties."); *Diamond Sawblades and Parts Thereof from the Republic of Korea*, 71 Fed. Reg. 29,310 (Dep't Commerce May 22, 2006), IDM at Comment 1 ("{Commerce} should not make any changes to the product characteristics or model match criteria at this time. We find that the appropriate time to consider comments with respect to the physical characteristics and model match criteria is at the beginning of the proceeding.").  In its Final Determination here, even Commerce conceded that it has "historically been hesitant to revise the CONNUM once established."  Final Determination at 13.  This practice is well-documented, and Commerce has been explicit that it applies in investigations.

In response to the abundant evidence of an established practice, the Government and LGC have been able to point to only a single instance where Commerce has modified the model match framework at the final stage of an investigation, and that was to include a single binary indicator of the presence of a stabilizer in the product.  *See* Commerce's Br. at 21; LGC's Br. at 32.  This lone example does not undermine the lengthy record of Commerce's established practice; rather, it highlights the exceptional nature of such a modification.  In *SWR from Korea*, a respondent submitted alternative data sets during the investigation and sought to include new product characteristics in the model match at the final stage of the proceeding.  In that case, Commerce was unpersuaded by similar appeals to one-off breaks in practice, explaining that "the

citing of an isolated exception, or several such exceptions, had they been cited, does not itself warrant such divergence from standard Commerce policy in other instances." *SWR from Korea*, IDM at Comment 3.  Similarly, in this case, citing a single example does not negate Commerce's established practice.

This issue has also been discussed in the context of administrative reviews, where Commerce – sustained by this Court – has declined to reconsider a settled model match framework absent "compelling reasons" and "convincing evidence."  *See Ghigi 1870 S.p.A. v. United States*, 547 F. Supp. 3d 1332, 1343 (Ct. Int'l Trade 2021); *Manchester Tank & Equip. Co. v. United States*, 483 F. Supp. 3d 1309, 1315 (Ct. Int'l Trade 2020).  This Court has agreed with Commerce's traditional approach, explaining that "{c}hanges to Commerce's model-match method are not undertaken lightly."  *Ghigi 1870*, 547 F. Supp. 3d at 1343.

The policy underlying this established practice is straightforward: it is to prevent respondents from cherry-picking a model match hierarchy crafted to limit detection of dumping. As this court has explained, "it is hard to imagine that a foreign manufacturer, given the option of selecting what constitutes similar merchandise, and assuming that there exists more than one product from which such a choice can be made, would not make the choice of merchandise most advantageous to itself."  *Timken Co. v. United States*, 630 F. Supp. 1327, 1338 (Ct. Int'l Trade 1986).  In *Timken*, the Court disapproved of a situation where "an interested party be accorded so much control over a determination of such importance," *i.e.*, the determination of which foreign like products are similar merchandise.  *Id*.  This concern is directly at issue here, where LGC – which controls the information used in the dumping margin analysis – hand-picked for Commerce's consideration three alternative reporting parameters that, when implemented, substantially decrease the dumping margin.

In a misguided effort to claim that Commerce regularly changes model match characteristics in the final stage of an investigation, LGC points to *Steel Cylinders from Thailand*.  LGC Br. at 32-33.  In that case, however, Commerce decided at the *preliminary* stage of the investigation to accept a third code option within an existing physical characteristic (*i.e.*, coating type), and it made this decision early following the comment period for product characteristics.  *Steel Cylinders from Thailand*, IDM at Comment 2.  Moreover, Commerce did "not eliminate or create a new field in the product matching hierarchy." *Id*.  Commerce emphasized that there must be a "compelling reason" for changes to product characteristics in that proceeding, *i.e.*, within an investigation.  And even more importantly, in that same determination, the petitioner separately argued that in the *final stage* of the investigation, Commerce should modify the product characteristic set out at the beginning of the proceeding regarding cylinder capacity.  Commerce rejected this argument, explaining that "Commerce's practice is to adhere to the product matching criteria it develops *at the outset of the investigation*."[1] *Id.*, IDM at Comment 1 (emphasis added).  In other words, this case cited by LGC stands for exactly what Plaintiff is arguing: Commerce – in its own words – has a long-standing practice "of developing product characteristics and a model-match methodology in the early stages" of an investigation and "reject{ing} model matching proposals from interested parties after Commerce has requested that respondents submit data conforming to model match Commerce has established." *Id*.

---

[1]     The model match is established "at the outset" of an investigation through the antidumping questionnaire or letter setting out the matching criteria. *See, e.g.*, *SWR from Korea*, IDM at Comment 3 ("POSCO received the final CONNUM methodology in the Initial AD Questionnaire" after consultations with interested parties); *see also Less-Than-Fair-Value Investigation of Certain Superabsorbent Polymers from the Republic of Korea: Product Characteristics Hierarchy* (Jan. 21, 2022) (P.R. 89) (establishing the model match hierarchy for the instant investigation after substantial commentary by interested parties).

