A-580-914<br>
Remand<br>
Slip Op. 24-26<br>
**Public Document**<br>
E&C/OVII:  CD

*The Ad Hoc Coalition of American SAP Producers v. United States*,
**Court No. 23-00010, Slip Op. 24-00026 (CIT March 1, 2024)**
**Certain Superabsorbent Polymers from the Republic of Korea**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

**I.   SUMMARY**

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the opinion and remand order of the U.S. Court of International Trade (the Court) in *The Ad Hoc Coalition of American SAP Producers v. United States*, Court No. 23-00010, Slip Op. 24-36 (CIT March 1, 2024).[1]  These final results of redetermination concern the less than fair value (LTFV) investigation of certain superabsorbent polymers (SAP) from the Republic of Korea (Korea).[2]

In the *Remand Order*, the Court remanded Commerce's determination that absorbency under pressure (AUP), permeability (PERM), and centrifugal retention capacity (CRC) at 4 g/g increments are commercially significant physical characteristics such that they should be included in the model match hierarchy.  In particular, the Court held that, although Commerce is not required to adhere to the model match hierarchy it constructs in the early stages of a proceeding,[3] Commerce's finding that the AUP and PERM characteristics are commercially

---

[1] *See The Ad Hoc Coalition of American SAP Producers v. United States*, Slip Op. 24-00026 (CIT March 1, 2024) (*Remand Order*).
[2] *See Certain Superabsorbent Polymers from the Republic of Korea:  Final Determination of Sales at Less Than Fair Value*, 87 FR 65035 (October 27, 2022) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).
[3] *See Remand Order* at 19.

significant was unsupported by substantial evidence on the record.[4]  Further, the Court held that Commerce failed to provide substantial evidence in support of its finding that LG Chem, Ltd.'s (LGC) proposed 4 g/g increments for the CRC characteristic—narrower when compared to increments proposed by the petitioner[5]—were more commercially significant than the increments initially adopted.[6]  In particular, the Court found that Commerce's determination relied on a "few pieces of anecdotal information."[7]  The Court also held that Commerce did not appear to verify the new physical characteristic information relied on in the *Final Determination* to calculate LGC's margin because Commerce explicitly verified only data fitting the original model match hierarchy, not data for the hierarchy it used in the *Final Determination*.[8]  Finally, the Court held that Commerce did not adequately address the petitioner's concern that the way LGC defined the characteristics was distortive and unusable and remanded the issue for further consideration.[9]

As discussed below, consistent with the *Remand Order*, Commerce has reconsidered its model match hierarchy established in the LTFV investigation of SAP from Korea and determines that, because record evidence supports a model match hierarchy consisting of CRC in 6 g/g increments, and because there is no additional evidence on the record to bolster support for the model match hierarchy adopted in the *Final Determination*, it has adopted the product characteristics used in the *Preliminary Determination*.[10]

---

[4] *Id.* at 20-37.
[5] The petitioner is the Ad Hoc Coalition of American SAP Producers.
[6] *See Remand Order* at 20-37.
[7] *Id.* at 36.
[8] *Id.* at 37-41.
[9] *Id*.
[10] *See Certain Superabsorbent Polymers from the Republic of Korea:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 87 FR 34647 (June 7, 2022) (*Preliminary Determination*), and accompanying Preliminary Determination Memorandum (PDM) at 7-8; *see also* Memorandum, "Product Characteristics Hierarchy," dated January 21, 2022 (Product Characteristics Memorandum).