**B.      Commerce Failed To Comply With The Necessary Steps For Departing From An Established Practice**

In addition to flatly denying the existence of a well-documented, established practice, the Government and LGC also mischaracterize Plaintiff's argument.  The Government claims that Plaintiff argues that the agency "is unable to modify the model match from a preliminary determination to final determination *within* an investigation."  Government's Br. at 21.  LGC claims that Plaintiff's position is that the agency is "legally barred" from changing its model-match framework.  LGC's Br. at 31.  These characterizations are misleading.  Plaintiff acknowledges that Commerce can implement a model-match framework within the bounds of law and its prior practice, but alterations to a settled model match framework at the end of an investigation can occur only where there are "compelling reasons" and "convincing evidence."  Plaintiff's Br. at 32.  This is a high bar for justifying a change to an established practice, and it was not met here.

In addition to denying the existence of an established practice, the Government does not address Commerce's failure to take the appropriate steps when departing from this practice.  If Commerce chooses to deviate from an established practice, "it must at least acknowledge the change and show that there are good reasons for the new policy."  *Pakfood Public Co. v. United States*, 753 F. Supp. 2d 1344, 1441-42 (Ct. Int'l Trade 2011).  Commerce did not comply with these requirements.  Nowhere in its Final Determination did Commerce acknowledge its established practice or explain why it diverged from it, nor did it provide "compelling reasons" or "convincing evidence" for its departure.  Final Determination at 13.  Indeed, because the Government continues to insist that Commerce does *not* have a practice of maintaining the settled model match hierarchy in the final stage of an investigation, the Government does not – and cannot – claim that Commerce acknowledged a change to this practice or justified diverging

5

from it.  On this basis alone, remand is warranted for Commerce to articulate the "compelling reasons" and "convincing evidence" for its decision.

## II.      COMMERCE DID NOT RELY ON SUBSTANTIAL EVIDENCE IN CHANGING THE MODEL MATCH HIERARCHY IN THE FINAL DETERMINATION

The Government maintains that its decision to replace the model match hierarchy is supported by substantial evidence.  Specifically, the Government claims that the record shows "substantial price differences between SAP with certain guaranteed levels of AUP and permeability and SAP with CRC ranges reported in 4 g/g" and that such differences are "meaningful from a commercial perspective."  Government's Br. at 9.  However, the record evidence does not support this conclusion, notwithstanding Commerce's reference to anecdotal and unrelated pieces of information.

Commerce largely premised the commercial significance of AUP, permeability, and narrow CRC increments on a small set of unverified and largely undated marketing materials. *Id*. at 14-15.  But these materials do not represent the substantial evidence required by the law. For example, the Government explains that AUP and permeability must be included in the model match because these are "basic properties of SAP."  *Id*. at 15.  To support this claim, the Government cites to lists of SAP physical characteristics in three slide decks discussing SAP. The Government argues that mention of AUP and permeability in these materials – with no discussion of price or cost – is enough to show commercial significance.  *Id*. at 14.  But mere references to AUP and permeability in these materials do not demonstrate the existence of commercially significant differences.  Indeed, these materials identify a large number of physical characteristics of SAP products, including:

- CRC
- Absorption speed

6

**NON-CONFIDENTIAL**

- Odor control
- Haptics properties
- Saline flow conductivity
- Raw materials purity
- Flow rate
- Bulk density
- Particle size distribution
- Absorption
- pH
- absorption under pressure
- gel bed permeability
- residual monomer and extractables
- color

LGC's Rebuttal Model Match Comments at Attachment 1, pp. 3, 13, 18-25; Attachment 2, Section II "SAP Properties;" Attachment 3, p. 1 and Table 3; Attachment 4; Attachment 5, pp. 9-10 and 13-14; and Attachment 6, p. 101 (P.R. 54-55). Out of these characteristics – many of which are discussed at length in the marketing materials – Commerce summarily concluded that AUP and permeability drive commercially significant price differences. Government's Br. at 14. But Commerce provided no data or analysis demonstrating that AUP or permeability have greater commercial significance than the other characteristics cited in the materials that served as the primary basis for Commerce's decision. Instead, the Government repeatedly claims that because AUP and permeability are "an integral part of modern diapers," they are also commercially significant. *Id*. at 13-15.