## II. BACKGROUND

In order to define the proceeding's control numbers that would identify identical or similar merchandise for comparison of U.S. sales to foreign like product in the home market or comparable third country market, Commerce established a model match hierarchy of the physical characteristics of the subject merchandise. Commerce released its model match hierarchy on January 21, 2022, prior to the publication of the *Preliminary Determination*.[11] Commerce declined to use LGC's proposed model match hierarchy of CRC measured in 4 g/g increments, as well as LGC's request that Commerce adopt two additional product characteristics (AUP and PERM) in the model match system (CONNUM2). Commerce based its *Preliminary Determination* on the adopted model match hierarchy that excluded these additional product characteristics (CONNUM).[12] However, for the *Final Determination*, Commerce revised the model match hierarchy to include LGC's proposed two additional characteristics and use LGC's proposed CRC characteristic reporting of 4 g/g increments, as it determined that the additional two characteristics and increments were commercially meaningful.[13]

On May 3, 2024, we released the Draft Results to interested parties for comment.[14] On May 16, 2024, we received comments from LGC.[15]

## III. ANALYSIS

After careful analysis of the *Remand Order* and the comments received by interested parties, Commerce continues to determine that there is no information that would additionally support a finding that AUP, PERM, and LGC's narrower CRC increments (4 g/g) are

---

[11] *See* Product Characteristics Memorandum.
[12] *See Preliminary Determination*.
[13] *See Final Determination*.
[14] *See* Draft Results of Redetermination Pursuant to Court Remand, *The Ad Hoc Coalition of American SAP Producers v. United States*, Slip Op. 24-00026 (CIT March 1, 2024), dated May 3, 2024 (Draft Results).
[15] *See* LGC's Letter, "LG Chem, Ltd.'s Comments on the Department's Draft Results of Redetermination Pursuant to Court Remand," dated May 16, 2024 (LGC's Draft Remand Comments).

commercially significant such that they should be included in the model match hierarchy. Further, Commerce determines that the record supports analyzing CRC in 6 g/g increments.

As such, for purposes of these final results of redetermination, we have adopted the product characteristic used in the *Preliminary Determination*,[16] the one characteristic of CRC at the following increments:

1: < 30 g/g

2: ≥ 30 g/g but < 36 g/g

3: ≥ 36 g/g

We have recalculated LGC's weighted-average margin accordingly.[17] Further, because we are revising the model match hierarchy, we need not address the Court's concerns regarding whether Commerce sufficiently verified the physical characteristics of AUP, PERM, and CRC at 4 g/g increments or further consider the issue of potential manipulation using a model match hierarchy with AUP, PERM, and CRC at 4 g/g increments.[18]

---

[16] *See* Product Characteristics Memorandum; *see also Preliminary Determination* PDM at 7 (citing Petitioner's Letter, "Comments on Model Match Product Characteristics," dated December 13, 2021 (Petitioner's Model Match Comments); LGC's Letter, "Model Match Comments of LG Chem, Ltd.," dated December 13, 2021 (LGC's Model Match Comments); Petitioner's Letter, "Rebuttal Comments on Model Match Product Characteristics," dated December 23, 2021 (Petitioner's Model Match Rebuttal Comments); LGC's Letter, "Rebuttal Model Match Comments of LG Chem, Ltd." dated December 23, 2021 (LGC's Model Match Rebuttal Comments); Sumitomo Seika Polymers Korea Co., Ltd.'s (SSPK) Letter, "Rebuttal Comments on Model Match Product Characteristics," dated December 23, 2021 (SSPK's Rebuttal Model Match Comments); Petitioner's Letter, "Petitioner's Pre-Preliminary Comments," dated May 10, 2022 (Petitioner's Pre-Preliminary Comments), at 1-3; and LGC's Letter, "LGC's Pre-Preliminary Comments," dated May 13, 2022, at 2-12).
[17] *See* Memorandum, "Final Remand Results Calculation Memorandum for LG Chem, Ltd," dated concurrently with the release of these final results of redetermination.
[18] *See, e.g., Remand Order* at 41 (recognizing that "{r}emand on the basis of issue B {the physical characteristics issue}, may moot further discussion of this issue C {the verification issue}.").