The Government also points to some discussion during the U.S. International Trade Commission (the "Commission") investigation preliminary staff conference, where a domestic industry official listed some examples of SAP properties, including CRC, speed, AUP, and

permeability.  Government's Br. at 14-15; Plaintiff's Br. at 11.  But the Commission's final report lists quality-related characteristics of SAP identified by purchasers, including:

- CRC
- AUP
- Absorption speed
- Free swell
- Hydroxyl value
- Iodine value
- Permeability
- Particle size distribution
- Color
- Color stability
- Residual monomer
- Moisture content
- Foreign material
- pH
- Odor

*Superabsorbent Polymers from South Korea*, USITC Pub. 5388 (Dec. 2020) at II-20.  When viewed in the context of the many SAP characteristics identified throughout the investigation, it is clear that the mere reference to AUP and permeability in briefing materials are not an adequate evidentiary basis to find commercial significance.

The Government argues that Commerce observed price differences between LGC's home market sales databases using the original and replacement model match hierarchies.  Specifically, Commerce compared the weighted-average home market prices between the two databases and noted that such prices differed "from fifteen to as high as twenty percent."  Government's Br. at 13.  This does not actually support the Government's claims, however, because changes to

weighted-average prices are the normal and expected result of changing the CONNUMs assigned

to products.  Indeed, Commerce observed that there are also cost differences between databases,

but – in contrast to its treatment of price – the agency dismissed such differences as

commercially insignificant and unrelated to the new physical characteristics.  *Id*. at 12-13.

The Government is unable to counter Plaintiff's demonstration that the new CONNUMs,

when controlled for each new physical characteristic, show *no correlation* between price and the

characteristic.  Plaintiff's Br. at Attachment 1.  For example, Plaintiff's analysis shows that as

the values in the data fields CRC1, AUP, or PERM increase, the average unit value for price

does not have a correlating increasing (or decreasing) trend.  Commerce's practice is to rely on

such correlations as evidence of commercially significant differences among product

characteristics, and it rejects product characteristics that do not show this.  *See, e.g.*, *SWR from

Korea*, IDM at Comment 3 (rejecting proposed model match characteristics absent a showing

that "pricing differences are correlated with variations in those three proposed characteristics.").

There are no such correlated price trends for AUP, permeability, and CRC in narrow ranges.

Further, there is no indication in LGC's sales documentation that certain minimum guaranteed

performance levels for a given grade of SAP [

                                              ].  *See, e.g.*, LGC Section A Response (Jan. 19,

2022) ("LGCA") at Exhibit A-18(A) (Exhibit C) and Exhibit A-18(B) (Exhibit) (P.R. 77 / C.R.

36-39).

The Government does not point to any error in Plaintiff's analysis showing that price

trends *do not* correlate to AUP, permeability, or CRC in narrow ranges.  Rather, the Government

claims that controlling for the price effects of the new characteristics is inappropriate and that

any price analysis must be done with "all three product characteristics *collectively* . . . to identify

NON-CONFIDENTIAL

a more reflective sales price of the foreign like product." Government's Br. at 13. In other words, Commerce looked at whether the new *CONNUMs* reflected a price correlation instead of examining the new *product characteristics*. The Government provides no explanation why this should be the case and, in so doing, fails in its obligation to consider evidence provided by Plaintiff that fairly detracts from its conclusion. *See CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016). The fact that there are price differences among the CONNUM2s reported by LGC is irrelevant if it cannot be demonstrated that those differences are related to particular physical characteristics. *See* 19 C.F.R. § 351.411(b) (permitting Commerce to consider only those differences among products associated with "physical differences") and *International Trade Administration Policy Bulletin 92.2* (July 29, 1992) (prohibiting Commerce from attributing price or cost differences related to "extraneous factors" to physical differences).

Commerce defines product control numbers in order to capture those physical characteristics that have a meaningful impact on costs or prices. Here, by viewing LGC's CONNUM2s "collectively," and looking at price differences among CONNUM2s (rather than among specific product characteristics within those CONNUM2s), Commerce has effectively flipped the script and assumed the conclusion. In this case, the source of any price differences among CONNUM2s is unknown: it may result from random variations or non-random factors having nothing to do with the AUP, permeability, and CRC characteristics as reported by LGC. The fact that CONNUM2s have different prices says absolutely nothing about whether those differences are attributable to physical characteristics. Absent a finding that prices move specifically in relation to LGC's reported AUP, permeability, and CRC characteristics – which

they demonstrably do not – Commerce's decision to define CONNUMs based on those characteristics is unsupported by substantial evidence and not in accordance with law.

In addition, viewing the CONNUM2s "collectively" further masks the fact that the product characteristic codes selected by Commerce do not reflect commercially significant differences.  For example, the product codes differ according to testing methodologies for product characteristics, and not the underlying physical characteristics themselves.  Further, several CONNUMs have product codes that reflect [

]

making it impossible to even articulate a price / property relationship.  *See* Final Determination Margin Calculation (Oct. 20, 2022) at Attachment 3 (P.R. 187 / C.R. 260) (showing that [   ] or [   ] of LGC's CONNUMH2s have product characteristic code [                    ]).