IV.     **INTERESTED PARTY COMMENTS**

**Issue 1:  Whether the Revised Model Match is Supported By Substantial Evidence**

*LGC's Comments*

The following is a verbatim summary of the argument submitted by LGC.  For further details, *see* LGC's Draft Remand Comments at 5-11:

> {Commerce's} simple reversion to the *Preliminary Determination* model match is unsupported by evidence or rationale on the record of the underlying investigation.  The Draft Remand Results themselves, the *Preliminary Determination* and accompanying preliminary decision memorandum, and Petitioner's submissions provide very limited explanation as to why the *Preliminary Determination* model match is appropriate.  In addition, there is zero factual evidence on the record supporting the *Preliminary Determination* model match.  Indeed, the only evidence on the record of this proceeding and the only detailed analysis presented by {Commerce} support the Final Determination model match.  {Commerce} must provide a full, reasoned analysis supporting its model match revision in the final remand, including analysis of the significant evidence LGC presented during the investigation which fairly detracts from the validity of the Preliminary Determination model match.  Without this analysis, {Commerce's} Draft Remand Results are not supported by substantial evidence and do not meet the standard of review.
>
> Put another way, it is not sufficient for {Commerce} to simply reject *its Final Determination* decision; rather, {Commerce} must also provide evidence to support the notion that the model match applied in the *Preliminary Determination* is, in itself, better supported by the facts on the record.  Instead, {Commerce} has opted to revert to its *Preliminary Determination* model match reflexively, with no regard for the correctness of that initial decision based on the facts on the record.  Even assuming, *arguendo*, that the Final Determination was not adequately supported (to be clear, LGC believes it was), that situation alone does not automatically render {Commerce's} *Preliminary Determination* supported by evidence.

**Commerce's Position:**  As an initial matter, regarding CRC, the Court held "{a}ll parties agreed that the model match criteria should include a characteristic for the ability of super-absorbent polymer products to hold liquid, recognized within the industry as 'centrifugal retention capacity' or 'CRC'"[19] and LGC does not challenge Commerce's inclusion of CRC in the revised

---

[19] *See Remand Order* at 4; *see also* Petitioner's Model Match Comments at 1;and LGC's Model Match Comments at 2.

model match hierarchy.[20]  However, the Court held that evidence demonstrates that AUP and PERM have no commercial significance or utility that is not already captured by the CRC product characteristic.[21]  In addition, SSPK, a Korean producer and exporter of SAP, "d{id} not believe the inclusion of AUP or {PERM} is necessary to differentiate between its different models of {SAP}."[22]  Accordingly, the Court held that Commerce's determination that the AUP and PERM characteristics are commercially significant was unsupported by substantial evidence.[23]  Therefore, as stated in the Draft Results, we reexamined the record and determined that there is no information that would additionally support a finding that the characteristics of AUP and PERM are commercially significant such that they should be included in the model match hierarchy.  Commerce's exclusion of AUP and PERM in the model match hierarchy is thus in line with both the Court's finding that the evidence on the record does not demonstrate the commercial significance of AUP and PERM and Commerce's statutory obligation to identify appropriate physical characteristics for the purpose of establishing the foreign like product.[24]

Further, we reexamined the record and determined that there is no information that would additionally support a finding that the characteristic of CRC measured using narrower 4 g/g ranges is commercially significant.  In the *Remand Order*, the Court found that the marketing materials and CRC ranges petitioners proposed the International Trade Commission (ITC) use for its underselling analysis did not demonstrate that CRC measured in the narrower 4 g/g increments was linked to the price or cost of SAP.[25]  Thus, the Court held that Commerce's

---

[20] *See* LGC's Draft Remand Comments.
[21] *See Remand Order* at 32.
[22] *See* SSPK's Rebuttal Model Match Comments at 2-3; *see also Remand Order* at 8-9, and 34.
[23] *See Remand Order* at 31.
[24] *See* section 771(16)(A) of the Tariff Act of 1930, as amended (the Act); *see also Remand Order* at 36.
[25] *See Remand Order* at 33-34.

determination that CRC measured using 4 g/g increments is commercially significant was not supported by substantial evidence.[26]