The Government also claims that AUP, permeability, and narrow CRC ranges create CONNUMs that are "commercially distinct in both utility and value," citing *Bohler Bleche GmbH & Co. KG v. United States*, 324 F. Supp. 3d 1344 (Ct. Int'l Trade 2018).  Government's Br. at 12, 14, and 18.  But the new product characteristics do not fit this description of commercial significance.  First, as shown above, the new characteristics and increments have absolutely no correlation with SAP "value," *i.e.*, price.  Second, Plaintiff has demonstrated that AUP and permeability have an inverse relationship with CRC, meaning that these two product characteristics have no commercial significance or "utility" that is not already captured by the CRC product characteristic.  LGC's product brochure highlights the existing "correlation between properties" among CRC, AUP, and permeability, and explicitly describes the "inverse proportion" or "direct proportion" between them.  LGC's Rebuttal Model Match Comments at Attachment 2, Section II "SAP Properties" (P.R. 54-55).  Other LGC submissions confirm that

11

"{t}here is a trade off between main absorption properties of SAP."  LGCA at Exhibit A-25, pp. 22-23 (P.R. 77-78).

The Government rejects this basic science underlying SAP chemistry, seizing upon a marketing claim in undated BASF materials for a legacy SAP product as "break{ing} the normal restrictions of the CRC & AAP interdependency."  Government's Br. at 14.  Based solely on this, Commerce "concluded that LG Chem {also} uses more advanced technologies to achieve SAP with the right balance of CRC, AUP, and permeability."  *Id*. at 16.  But LGC never makes this claim.  In fact, LGC concedes in its brief that "'AUP' is a trait that is generally inversely related to CRC."  LGC's Br. at 23, 28.  Commerce made this assumption about LGC's products without any evidence, data, or supporting information, and it improperly premised its model match determination on this baseless conclusion.

With respect to narrower CRC increments, Commerce's determination relies only on (1) a single graphic in an eight-year-old presentation discussing the relative CRC levels of legacy products no longer sold on the U.S. market and (2) the broad CRC ranges Plaintiff suggested the Commission use for its underselling analysis.  Government's Br. at 15-16.  With respect to the graphic, nothing in it links a narrower CRC level to the price (or cost) of SAP.  Thus, there is no way to reasonably draw a conclusion as to whether narrower CRC ranges caused commercially significant price or cost differences.  Commerce's reliance on this graphic cannot satisfy the substantial evidence standard.

The pricing products used for the Commission's underselling analysis are completely irrelevant to Commerce's investigation.  The pricing products are used to compare U.S. sales of imported and domestic SAP, whereas Commerce's investigation compares a foreign producer's foreign like product normal values and export sales.  But in any event, the Commission's pricing

products establish *broader* CRC increments, not narrower ones.[2]  Moreover, the only other

foreign producer in the investigation agreed that broad increments for high, medium, and low

CRC levels are appropriate (and explicitly opposed the inclusion of AUP and permeability).  *See*

Sumitomo Seika Rebuttal Comments on Model Match (Dec. 23, 2021) at 2-3 (P.R. 53).  Thus,

Commerce's rationale for narrower CRC increments was unsupported by any evidence, and

certainly not substantial evidence.

It is notable that LGC was unable to produce any evidence from its own records to

support its proposed CRC increments.  In fact, LGC's materials differentiate SAP as "high

capacity" and "low capacity," undermining LGC's very specific claim that 4 g/g CRC

increments are a "traditional" industry practice.  *See* LGCA at Exhibit A-25, p. 7 (P.R. 77).

LGC's brief repeats the Government's arguments, but it also criticizes the settled model

match used throughout the vast majority of the investigation because it "only established three

CONNUMs" and claims that there are no other antidumping proceedings with a small number of

CONNUMs.  LGC's Br. at 9, 10, and 21.  The number of CONNUMs is not relevant to whether

Commerce's determination was based on substantial evidence or otherwise in accordance with

law.  Commerce creates different CONNUMs only when products have commercially significant

differences, and not for the sake of creating unnecessary complexity.  Nevertheless, there are

several proceedings with limited numbers of CONNUMs, particularly with respect to chemical

products (like SAP) that have a basic molecular makeup.  For example, in *Glycine from China*,

there were no reportable product characteristics, such that all glycine was effectively treated as

being within a single CONNUM.  Request for Information, *Glycine from China* (Dep't

---

[2]      The Commission's pricing products included CRC ranges of 6, 8, and 7 g/g.