As such, we have adopted the model match hierarchy used in the *Preliminary Determination,* including ranges of CRC in 6 g/g increments. Record evidence supports this determination. The petitioner asserted both in its initial, certified comments on the model match hierarchy and throughout the investigation that CRC is "typically" measured using 6 g/g ranges that distinguish between low, intermediate, and high capacity grades of SAP.[27] Further, LGC's product brochure demonstrates that SAP can be "high capacity" or "low capacity," which supports the petitioner's characterization of CRC increments.[28] Finally, SSPK, a Korean producer and exporter of SAP, asserted that differences in CRC are accurately categorized as low, intermediate, and high capacity grades.[29]

The petitioner has asserted, and the Court has found, that the evidence on the record does not demonstrate that more categories defined by smaller ranges (*i.e.*, 4 g/g) is commercially significant.[30] LGC asserts that categorizing CRC by increments of 6 g/g is overly broad and would result in products with commercially significant differences falling into the same category.[31] However, there is no additional evidence on the record to support a finding that categorizing CRC in 4 g/g increments results in commercially significant price or cost differences.[32] Moreover, the Court of Appeals for the Federal Circuit has recognized that Commerce has "considerable discretion" in developing the methodology used for identifying a

---

[26] *See Remand Order* at 33-37.
[27] *See* Petitioner's Model Match Comments at 1; *see also* Petitioner's Model Match Rebuttal Comments at 6; and Petitioner's Pre-Preliminary Comments at 1-3.
[28] *See* LGC's Letter, "Initial Section A Questionnaire Response," dated January 19, 2022, at Exhibit A-25.
[29] *See* SSPK's Rebuttal Model Match Comments at 2-3.
[30] *See* Petitioner's Model Match Rebuttal Comments at 6; *see also Remand Order* at 36.
[31] *See* LGC's Model Match Rebuttal Comments at 3-4.
[32] *See Remand Order* at 33-35.

7

foreign like product.[33]  Therefore, finding that the petitioner has adequately asserted that CRC is typically measured in 6 g/g increments, and finding that record evidence does not additionally support a finding that different, or narrower, increments will result in commercially significant differences, Commerce adopts CRC as the sole physical characteristic of commercial significance measured in 6 g/g increments.

LGC also argues that Commerce must consider evidence LGC presented during the investigation which demonstrates that the revised model match hierarchy "fails to reflect significant commercial difference between different grades of SAP" that its preferred model match characteristics would address.[34]  However, Commerce already considered such evidence to support its *Final Determination* that LGC's preferred model match characteristics are commercially significant, and the *Remand Order* held that substantial evidence did not support this determination.[35]  Indeed, the CIT in *Union Steel* recognized that Commerce has no obligation to justify departures from positions the court has rejected.[36]

**Issue 2:   Commerce Overlooked Record Evidence Which Supports the Final Determination Model Match**

*LGC's Comments*

The following is a verbatim summary of the argument submitted by LGC.  For further details, *see* LGC's Draft Remand Comments at 11-18:

{T}he Draft Remand Results show no evidence of {Commerce} revisiting the investigation record or engaging record evidence with further analysis to determine whether additional record evidence supports the Final Determination remand, in accordance with the Remand Order.  As a result, in the final remand, {Commerce} should further assess two issues which were not fully addressed in the Remand Order.  As an initial matter, given the importance of a pricing analysis in determining the commercial significance of a product characteristic, {Commerce} must clarify

---

[33] *See Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1384 (Fed. Cir. 2001).
[34] *See* LGC's Draft Remand Comments at 2, and 9-11.
[35] *See Remand Order* at 31-36.
[36] *See Union Steel v. United States*, 804 F. Supp. 2d 1356, 1363 (CIT 2011) ("Commerce has no obligation to justify departures from prior litigation positions used to defend unlawful determinations.").

what pricing analysis on the record is the most appropriate basis for determining the commercial significance of SAP product characteristics.  {Commerce} should consider its own pricing analysis, as well as pricing analyses submitted by LGC and Petitioner.  In assessing this pricing data, {Commerce} must consider that record evidence demonstrates that SAP purchasers and producers look to the balance of CRC, AUP, and permeability when evaluating whether a SAP product meets a customer's specifications.  Next, {Commerce} should further address the sufficiency of the only factual evidence on the record pertinent to {Commerce's} model match analysis, including marketing data.