**NON-CONFIDENTIAL**

Commerce May 18, 2017) at C-5, ACCESS Barcode Number 3573743-01. In *Urea Ammonium Nitrate Solutions from the Russian Federation and the Republic of Trinidad and Tobago*, the CONNUM was based on one physical characteristic – nitrogen content – and a second binary characteristic regarding whether the product contained corrosion inhibitors. Product Characteristics for the Less-Than-Fair-Value Investigations of *Urea Ammonium Nitrate Solutions from the Russian Federation and the Republic of Trinidad and Tobago* (Dep't Commerce Sept. 1, 2021), Attachment, ACCESS Barcode Number 4157013-01. Thus, it is consistent with past Commerce practice to have a limited number of product characteristics and CONNUMs.

Despite the Government's assertions of a robust evidentiary basis for replacing the model match, it relies heavily on a very few pieces of anecdotal information as the sole factors weighing in favor of finding commercial significance among LGC's preferred product characteristics. This evidence is not "convincing" or "compelling" and does not permit a reasonable person to conclude that AUP and permeability are commercially significant. Furthermore, there is no evidence to permit a reasonable person to conclude that CRC levels should be narrowed. The justifications offered by the Government and LGC utterly fail to demonstrate that Commerce based its Final Determination on substantial evidence.

**III.    THE GOVERNMENT AND LGC FALSELY ASSERT THAT COMMERCE VERIFIED LGC'S UNSOLICITED DATABASES AND REVISED CONNUMS**

The statute requires the agency to "verify all information relied upon in making . . . a final determination in an investigation." 19 U.S.C. § 1677m(i). No party contests this basic requirement. *See* Government's Br. at 24. The Government asserts that Commerce "verified the sales and cost data that LG Chem provided, including the AUP and permeability levels that LG Chem also provided in the alternative databases." *Id*. at 6. LGC takes the Government's claim a

14

step further, insisting that Commerce "specifically verified LGC's product characteristics at both the sales and cost verifications, and did so on the basis of both the initial control number and the control number LGC proposed." LGC's Br. at 35. The legal and factual premises of these assertions are flatly wrong.

The Government places no limit on Commerce's discretion in verifying a respondent's data, noting only that courts have provided the agency "latitude" in its approach to executing the statute's requirement to verify all information. Government's Br. at 25. However, this Court has explained that "{v}erification is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness." *Dalian Meisen Woodworking Co v. United States*, 571 F. Supp. 3d 1364, 1371 (Ct. Int'l Trade 2021). For its part, LGC points to the court's occasional characterization of verification as "a spot check" to suggest that the requirement to "verify all information" does not require a very close look at a respondent's data. LGC's Br. at 34, 38, and 39. These short-hand references do not dilute the statutory requirement to verify all information, and Commerce did not satisfy this requirement, whether pursuant to any "spot check" or other basis.

As a baseline, it is important to understand exactly what happened at verification with respect to LGC's preferred model match criteria and the alternative CONNUMs. For the cost verification, Commerce sought to verify "the cost data file submitted on April 04, 2022." This was cost database lgccop02.sas7bdat, and *not* lgccop02_alt.sas7bdat, the database with the alternative model match. *See* LGC's First Section D Supplemental Questionnaire Response (Apr. 5, 2022) at 2 (P.R. 116). Commerce informed LGC it would review costs for original CONNUM [  ] and CONNUM [  ] "in detail." Cost Verification Report (Aug. 29, 2022) at 2 (C.R. 256, P.R. 171). Commerce reviewed the reported per unit costs for the selected

15

CONNUMs, but ultimately these CONNUMs were not used in the Final Determination.

Commerce reported that it "traced the physical characteristics of the grade [          ] (*i.e.*,

centrifuge retention capacity) to the COA (*i.e.*, certificate of analysis) data from the global

supplier quality assurance system . . . and confirmed that the product had been appropriately

classified as CONNUM [  ]." *Id*. at 13.  Commerce did *not* trace AUP, permeability, or

replacement CRC ranges to the certificate of analysis or otherwise verify their accuracy, even on

a "spot check" basis, as part of the cost verification.  Commerce did not ask to review – and did

not review – costs for any CONNNUM2s created for the altered model match hierarchy.

Similarly, for the sales verification, Commerce planned to "{r}eview the product-

matching criteria listed in the Appendix to the questionnaire," *i.e.*, the original model match

criteria.  Sales Verification Report (Sept. 1, 2022) at 10 (C.R. 257, P.R. 173).  LGC officials

informed Commerce officials that "the values of centrifuge retention capacity (CRC) are based

on the guaranteed values of the certificate of analysis."  Commerce "compared that to the

information reported in the HM {*i.e.*, home market} sales database." *Id*.  Again, Commerce

officials verified the CRC characteristics, but not with the new characteristics or CONNUM2s.