**Commerce's Position:**  We disagree with LGC that Commerce must reassess record evidence to determine the most appropriate pricing analysis.  In the *Final Determination*, Commerce conducted a price analysis of LGC's home market database comparing the *Preliminary Determination* model match characteristics to LGC's preferred model march characteristics and found that the price differences could be as much as 20 percent.[37]  However, the Court held:

> "this does not actually support the claim of 'commercial significance' because changes to weighted-average prices are an unsurprising and expected result of changing the CONNUMs assigned to products:  {Commerce} observed that there are also cost differences between databases but in contrast to its treatment of price the agency dismissed such differences as commercially insignificant and unrelated to the new physical characteristics."[38]

The Court further held that "{t}he agency's analysis of the record appears flawed to the extent the {petitioner} show{s} that it does not actually evince any material correlation between LGC's reported alternative CONNUMS (*i.e.*, CRC {in 4 g/g increments}, PERM, and AUP) and either prices or costs."[39]  Accordingly, the Court was not persuaded by Commerce's analysis that took a "collective" view of product characteristics when examining pricing or cost correlation rather than individually examining the commercial significance of each characteristic separately.[40]  Rather, the Court was persuaded by the petitioner's analysis and held the petitioner "appear{s} correct that viewing {LGC's preferred CONNUMs using CRC in 4 g/g, AUP and PERM}

---

[37] *See Final Determination* IDM at 9.
[38] *See Remand Order* at 24.
[39] *Id.* at 27.
[40] *Id.* at 26-27.

9

'collectively' masks the commercial significance of each of the product characteristic codes selected by {Commerce}. . . ."[41] Thus, we disagree with LGC that this issue was not fully addressed in the *Remand Order*.

We also disagree with LGC that Commerce is required to revisit record evidence on pricing trends. Even assuming, *arguendo*, Commerce is required to reassess the price analyses put forth by LGC and the petitioner, upon reassessment, we agree with the petitioner's applied methodology. LGC contends that LGC's and Commerce's analysis in the *Final Determination* is the more appropriate basis for any price trend analysis because it considers the commercial reality that SAP customers require a balance of CRC, AUP, and PERM and petitioner's price analysis fails to capture meaningful commercial differences between different SAP products, which are reflected in the costs and prices of those products.[42] LGC supported this claim in the investigation by providing a table that summarizes the percentage differences in manufacturing costs between products with the highest and lowest manufacturing costs within one CONNUM of the model match hierarchy adopted in the *Preliminary Determination*.[43] However, cost differences in CONNUM2 appear to be driven primarily by certain CONNUM2 subcategories with small production quantities.[44] LGC claimed that even if CONNUM2s with small production quantities are ignored, there are still significant manufacturing cost differences.[45] However, as shown by the tables in Petitioner's Rebuttal Brief, any cost differences appear to be attributable to factors other than varying CRC, AUP, or PERM characteristics.[46] The tables do not show that costs tend to increase or decrease as CRC in 4 g/g increments, AUP, or PERM

---

[41] *Id.* at 31.
[42] *See* LGC's Draft Remand Comments at 14.
[43] *Id.* at 16 (citing LGC's Case Brief at 4-25).
[44] *See* Petitioner's Rebuttal Brief at 3-4.
[45] *See* LGC's Case Brief at FN 57.
[46] *See* Petitioner's Rebuttal Brief at 3-4.

increase or decrease.[47] In addition, Commerce reviewed the alternative cost database submitted by LGC and did not find any additional material or conversion costs associated with the need to achieve certain characteristics (*i.e.*, certain guaranteed levels of CRC, AUP, or PERM). As such, record evidence suggests there are no cost differences among LGC's high-volume CONNUM2s, whether they fall within the same or different CONNUMs as defined by the model match.[48]