This factual background shows that claims by the Government and LGC that the agency

conducted an adequate verification are false.  Indeed, the Government never asserts that

Commerce verified these product characteristics or new CONNUMs, instead carefully asserting

that "it verified LG Chem's cost accounting data, the basis of the alternative databases that

reflect its proposed product characteristics."  Government's Br. at 25.  But this is not equivalent

to the verification program that Commerce set out to accomplish, which was to audit the product

characteristics and CONNUMs used in the margin program.  The Government states that

Commerce "reviewed the certificate of analysis for each selected sale," but it only did so with

respect to CRC (in the original ranges).  *Id*. at 26.  Commerce was clear about what it checked –
CRC – and was silent about what it did not check – AUP, permeability, and CRC in narrow
ranges.  Commerce did not verify – even on a spot check basis – the new product characteristics
or new CONNUMs used to calculate LGC's margin.  The fact that Commerce identified specific
areas to verify and then reviewed the certificates of analysis with regard to the original model
match highlights the *failure* of Commerce to verify the replacement product characteristics or
any new CONNUM.

Nor does it matter that Commerce verified LGC's books and records with respect to costs
– the agency verified reported costs only for CONNUMs [  ] and [  ], which were not used for the
final margin analysis.  The first order of business for Commerce's cost verification was to verify
the cost buildups and allocations of CONNUMs, but it did not do this for any CONNUM2.
Thus, Commerce improperly relied on CONNUM2s for its margin calculation.

LGC repeats the Government's erroneous arguments and goes even further, categorically
asserting that "Commerce did verify LGC's reported product characteristic data, including the
data presented on the basis of the control number Commerce used in the Final Determination."
LGC's Br. at 15.  As described above, there is no evidence that this actually happened.  Indeed,
the Government concedes that Commerce only looked at certain of LGC's underlying books and
records and did *not* specifically review the data as presented by LGC in its alternative databases.
LGC's assertion goes well beyond the commentary in Commerce's verification reports, which
refers only to reviewing CONNUMs and product characteristics for the original model match.
This total lack of review for any CONNUM2 or new product characteristic used in the margin
analysis fails to meet the statutory requirement to verify all information used in the Final

Determination.  As a result, the Final Determination must be remanded with instructions to use

the verified databases in lieu of the unverified ones.

## IV.   COMMERCE DID NOT ADDRESS PLAINTIFF'S ARGUMENT REGARDING MANIPULATION OF THE DUMPING MARGIN AS REQUIRED BY LAW

In the investigation below, Plaintiff argued that the new model match hierarchy promoted

by LGC permits the respondent to categorize identical products in more than one CONNUM,

allowing manipulation and reducing the accuracy of the dumping margin.  Specifically, this

model match hierarchy allows LGC to choose among several codes to report a given product

characteristic depending on how LGC decided to test for the relevant characteristic.  This is the

case even though the type of testing does not affect or change the underlying physical

characteristic.  In other words, LGC can report a unique physical characteristic of a product in

more than one way based simply on the selected testing methodology.  This in turn means that

products with identical physical characteristics could have different CONNUMs – or a single

product could be classified in more than one CONNUM – based on the testing methodology for

such characteristics.  Plaintiff's Br. at 39-40.  Plaintiff argued that this approach allows for

manipulation and can reduce the accuracy of the dumping margin.  This argument has been core

to Plaintiff's objection to LGC's preferred model-match hierarchy and is directly relevant to

whether the antidumping margin is accurate.  Plaintiff Rebuttal Model Match Comments at 5-6

(P.R. 49); Plaintiff Response to LGC's Request for Reconsideration (Jan. 31, 2022) at 3 (P.R.

94); Plaintiff Rebuttal Brief at 6-7 (P.R. 178).

Commerce did not engage with Plaintiff's argument at all in the Final Determination

despite this argument representing the fundamental issue that could undermine the effectiveness

of the antidumping order.  Commerce did not discuss the possibility of LGC changing the testing

procedure for a given physical characteristic and its effect on accuracy.  Yet the Government

claims that Commerce did, in fact, address Plaintiff's repeated and detailed argument outlining

concerns about manipulation.  The Government purports that Commerce "discerned" in its Final

Determination evidence that the agency engaged with and dismissed Plaintiff's argument.

Government's Br. at 23-24.  The Government is wrong.

Under the statute, Commerce must "address[] relevant arguments, made by interested

parties who are parties to the investigation or review." *See* 19 U.S.C. § 1677f(i)(3)(A).  In

interpreting this provision, this Court has held that Commerce "must address any arguments

made by the parties that are material to Commerce's determination." *Suzano S.A. v. United

States*, 589 F. Supp. 3d 1225, 1233 (Ct. Int'l Trade 2022).  Indeed, this Court recently ruled that

"a failure to address an essential argument in making a final decision is sufficient grounds for

remand." *Bonney Forge Corp. v. United States*, 560 F. Supp. 3d 1303, 1312 (Ct. Int'l Trade

2022); *see also Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1367 (Ct. Int'l Trade

2020).  Thus, the law and jurisprudence leave no question that Commerce must address a party's

material or essential arguments – something that Commerce did not do in this case.