LGC claims that its proposed model match better distinguishes between products that are so different that they have wide variations in price.[49] LGC supported this claim in the investigation by providing a table using the same methodology as referenced above for manufacturing costs.[50] However, record evidence does not show how the price differences in the table were related to differences in the product characteristics.[51] Furthermore, as recognized by the Court,[52] an analysis of price by viewing the CONNUM2s collectively masks the commercial significance of each of the product characteristic codes.[53] As such, the price differences may result from random variations or non-random factors unrelated to CRC, AUP, and PERM characteristics.

LGC further argues that the petitioner's analysis is an overly simplistic calculation of average unit values (AUVs) for each breakout within each of the three characteristics.[54] LGC states that "any sufficient analysis must incorporate price movements during the period of

---

[47] *See* Petitioner's Rebuttal Brief at 3.
[48] *See* Petitioner's Rebuttal Brief at 4.
[49] *See* LGC's Draft Remand Comments at 14.
[50] *Id.* (citing LGC's Case Brief at 21).
[51] *See* Petitioner's Rebuttal Brief at 5.
[52] *See Remand Order* at 31 ("The Coalition appear correct that viewing the CONNUM2s 'collectively' masks the commercial significance of each of the product characteristic codes selected by {Commerce} -- the very question {Commerce} is attempting to answer in considering whether to include AUP and permeability in addition to CRC.").
[53] *See Preliminary Determination* PDM at 11; *see also* Memorandum, "Final Determination Margin Calculation for LG Chem, Ltd.," dated October 20, 2022, at Attachment 3.
[54] *See* LGC's Draft Remand Comments at 13.

investigation (POI) while eliminating relative quantities sold" to support its claim that AUP and PERM should not be considered in the model match.[55] In addition, LGC claims that the petitioner's analysis does not account for sales made on differing bases (*i.e.*, long-term contract or spot basis).[56] However, LGC provides no evidence to support its reasoning for determining that the petitioner's analysis is insufficient because of the lack of incorporation of price movements during the POI while eliminating relative quantities sold and sales made on differing bases. Furthermore, LGC does not provide support that its analysis accounts for price movements during the POI and sales made on differing bases.

LGC cites to *Bohler* in support of its argument that Commerce has not adequately considered market realities in developing its model match hierarchy.[57] In *Bohler*, the Court found that the percentage ranges within individual CONNUMs were caused by differences in cost and price driven by products' alloy (the relevant product characteristic) contents.[58] Importantly, Commerce did not contest that the cost and price differences alloy content was creating were "driven primarily by the intended end use."[59] In contrast, record evidence does not demonstrate that AUP, PERM, and CRC in 4 g/g increments are independently creating price and/or cost differences.

Moreover, we disagree with LGC that the "market realities" of manufacturing SAP products with the right balance of CRC, AUP, and PERM were not considered in the *Remand Order*. The Court held that evidence provided by the petitioner and LGC demonstrates that AUP and PERM have an inverse relationship with CRC and thus, these two product characteristics

---

[55] *Id*.
[56] *Id.* at 13-14.
[57] *Id.* at 13 (citing *Bohler Bleche GmbH & Co. KG v. United States*, 324 F. Supp. 3d 1344 (CIT 2018) (*Bohler*)).
[58] *See Bohler*, 324 F. Supp. 3d at 1350.
[59] *Id.*

"have no commercial significance or utility that is not already captured by the CRC product characteristic."[60]

LGC also argues that additional record evidence not specifically addressed in the *Remand Order* shows that LGC publicly advertises the capability to break the normal restriction of CRC, AUP, and PERM.[61] Specifically, in LGC's "SAP Basics" PowerPoint presentation, LGC notes that the production of "excellent SAP" involves "overcom{ing} the trade-off relationship" between absorption capacity (as measured by CRC), AUP, and PERM.[62] However, LGC does not provide support that all SAP produced is "excellent SAP," and does not specify if "excellent SAP" is a specialty product as it appears according to the marketing materials. This record evidence does not provide support for a finding that AUP and PERM are commercially significant, nor does it support a finding that CRC is better measured in narrower increments. Further, the presentation does not detract from Commerce's finding that CRC is a commercially significant product characteristic accurately measured in 6 g/g increments.