A.     **The Government's Brief Offers An Impermissible And Unpersuasive *Post
       Hoc* Rationalization Regarding Manipulation And Inaccuracy**

The Government claims that Commerce considered and rejected Plaintiff's argument

regarding manipulation and inaccuracy resulting from the model match framework introduced in

the Final Determination.  The Government is flatly wrong.  The Government concedes that

Commerce did not mention "manipulation" or "distortion" in its Final Determination but argues

this is immaterial to the Court's analysis.  Government's Br. at 23.  Although the semantics of a

determination are less important than its substance, neither the substance nor the language of the

Final Determination addressed Plaintiff's argument.  Commerce simply did not address the

questions or concerns raised by Plaintiff, such as LGC's ability to choose from multiple testing

methods for identifying a unique product characteristic, unique products falling within more than one CONNUM, or the incentives over the life of the order for foreign producers and their customers to abuse the structural flaws in the model match hierarchy.  Rather, Commerce's analysis in the Final Determination focused exclusively on whether LGC's proposed model match reflected commercially significant differences, and not on the possibility for manipulation, distortion, misuse, "gaming" the system, or a myriad of other terms that could describe this problem.

After acknowledging Commerce's failure to expressly consider Plaintiff's argument, the Government points to its analysis on the commercial significance of LGC's preferred characteristics.  The Government refers to this separate discussion in a *post hoc* attempt to find an implicit basis for any analysis purportedly relevant to the potential for manipulation.  *Id*. at 23-24.  The Government claims that the following two points Commerce made regarding "customer preference" as part of the agency's commercial significance analysis also constitute consideration and reasoned analysis of Plaintiff's manipulation argument:

- "{T}he home market sales database suggests that LG Chem defines its SAP grades using both AUP and permeability 'and that customers purchase SAP with expectations related to these characteristics.'"
- "{A}chieving different guaranteed levels of AUP and permeability, completed through relevant testing, is commercially significant to downstream customers."

*Id*. at 23-24.  According to the Government, these two points show that there was a "reasonably 'discernible path' to conclude that Commerce considered and addressed potential concerns of distortion or manipulation."  *Id*. at 24.  But these points do not address Plaintiff's core concern at all, which is the ability of respondents to manipulate the applicable CONNUM by using different tests for a given physical characteristic.  The considerations highlighted by Commerce address

customers' expectations for AUP and permeability and say nothing about LGC's ability to use a variety of testing options to measure such physical characteristics.

The Court should reject efforts by the Government to create a *post hoc* justification for its failure to account for Plaintiff's argument.  This Court has held that it cannot "consider the explanations offered by Government counsel after-the-fact: *Post hoc* rationalizations similarly do not satisfy the substantial evidence standard." *Bonney Forge*, 560 F. Supp 3d at 1312; *see also Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1908 (2020) (explaining that an agency decision cannot be "upheld on the basis of impermissible '*post hoc* rationalization.'").  Yet this is exactly what the Government attempts to do in its response brief, and the Court should not entertain this after-the-fact effort to cobble together an explanation over the course of this appeal.

Even if the Court indulges the Government's claim that Commerce's discussion on commercial significance was actually a discussion about manipulation of the dumping margin, the substance of this new-found explanation is not based on evidence that would permit a reasonable person to conclude that this resolves the issue.  Specifically, the Government contends that "customer preferences" immunize LGC from manipulating the CONNUMs. According to the Government, because LGC "conducts tests to satisfy customers' expectations and preferences, it would be difficult to manipulate testing."  Government's Br. at 23.  But this argument cuts directly *against* the conclusion drawn by the Government: LGC's customers actively *opposed* trade relief in the investigation below and have a very strong interest in obtaining SAP that is not subject to a cash deposit rate the captures the full margin of dumping. *See, e.g.,* USITC Pub. 5388 at 3, B-4 (showing that customer Procter & Gamble appeared alongside LGC before the Commission "In Opposition" to the order and that Procter & Gamble

and Kimberly-Clark Corporation appeared as "respondent entities").  In other words, LGC's

customers' interests are entirely aligned with LGC's interests, which does not mitigate but rather

*increases* the risk of manipulation.

As discussed above, this court in *Timken* observed that "it is hard to imagine that a

foreign manufacturer, given the option of selecting what constitutes similar merchandise, and

assuming that there exists more than one product from which such a choice can be made, would

not make the choice of merchandise most advantageous to itself."  630 F. Supp. at 1338.  This

reasoning similarly applies to the foreign manufacturer's customers and certainly provides no

justification for using a model match that is subject to manipulation.  The reality is that the new

model match hierarchy used by Commerce in the Final Determination allows LGC and its

customers to identify the desired physical characteristics and then select the testing method that

provides the most favorable result.