Second, LGC claims that a PowerPoint presentation describing CRC, AUP, and PERM as "basic properties" of SAP demonstrates the commercial significance of AUP, PERM, and CRC in narrower increments.[63] However, the characteristics identified in the industry (in one company document) as basic properties does not demonstrate their price or cost effects and thus commercial significance. This record evidence does not detract from Commerce's finding that CRC is accurately measured in 6 g/g increments.

Third, LGC asserts that "marketing materials on the record emphasize that a 10 percent higher absorption capacity specifically distinguishes different SAP products which are marketed

---

[60] *See Remand Order* at 32.
[61] *See* LGC's Draft Remand Comments at 15.
[62] *Id.* (citing LGC's Model Match Rebuttal Comments at Attachment 2).
[63] *See* LGC's Draft Remand Comments at 15-16 (citing LGC's Model Match Rebuttal Comments at Attachment 2).

13

and sold as commercially distinct" thus demonstrating that CRC is better measured in 4 g/g increments.[64] Importantly, the *Remand Opinion* dismissed the referenced marketing materials as evidence of commercially significant price or cost differences.[65] Further, evidence that products with smaller ranges of CRC are marketed and sold as commercially distinct products does not demonstrate that defining a product characteristic in more narrow increments will produce price and/or cost differences. As such, this record evidence does not detract from our determination here.

Finally, LGC points to record evidence from the ITC's related injury analysis to support its argument that measuring CRC in 6 g/g increments is "incorrect{} and arbitrar{y}."[66] As noted in the *Remand Order*, Commerce and the ITC use pricing products differently and for different reasons.[67] Specifically, the ITC's investigation determines whether imports are materially injuring, or threatening material injury to, a U.S. industry, while Commerce determines if an imported product is being, or is likely to be, sold in the United States at less than fair value. Further, as the Court noted, the pricing products before the ITC establish, if anything, broader CRC increments than 4 g/g increments, as asserted by LGC.[68] The pricing products used in the ITC's parallel analysis do not detract from Commerce's determination to adopt a model match hierarchy of CRC in 6 g/g increments.

Commerce has, considering the *Remand Order*, reanalyzed record evidence and has not identified additional record evidence that detracts from the adopted model match hierarchy consisting of CRC in 6 g/g increments. Further, we have not identified additional record

---

[64] *Id.* at 16-17.
[65] *See Remand Order* at 33-34.
[66] *See* LGC's Draft Remand Comments at 17.
[67] *See Remand Order* at 34.
[68] *Id.*

evidence to support a finding that AUP, PERM, and narrower measurements of CRC in 4 g/g increments are commercially significant characteristics.

## V.     FINAL RESULTS OF REDETERMINTATION

In accordance with the Court's *Remand Order*, Commerce has, as discussed above, adopted the product characteristics used in the *Preliminary Determination*. Based on this change, Commerce determines that the following weighted-average dumping margin exists:

| Exporter/Producer | Estimated Weighted-Average Dumping Margin (percent) |
|---|---|
| LG Chem, Ltd. | 26.05 |
| All Others | 26.05 |

Should the Court affirm these final results of redetermination, Commerce intends to publish a notice of amended final determination and amended antidumping duty order in the *Federal Register* and issue appropriate customs instructions to U.S. Customs and Border Protection, consistent with the discussion above.

6/14/2024

X _____

Signed by: RYAN MAJERUS

Ryan Majerus
Deputy Assistant Secretary
 for Policy and Negotiations,
 performing the non-exclusive functions and duties
 of the Assistant Secretary for Enforcement and Compliance