> **B.    LGC Does Not Show That Commerce Engaged With Plaintiff's
> Manipulation Argument And Does Not Understand Or Rebut Plaintiff's
> Core Concern Regarding A Unique Product's Potential Classification Under
> More Than One CONNUM**

For its part, LGC does not make any attempt to articulate a "discernible path" to

addressing manipulation in Commerce's determination – because no such path is evident.  *See*

LGC's Br. at 39-44.  LGC simply asserts that "Commerce considered this argument but

ultimately did not find it persuasive" but points to no evidence of this purported analysis.  *Id*. at

43.  LGC repeatedly side-steps, mischaracterizes, and avoids the central concern, which is that

the model match framework adopted for the first time in the Final Determination allows LGC to

choose more than one CONNUM for a product based on a testing methodology rather than a

unique physical characteristic.  LGC instead raises a series of irrelevant points that do not justify

Commerce's inclusion of product characteristic codes that permit a product to potentially fall

into more than one CONNUM:

- LGC wrongly asserts that Plaintiff denies that "AUP and permeability are indeed separate and key performance characteristics." *Id*. at 40. There is no question that these are performance characteristics, and Plaintiff has never suggested otherwise. Again, the gravamen of Plaintiff's complaint is that within the proposed product characteristics of AUP and permeability, different codes can apply to a unique property based on the testing methodology used.

- LGC notes that "when proposing product categories for the Commission's injury analysis, Plaintiff included specific measurements for both AUP and permeability." *Id*. at 41. LGC fails to mention that the measurements identified by Plaintiff included a *single* test parameter for a given characteristic, and not *multiple* test parameters. Plaintiff has advocated throughout the investigation that a property should be reported on a consistent basis and not according to one of several tests.

- LGC asserts that including "the minimum guaranteed values is especially important because respondents could otherwise classify the same product into different CONNUMs where the guaranteed value of the product is close to a demarcation point for that characteristic." *Id*. at 42. But LGC deflects from the central point of Plaintiff's argument, which is that LGC's model match framework establishes multiple tests for determining the existence of a minimum guaranteed value for a product characteristic. This does, in fact, allow LGC to "classify the same product into different CONNUMs," permitting the company to adjust its testing protocols to manipulate the dumping margin analysis. Moreover, LGC's argument on this point is not credible because it included a code in each product characteristic for "no minimum guaranteed value" at all, and [                    ] home market sales CONNUMs. This is at odds with LGC's assertion that having a minimum guaranteed value is "especially important." *Id*.

- LGC argues that manipulation is not possible because "Commerce's investigations look backwards in time." *Id*. at 43. This claim reveals a basic misunderstanding of antidumping laws. An antidumping order typically is in place for a period of five years (or more). *See* 19 U.S.C. § 1675(c) (discussing five-year reviews). As LGC conveniently ignores, interested parties may request the initiation of an annual administrative review to reconsider the dumping margin based on updated data, meaning that the respondents and their customers have ongoing opportunities to revise testing practices for product characteristic codes. 19 U.S.C. § 1675(a) (discussing administrative reviews). Thus, the model match has an enormous impact on the way that respondents (and their customers) structure sales going forward, and LGC is flatly wrong to claim otherwise.

In sum, LGC's brief discusses many aspects of the new model match framework except

the one relevant to manipulation: LGC's preferred model match framework allows a unique

product to qualify for more than one CONNUM depending on the selected testing methodology.

NON-CONFIDENTIAL

In any event, Commerce never relied on these dubious rationales for its Final Determination and nor did the Government in its response brief.  The Court should not accept them either.

## V.     CONCLUSION

For the reasons set forth above, the Court should reject the arguments raised by the Government and LGC in their response briefs.  Accordingly, Plaintiff requests that the Court enter judgment on the administrative record in its favor and remand the Final Determination with instructions for Commerce to cure the deficiencies in the model match hierarchy.

Respectfully Submitted,

/s/ *Jamieson L. Greer*
Stephen J. Orava
Jamieson L. Greer
Daniel L. Schneiderman

**KING & SPALDING LLP**

*Counsel to The Ad Hoc Coalition*
*of American SAP Producers*

November 13, 2023

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to paragraph 2(B)(2) of the U.S. Court of International Trade's Standard

Chamber Procedures, the undersigned certifies that this brief complies with the word count

limitations set forth in the Court's scheduling order. Exclusive of the exempted portions, as

provided in paragraph 2(B)(1), this brief includes **6,993** words. In preparing this certificate, the

undersigned has relied upon the word count feature of the word-processing system used to

prepare this submission.

<u>/s/ *Jamieson L. Greer*</u>
Jamieson L. Greer

**KING & SPALDING LLP**

*Counsel to The Ad Hoc Coalition*
*of American SAP Producers*

November 13, 2023